1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3                    CASE NO. 9:18-cv-80176-BB/BR

4
    IRA KLEIMAN, as the personal representative
5   of the Estate of David Kleiman, and
    W&K Info Defense Research, LLC,
6
              Plaintiffs,
7
    -vs-
8
    CRAIG WRIGHT,
9
              Defendant.
10

11  * * * * * * * * * * * * * * * * * *

12  VIDEOTAPED TELECONFERENCE DEPOSITION OF JIMMY NGUYEN

13  DATE TAKEN: April 30, 2020

14  TIME: 12:05 p.m. - 7:35 p.m.

15
    TAKEN BEFORE: RICK E. LEVY, RPR, FPR
16                AND NOTARY PUBLIC

17

18  * * * * * * * * * * * * * * * * * *

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3        VEL FREEDMAN, ESQUIRE
          ROCHE FREEDMAN, P.A.
 4        200 S. Biscayne Boulevard
          Suite 5500
 5        Miami, Florida 33131

 6        ANDREW BRENNER, ESQUIRE
          BOIES SCHILLER & FLEXNER, P.A.
 7        100 S.E 2nd Avenue
          Suite 2800
 8        Miami, Florida 33131
          abrenner@bsfllp.com
 9

10   On behalf of the Defendant:

11        ANDRES RIVERO, ESQUIRE
          ZALMAN KASS, ESQUIRE
12        RIVERO MESTRE, P.A.
          2525 Ponce de Leon Boulevard
13        Suite 1000
          Coral Gables, Florida 33134
14

15   APPEARING ON BEHALF OF THE WITNESS:

16        SPENCER SILVERGLATE, ESQUIRE
          TREVOR GILLUM, ESQUIRE
17        CLARKE SILVERGLATE, P.A.
          799 Brickell Avenue
18        Suite 900
          Miami, Florida 33131
19

20   Also Present: Michael Hollander, The Videographer

21

22

23

24

25
```

```
                          -  -  -
                        I N D E X
                          -  -  -

WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS
JIMMY NGUYEN
BY MR. FREEDMAN:    6



                        -  -  -
                    E X H I B I T S
                        -  -  -
```

| NUMBER | PAGE |
|---|---|
| PLAINTIFF'S EX. 1 | 15 |
| PLAINTIFF'S EX. 2 | 24 |
| PLAINTIFF'S EX. 3 | 29 |
| PLAINTIFF'S EX. 4 | 45 |
| PLAINTIFF'S EX. 5 | 53 |
| PLAINTIFF'S EX. 6 | 54 |
| PLAINTIFF'S EX. 7 | 67 |
| PLAINTIFF'S EX. 8 | 76 |
| PLAINTIFF'S EX. 9 | 102 |
| PLAINTIFF'S EX. 10 | 124 |
| PLAINTIFF'S EX. 11 | 140 |
| PLAINTIFF'S EX. 12 | 147 |
| PLAINTIFF'S EX. 13 | 149 |
| PLAINTIFF'S EX. 14 | 152 |
| PLAINTIFF'S EX. 15 | 157 |
| PLAINTIFF'S EX. 16 | 161 |
| PLAINTIFF'S EX. 17 | 167 |
| PLAINTIFF'S EX. 18 | 172 |
| PLAINTIFF'S EX. 19 | 176 |
| PLAINTIFF'S EX. 20 | 192 |
| PLAINTIFF'S EX. 21 | 195 |

1                        - - -

2          THE VIDEOGRAPHER:  We are now on the record.

3     Participants should be aware that this proceeding

4     is being recorded.  As such all conversations held

5     will be recorded unless there is a request or

6     agreement to go off the record.  Private

7     conversations and attorney-client interaction

8     should be held outside the presence of this remote

9     interface.  This is the remote video recorded

10    deposition of James Nguyen taken by counsel for the

11    plaintiff.

12          Today is Thursday April 30th 2020 and the time

13    is now 12:04 p.m in the Eastern Time Zone.  We are

14    here in the matter of Kleiman vs Wright.  My name

15    is Michael Hollander, remote video technician on

16    behalf of US Legal Support.  I am not related to

17    any party in this action nor am I financially

18    interested in the outcome.

19          At this time will the reporter Rick Levy on

20    behalf of US Legal please enter the statement for

21    remote proceedings into the record.

22          THE COURT REPORTER:  The attorneys

23    participating in this deposition acknowledge that I

24    am not physically present in the deposition room

25    and that I will be reporting this deposition

1   remotely.

2       They further acknowledge that in lieu of an

3   oath administered in person I will administer the

4   oath remotely.  This arrangement is pursuant to the

5   Florida Supreme Court Administrative Order No.

6   AOSC20-16.

7       The parties and their counsel consent to this

8   arrangement and waive any objections to this manner

9   of reporting.  Please indicate your agreement by

10  stating your name and your agreement on the record.

11      MR. FREEDMAN:  Vel Freedman for the

12  plaintiffs, we agree.

13      MR. RIVERO:  Andres Rivero for Dr. Wright, we

14  agree.

15      MR. KASS:  Zalman Kass for Dr. Craig Wright,

16  we agree.

17      MR. SILVERGLATE:  Spencer Silverglate, counsel

18  for the witness Jimmy Nguyen, we agree.

19      MR. GILLUM:  Trevor Gillum with Jimmy Nguyen

20  agree.

21      THE WITNESS:  My name is James.  I go by Jimmy

22  Nguyen, N-G-U-Y-E-N.  I declare my testimony in

23  this matter is under penalty of perjury.

24                    - - -

25

```
 1    Thereupon,

 2                         (JAMES NGUYEN)

 3                         having been first duly sworn or

 4    affirmed, was examined and testified as follows:

 5                    DIRECT EXAMINATION

 6    BY MR. FREEDMAN

 7         Q.   Good morning Mr. Nguyen, how are you?

 8         A.   Fine.   How are you?

 9         Q.   Before we just get started with the

10    formalities of the deposition I just wanted to lay out a

11    quick schedule the way I was hoping this would go.   I

12    know it's about 9:00 by you.   Obviously we can take some

13    breaks but I wanted to take our lunch break at 12:00 by

14    you which would be 3:00 here.

15              A break for about an hour or hour and 15 if

16    that's enough for you.   Then if we still have more to go

17    we can finish up and if we're done obviously we're done.

18         A.   Okay.

19         Q.   All right.

20              MR. RIVERO:  Vel, if I may, just for avoidance

21              of doubt we're going to designate the deposition as

22              confidential and then review it subsequently to

23              de-designate but just for avoidance of that we're

24              invoking that.

25
```

1    BY MR. FREEDMAN

2         Q.   Mr. Nguyen, can you please state your name --

3    just before we begin am I pronouncing it correctly, is

4    it Nguyen?

5         A.   Tough name to pronounce.  That's good.

6         Q.   What is properly I'll give it one shot and

7    then we'll move on.

8         A.   Well, Vietnamese pronunciation is Nguyen but

9    that's very difficult for American English and you so a

10   lot of people say Nguyen or sometimes I just say Nguyen.

11        Q.   Got it.  I am going to stick to Nguyen because

12   you are right I would not have gotten that correct.

13   Mr. Nguyen, can you please state your name and date of

14   birth for the record?

15        A.   Name is N-G-U-Y-E-N.  I pretty much go by

16   Jimmy ███████████████████████████

17   ████████████████████████████

18   ████████████████████████████████████

19        Q.   Actually Mr. Nguyen, every once in a while

20   your voice is cutting out a little bit.  I don't know if

21   there is a microphone if you can bring it a little

22   closer?

23        A.   I'll talk louder.

24        Q.   That works.  Perfect.  Mr. Nguyen, you

25   understand that your testimony is being recorded today?

1          A.    Yes.

2          Q.    And you understand both by a court reporter

3    who is taking a transcript and a videographer who is

4    taking a video?

5          A.    Yes.

6          Q.    And you understand that your testimony may be

7    shown to a jury at some point in this case?

8          A.    Yes, I understand that.

9          Q.    And I know you're a lawyer but you understand

10   that your testimony is being given today under oath,

11   correct?

12         A.    Yes, I do.

13         Q.    If you don't understand a question,

14   Mr. Nguyen, I need you to let me know and I'll re-ask

15   it, is that fair?

16         A.    Yes, that's fair.

17         Q.    If you don't I will assume you understood the

18   question and I'm going to rely on your answer, okay?

19         A.    Okay.

20         Q.    Are you -- I'm going to also assume you have

21   familiarity with the groundrules of a deposition like

22   oral responses and breaks and anything like that given

23   your experience.  Tell me if I'm wrong.

24         A.    Generally.  It's been a number of years since

25   I've been involved in a deposition.

1      Q.   Do you want me to go through?  I'll go through

2    them just to refresh your memory.  You know I need you

3    to give oral responses -- sorry?

4      A.   I haven't practiced law in a while so it's

5    been a while.

6      Q.   So I need you to give oral responses if you

7    can so the court reporter can take them down.

8    Intuitively we nod our heads but I actually need you to

9    say yes or no.  And if you need a break at any point in

10   time just let me know.  This isn't a marathon.  We'll

11   stop.  You can stretch your legs, get a drink, whatever,

12   use the restroom.  Are you on any medications that would

13   affect your ability to testify today?

14     A.   No.

15     Q.   Have you ever been deposed before?

16     A.   I believe so.  I have never testified in court

17   proceedings before but I think I've been deposed.

18     Q.   Did it have anything to do with the matters at

19   issue in this case?

20     A.   No.

21     Q.   One last housekeeping matter.  Do you hold

22   citizenship for any country besides the United States?

23     A.   No.

24     Q.   Can you give me a brief professional

25   background of your career?

1    A.   Sure.  I have been a lawyer most of my

2   professional career.  I graduated law school in 1995 and

3   I was in private practice at corporate law firms from

4   1995 until I left legal practice, at least private

5   practice, in early 2017.

6         So I have been an associate and then a partner

7   at several major law firms.  I can list them for you if

8   you need?

9    Q.   Sure.

10    A.   Most of my career was spent at Foley & Lardner

11   in the Los Angeles office.  I lived in Los Angeles most

12   of my life.  Foley & Lardner in Los Angeles with a

13   little gap in between where I went to a boutique firm

14   before I came back.  Then I think I was in total at

15   Foley & Lardner about 12 years or so.  Then I went to

16   help a Chicago based firm launch their Beverly Hills/Los

17   Angeles office called Wildman, Herald.  It's now merged

18   into another firm and then the last major firm of my

19   career was Davis, Wright & Tremaine where I was for

20   about I think six years.  All of those were in Los

21   Angeles offices.

22         Then after I left Davis, Wright & Tremaine to

23   work with nChain which I know we'll talk about I was

24   there for a short period of time kept my own legal

25   practice to assist some of my longstanding clients on

1    some matters they wanted me to continue helping them on

2    for a period of time.  It wasn't something I did for a

3    long time.

4         Q.   Go ahead.

5         A.   Then I joined the Bitcoin world.

6         Q.   When did you stop practicing law?

7         A.   Good question.  I went on inactive status with

8    the California Bar when I moved out of California which

9    was in December 2018.  I would say I stopped doing legal

10   work, legal advice work, towards the end of 2017.

11        Q.   Then I know that you said you left private

12   practice to join nChain.  Was that around 2018?

13        A.   No, we -- I signed on with nChain in I believe

14   it was in September of 2016.  I notified my law firm

15   that I was intending to leave the law firm partnership

16   to pursue other ventures and it took -- there was kind

17   of a bit of a transition process.  A long period of time

18   to wind down, transfer my client relationships and

19   matters.  I had been a lawyer for so long.  Departing

20   and you don't want to leave your clients in a difficult

21   situation.

22             It took me longer than I expected to actually

23   complete the process to transition out of the law firm

24   but I signed on to join nChain in September of 2016 I

25   believe is the month and sort of overlapped with my

1    departure from the law firm.

2         Q.   Can you walk me through the positions you held

3    at nChain starting from -- actually take one step back.

4    Are you still at nChain today?

5         A.   No, I am not.

6         Q.   Can you walk me through the positions you held

7    at nChain starting from November 2016 when you started

8    and going up until you left?

9         A.   Sure.   In the beginning I didn't have a formal

10   title.   The company was fairly new and part of my, you

11   know, job that I was asked to do was help figure out a

12   number of things at the company such as in particular

13   focusing on its IP program since my legal practice that

14   I had in law was focused on IP and digital technology

15   areas.

16         So in the beginning I would say I didn't have

17   a title.   Eventually we gave me a title to cover those

18   duties but the general area in which I was asked to work

19   was the commercialization of intellectual property.

20         Eventually I got the title of IP

21   Communications and Legal Officer to summarize the

22   variety of tasks that were described in my first

23   contract with nChain because it included IP strategy,

24   some communications, marketing related things as well as

25   legal advice related to particularly the IP.

1          Then I became later chief business officer for

2     a very short period of time because then I got asked to

3     become CEO of the company.

4          So I was CEO for a while and then when I left

5     that role I was appointed to be chair of what we call a

6     Strategic Advisory Board and I maintained that role

7     until last month, March 2020.

8          Q.   Did you say the Strategic Advisory Board?

9          A.   Yes.

10          Q.   So I am going to try -- I think I took some

11     notes I'll try to break it down a little bit.  You

12     started with nChain in November 2016 and you didn't have

13     a formal title until you got the title of IP

14     Communications and Legal Officer.  How long did that no

15     formal title period last?

16          A.   I have to correct you one thing about your

17     question.  I signed on to nChain in September of 2016, I

18     believe, not November.

19          Q.   Sorry.  I have September written down.  I

20     don't know why I said November.  September.

21          A.   What was your question?

22          Q.   There was this intermediate period where you

23     didn't have a formal title.  How long did that last?

24          A.   From September 2016 to sometime I think in

25     spring of 2017.  I would say around March or April.

1      Q.   Of 2017?

2      A.   Correct.

3      Q.   And then -- so I'm assuming around -- I

4 understand these aren't exact but around April of 2017

5 you obtained this title of IP Communications and Legal

6 Officer?

7      A.   Yes.

8      Q.   And then how long did that last until you were

9 made chief business officer?

10     A.   I think -- I have these dates on my LinkedIn

11 profile.  I think I would say it was around September,

12 October.  I think October because I was only the chief

13 business officer for two months before I got asked to

14 take on the CEO role and I took on the CEO role in 2017.

15 I think it was October 2017 when I became Chief Business

16 Officer.

17     Q.   Got it.  As you know this isn't a test so

18 you've referenced your LinkedIn page.  So if that helps

19 you I'm happy to bring that up on the screen for you.

20 Do you see that here?

21     A.   I saw it for a second.

22     Q.   What if I put it here and make it bigger.  How

23 is that?

24     A.   I can see that now.

25         MR. FREEDMAN:  Let's mark this as Exhibit 1

1        though I'm never going to be able to keep track of

2        them all.  One drawback of these electronic

3        depositions but I'll do my best and maybe Rick,

4        Mr. Court reporter, you can help me here.

5               (Plaintiff's Exhibit No. 1 was

6               marked for identification.)

7    BY MR. FREEDMAN

8        Q.   I'm going to scroll down here to your nChain

9    titles.  Do you see that here?

10       A.   Yes.

11       Q.   So I guess -- why don't we go down to the

12   bottom.  You have from February 2017 to October 2017.

13   So I guess if I'm reading this correctly that no formal

14   title period probably went from September of 2016 until

15   February of 2017?

16       A.   That's correct.

17       Q.   And then we had February of 2017 you were the

18   IP -- chief IP Communications and Legal Officer, right?

19       A.   Yes.

20       Q.   That went about until November of 2017 it

21   looks like; right?

22       A.   Correct.

23       Q.   At which time you then became the Chief

24   Business Officer.  Sorry, I'm reading it wrong.  Then

25   that lasted until as you said a very short period just

1   until December so about a month or so; right?

2        A.   About right.  About a month approximately.

3        Q.   And then on December of 2017 you became the

4   CEO?

5        A.   Correct.

6        Q.   And that lasted until November of 2018;

7   correct?

8        A.   Yes, approximately.  My transition out of the

9   CEO role was sort of gradual and so it's -- exact date

10  is hard to define.  It was right around -- there was I'm

11  sure you've heard about a hash war in the Bitcoin cash

12  and Bitcoin SV world so it was right after that time.

13       Q.   Got it.  Then you slowly transitioned out in

14  November of 2018 or so and then from about December of

15  2018 until March of 2020 you were then the chair of the

16  Strategic Advisory Board?

17       A.   Yes.

18       Q.   And at what point in this progression did you

19  stop performing any kind of legal services for nChain?

20       A.   I would say after I took the chief business

21  officer title.  I certainly still had to be involved in

22  legal matters, particularly with outside counsel since I

23  was the executive on the team that was a former lawyer

24  but I did -- was not acting in a legal advisor role I

25  think after that point.  Managing the legal affairs that

1   happened but more from a business perspective.

2       Q.   Got it.  Who was your contact to initially

3   join nChain?

4       A.   Robert MacGregor.

5       Q.   How did you know Robert MacGregor?

6       A.   I've known Rob for many years.  Originally he

7   was a client contact of mine in my legal practice and

8   that's how I first got to know him.

9       Q.   Got it.  Let's get back to that.  When did you

10  first meet Calvin Ayre?

11      A.   A long time ago.  I'm trying to remember.  I

12  don't remember the exact year.  I would say around 2006.

13      Q.   What was the context of that meeting?

14      A.   When I was a lawyer I was asked to start doing

15  legal work for I think it was a media agency or media

16  business that worked with or was related to his Bodog

17  business at the time?

18      Q.   Did you ever do legal work for him or his

19  companies?

20      A.   I definitely did legal work for Bodog

21  companies.  I'm trying to remember if -- I believe my

22  firm also did some legal work for him individually.

23      Q.   Did you yourself?

24      A.   I was involved in it since I was the law

25  firms -- the relationship partner, the key contact with

1    the client but you use colleagues with other specialty

2    areas, you know, that are outside of my specialty area.

3        Q.   Is it safe to say you have not acted as a

4    lawyer for -- let me just ask you.  When is the last

5    time you worked as a lawyer or gave legal advice to

6    Calvin Ayre?

7        A.   To Calvin Ayre personally?

8        Q.   Yes.

9        A.   Quite a long time.

10       Q.   10 years?

11       A.   Probably sooner than that.  I'm trying to

12   remember the sequence of law firms.  Probably we're in

13   2020 so around 2000 -- in the mid 2000s I think.  Sorry

14   not 2000s.  Around the 2013, 2014 maybe time period.

15       Q.   Is that the same response for any companies

16   that are affiliated with him as well?

17       A.   It's been a long time so that's why I don't

18   remember.

19       Q.   I understand.  Is that the same answer for

20   companies that may have been affiliated with him as well

21   not since 2013, 2014ish?

22       A.   Trying to remember that as well.  It would

23   probably be somewhere similar in that time period.

24   That's tougher for me to answer because I know at some

25   point Calvin left the Bodog organization from the online

1    gaming industry and so there were some of the companies

2    that I did legal work for from that organization or I

3    continued to do legal work for but I don't think Calvin

4    was involved any more.

5        Q.   Got it.

6        A.   At least that's what I was told.

7        Q.   Do you know what Calvin's connection to Craig

8    Wright is?

9        A.   Yes.  So I wasn't involved personally but what

10   I've been told and tell me if you want me to testify

11   about things I've been told but Stefan Matthews had

12   known Craig Wright for many years ago from Australia.

13   They had a working relationship because Stefan was the I

14   think CIO or CTO of an online gaming company in

15   Australia that was going public and they needed auditing

16   work done and at the time Craig worked for BDO, one of

17   those auditing firms.  He used to work in the auditing

18   field and so they had -- you know, they had a prior

19   working relationship they knew each other.

20          At some point Craig's Australian companies

21   were in financial distress, financial trouble, and as I

22   understand it I was told by Stefan that Craig contacted

23   Stefan to try and find routes for help.  Stefan then

24   introduced Craig to Calvin and that's how they met.

25       Q.   Do you know about when that was?

1        A.    Probably 2015 but I don't know for sure.

2        Q.    Have you ever talked to Craig about that?

3        A.    About the introduction?  I've talked to Craig

4   about his work with Stefan in years past.  I don't think

5   I've ever talked with Craig about how --

6        Q.    Do you know whether or not Calvin is funding

7   Craig Wright?

8        A.    Funding what I guess?

9        Q.    You tell me.  Do you know if he is funding

10  anything?

11       A.    So I understand they have some kind of

12  financial agreement that I don't know the terms of.

13       Q.    Who told you they have a funding agreement?

14       A.    I wouldn't call it a funding agreement.  I

15  don't know the terms of it.  I know they have some

16  agreement that I have heard about from some of Calvin's

17  representatives.  Calvin has a whole family office and

18  lawyers and executives so the subject has come up in

19  discussions since I don't represent either Calvin or

20  Craig individually that's sort of between the two of

21  them.

22       Q.    And Craig has never made any statements to you

23  about this financial relationship?

24       A.    No.

25       Q.    Do you know whether or not Calvin has given

1    Craig a loan that is secured by Craig's Bitcoin or

2    intellectual property?

3         A.   I do not know.

4         Q.   Does Calvin own Coin Geek?

5         A.   Yes.  As far as -- does he own it personally I

6    don't know.  Sometimes from my understanding there's

7    companies that he is associated with but is he the

8    founder general owner of Coin Geek businesses that's my

9    understanding.

10        Q.   When I say owner I understand that affluent

11   individuals use complex structures to control assets.

12   The ultimate beneficial owner essentially traced back to

13   Calvin?

14        A.   From what I understand, yes.

15        Q.   Does Calvin have any financial interest in

16   nChain?

17        A.   He is now as I understand it a shareholder.

18        Q.   When did that start?

19        A.   You know, this was after I was CEO so I was

20   less involved in operational structure but -- there's I

21   think a press release or something about it.  I think it

22   was announced in December last year.  I don't know when

23   it became effective.

24        Q.   And before that date did he have any interest

25   in nChain at all even through holding companies or other

1   companies affiliated with him?

2        A.   Not that I'm aware of.  I was always told he

3   was not a shareholder and didn't have a financial stake

4   in nChain at the time.

5        Q.   It doesn't -- I'm trying to figure it out

6   because you're saying that you've heard that Craig

7   turned to Stefan Matthews for help in bailing out the

8   businesses in Australia?

9        A.   Yes.

10       Q.   And then Stefan introduced Craig to Calvin?

11       A.   Yes.

12       Q.   And then as we'll talk about there is a

13   transfer of intellectual property from those Australian

14   companies to nChain; right?

15       A.   Yes.

16       Q.   And so I'm trying to figure out why Calvin

17   doesn't have a stake in it, doesn't add up to me?

18       A.   There's another step in the process you hadn't

19   asked me about yet.

20       Q.   Okay.

21       A.   Calvin and Stefan introduced Craig to Robert

22   MacGregor.

23       Q.   Got it.  I see.  And Robert MacGregor was the

24   one who provided all the funds then?

25       A.   Robert MacGregor was -- had a company in the

1    UK called The Workshop and it's a holding company as I

2    understand it it's the one that did the deal with the

3    marketing group.

4         Q.   Got it.

5         A.   Craig's company in Australia.

6         Q.   But where is Robert MacGregor now?

7         A.   You know, I'm not sure.  I haven't heard from

8    him in a while.  Last I heard he was in London.

9         Q.   Do you have contact information for him?

10        A.   I do.  I would say the last time I e-mailed

11   him I didn't hear back so I don't know if it's still

12   valid.  He's had health -- a serious health issue over

13   the last few years so he has not been as active.

14        Q.   Does Robert MacGregor or any of his companies

15   maintain any kind of interest in nChain?

16        A.   Not that I know of.

17        Q.   So getting back to Calvin and nChain, Coin

18   Geek is it fair to say that Calvin's companies invest in

19   nChain?

20        A.   I'm sorry, could you repeat that question?

21        Q.   Is it fair to say --

22        A.   Give qualification to my last answer which is

23   since I've been out of the CEO role of nChain I'm less

24   aware of anything that's happened with respect to the

25   ownership structure, corporate structure.

1    Q.   Of course.  Just what you know, all I'm asking

2    for is what you know.  So does Calvin -- do Calvin's

3    companies invest in nChain?

4    A.   Well, I don't -- I don't think I can answer

5    that because I was not involved in the share or whatever

6    agreement that led to him becoming a shareholder.

7    Presumably something happened there but I don't know the

8    terms.

9    Q.   I understand.  Give me a second here.  Does

10   nChain find lots of ways to work very closely with

11   Calvin's companies?

12   A.   Yes, that's a fair claim.  I don't know how

13   it's defined but there are a lot of common goals for the

14   growth of Bitcoin in particular, Bitcoin SV so there's

15   definitely a close working relationship.

16          (Plaintiff's Exhibit No. 2 was

17          marked for identification.)

18   BY MR. FREEDMAN

19   Q.   I am going to share with you Exhibit 2 to this

20   deposition which is a video or an interview that you did

21   I believe with Cryptofinder.  Do you recall this

22   interview?

23   A.   Yes.  I don't recall the interview but I

24   recall doing it.

25   Q.   Fair to say what the video captured is what

1    you said?

2         A.   I would assume so.

3         Q.   I am going to play for you I hope this works

4    where at the 26 minute and 16 second mark let me know if

5    you can hear this, okay?

6         A.   Sure.  I cannot hear it.

7              MR. FREEDMAN:  You cannot hear it?  That is a

8         problem.  Let me see if I can fix that.

9              MR. SILVERGLATE:  Do you want to go off the

10        record?

11   BY MR. FREEDMAN

12        Q.   Give me one second.  I might be able to fix

13   that this way.  Can you still hear me?

14        A.   Yes.

15        Q.   Let's try I am going to go back to the 26

16   minute if it lets me.

17        A.   Still cannot hear it.

18        Q.   All right.  If this doesn't work we'll have to

19   go off the record but I'm hopeful we got it.  How about

20   now?

21             VIDEO AUDIO VOICE:  That relationship stopped

22        between Coin Geek and nChain.

23             MR. NGUYEN:  Well, Calvin's been interested in

24        Bitcoin for a while.  Online gaming industries one

25        of the first industries to adopt Bitcoin a long

1    time ago.  So he got introduced to Craig and they

2    became friends a number of years ago.  I could say

3    2015 or so and then obviously Calvin has learned a

4    lot about Bitcoin from Craig so when nChain emerged

5    Calvin was kind of getting more involved in

6    Bitcoin.  He started the Coin Geek brand as a media

7    site at first and then decided to start getting

8    into mining.

9        So mining operations got more started

10   investing so nChain and Coin Geek are very close

11   business allies.  We I do lot of things together.

12   Obviously we both have money operations.  We have

13   the hash fork together.  We align on things.  We're

14   starting new efforts and investing where for

15   example Coin Geek is providing investment funds and

16   nChain is providing access to its IP and technical

17   portfolio to the investment companies.

18   BY MR. FREEDMAN

19       Q.   I want to stop there for a minute.  I don't

20   know if you recall I asked you whether or not Calvin's

21   companies invested in nChain I don't recall what your

22   answer was but I don't think it was yes.  Not sure if it

23   was no but this help refresh your recollection Coin Geek

24   does provide investment funds to nChain?

25       A.   It actually confirms what I -- my prior

1    answer.  I think you're referring to the last part of

2    the clip you just played where I'm talking about they

3    collaborate where Coin Geek is investing in new Bitcoin

4    tech start ups and nChain is involved by providing

5    access to nChain's IP technology to help the new start

6    ups.

7            That happened because -- so it's not Coin Geek

8    investing in nChain.  I was talking about Coin Geek

9    investing in -- we even had nChain at first and then

10   Coin Geek has invested in a number of the Bitcoin start

11   ups in the world.  That's what I was talking about.

12       Q.   Thank you for that clarification.  Would it be

13   fair to say that Coin Geek financially supports nChain's

14   teams?

15       A.   Here is how I would answer that.  Certainly

16   not all the teams but the arrangement is when Calvin and

17   Coin Geek wanted to support a competing what we call

18   software implementation, by completing reference

19   implementation of Bitcoin protocol when there were

20   disagreements at the time in 2000 -- I guess this was

21   2018 we were supporting a version of Bitcoin called

22   Bitcoin Cash.  As you know now there's several competing

23   versions of Bitcoin.

24            There was a split between BTC, Bitcoin core as

25   we call it, and Bitcoin Cash.  Then we were supporting

1    Bitcoin Cash after that split which happened in 2017.

2    There became disagreements among the different group

3    protocol developer groups involved in Bitcoin Cash and

4    Craig wanted to basically compete against the other

5    Bitcoin Cash implementation and see which the miners

6    would follow, that led to what's called this hash war.

7    To do that work to create a new version of the software

8    that more aligned to Craig's vision that's why we call

9    it the Satoshi Vision that took work.

10         The nChain team is the development team that

11   did that work.  It's done under a service agreement with

12   the Bitcoin Association which I now run and Calvin funds

13   the Bitcoin Association right now until we find other

14   ways of revenue which is membership revenue which is

15   something that's going to start happening soon.

16         The work that is done on not all of nChain but

17   the work -- nChain does a variety of things.  The

18   development work done for Bitcoin SV, the software

19   implementation, the technical scaling work for that

20   infrastructure is done through nChain under a service

21   agreement through Bitcoin Association which is funded by

22   I don't know that it's Coin Geek it's maybe -- some

23   entity associated with Calvin.

24        Q.   That's helpful.  Would it also be fair to say

25   nChain is a team that is the Bitcoin SV no team and they

1   are financially supported by Coin Geek.

2       A.   I don't know if it's by Coin Geek per se but

3   ultimately by a Calvin funded organization.   That's

4   pretty public.   Very public about that.

5               (Plaintiff's Exhibit No. 3 was

6               marked for identification.)

7   BY MR. FREEDMAN

8       Q.   So I am going to attempt to share with you

9   again I guess we're now on Exhibit 3.   See this You Tube

10  page that's the popped up?

11      A.   Okay.

12      Q.   This appears to be a little I'm not sure if

13  it's an interview.   It looks like an interview Coin Geek

14  put out in April 2019.   Do you recall this interview?

15      A.   I do so many interviews -- meeting interviews.

16  I don't recall every single one but it looks familiar.

17      Q.   That's you?

18      A.   Yes, that's me.   I do a lot so when people ask

19  me do I remember particular interviews they sort of blur

20  together.

21      Q.   I totally understand that.   Do you understand

22  from an evidentiary perspective I just need to make sure

23  it's you, it's a video, it's what you said?

24      A.   I understand.

25      Q.   All those things are true?

1     A.   Once you play the video I am fairly certain I

2     will be able to confirm it's video -- interview I did.

3     Q.   I am going to particularly direct you to the

4     time stamp of this video of 2:09.  We are going to start

5     at 2:08 and let's take listen for a second.

6          MR. NGUYEN:  Work for nChain.  So nChain has a

7          chain that is the Bitcoin.  They are supported

8          financially by Coin Geek.  They -- the project is

9          owned by the Bitcoin Association.  So it's kind of

10         an interrelated set of relationships but --

11    BY MR. FREEDMAN

12    Q.   I am going to stop there for a second.  I was

13    reading a quote from you again not -- this is not a test

14    but is it fair to say I guess that the nChain team --

15    nChain has a team that is the SV Bitcoin No Team they

16    are financially supported by Coin Geek.

17    A.   I think it's a fair statement.  I was trying

18    to remember what entity it is because Coin Geek is not a

19    single entity.  Coin Geek brand I guess you can say.

20    Q.   Absolutely understood.  I want to ask you

21    about something you said in the second half of that

22    which was Calvin and I are of course a huge supporter of

23    Bitcoin SV and the project owned by the Bitcoin

24    Association.  What do you mean by that?

25    A.   Someone -- when you create software you have

1    to answer the question who owns it.  So it's the Bitcoin

2    Association.

3        Q.    So meaning like the source code that creates

4    the Bitcoin SV client is owned by Bitcoin Association?

5        A.    I'm just trying out that technical way to

6    describe it.  I'm not sure exactly right.  Bitcoin

7    Association owns the Bitcoin SV No software.

8    ███████████████████████████████████

9    █████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ███████████████████████████████████████████████

12   █████████████████████████████████████████

13   ██████████████████████████████████

14   ███████████████████████████████████

15   ████████████████████████████████████████████████

16   █████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ███████████████████████████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████████████████████

21   ███████████████████████████████████████

22   ██████████████

23   ████████████████████████████████████████████████

24   ████████████████

25   ██████████████████████████████████





14   Q.   Understood.  So just getting back to the video

15   that is on the screen can you now confirm this is an

16   interview you gave and it's accurately recorded your

17   responses?

18   A.   Yes.

19   Q.   Thank you.  Have you ever communicated with

20   Calvin through text message?

21   A.   No.

22   Q.   WhatsApp?

23   A.   He is not a texter.

24   Q.   Any method beyond calling or e-mails?

25   A.   Not that I recall.  Just those two ways.

1       Q.   I want to jump with Robert MacGregor if you'll
2   come with me.  You gave me some information about him
3   already.  Can you explain to me how -- I understand
4   practically how because you've told me Stefan Matthews
5   introduced Craig to Calvin and Calvin to Robert
6   MacGregor but so not mechanically how but I guess what
7   is Robert's connection to Craig.  How did that whole
8   thing come about?
9       A.   Sure.  Again I'll just repeat I wasn't
10  directly involved in any of this so I'm just going to
11  tell you what I've been told.  As I understand it so
12  Stefan outreached from Craig.  I introduced Calvin
13  because obviously he had an interest in Bitcoin.  Craig
14  used to also do work in the online gaming industry as
15  well in some parts.  And then at the time Rob, I don't
16  know if it was at the time but he had started a company
17  in Canada called nTrust.  It was a set of businesses
18  that brand name to the public was nTrust that was
19  involved in electronic money transfer and international
20  remittance.
21           So -- as I found out later I think Craig had
22  even talked once to Rob before and might have been
23  introduced to by Stefan because Rob and I have to be a
24  bit careful because nTrust was a client of mine for many
25  years when I was a lawyer so I have to be careful about

1   what I disclose related to that but I can tell you that

2   nTrust and Rob MacGregor were interested in exploring

3   Bitcoin and virtual currency technologies as a fast,

4   more efficient way to be able to send funds across

5   countries for example.

6          The remittance fee could be very high.  An

7   overseas worker from the Philippines who is young and

8   left to move to Canada work and send money back to my

9   family in the Philippines the percentage you have to pay

10  to do that is high and so for the nTrust business I know

11  Rob MacGregor had been interested and once Bitcoin and

12  digital currencies came out in exploring how that could

13  be useful for his business and so as I understand it

14  that's why Stefan and Calvin introduced Craig to Rob at

15  this time thinking what Craig was doing with Bitcoin

16  could be useful for what nTrust could possibly do.

17       Q.   Do you know the final deal that Robert

18  MacGregor struck with Craig?

19       A.   No.  I was not involved in that at all.

20       Q.   Did you ever review the deal documents that

21  came out of that deal?

22       A.   I did later after I started working for nChain

23  but they're very long and so I won't say I read them all

24  in detail.  I have seen them but yes, it was after --

25  well after the transaction.

1    Q.   Can you give me a kind of high level summary

2    understanding that it may not be 100 percent accurate of

3    what that deal looked like?

4         MR. RIVERO:  Object to the form.

5         THE WITNESS:  Not really.  Honestly I know

6         there was the agreement, some payments and transfer

7         of assets.  At a high level that's what happened.

8    BY MR. FREEDMAN

9    Q.   Do you know which assets got transferred?

10   A.   I couldn't tell you.  There's a long list I

11   know.  Without looking at that agreement I wouldn't

12   know.  Even looking at the agreement since I was not

13   involved with its negotiation.  I don't know I have the

14   basis to answer that.

15   Q.   Have you seen an agreement that involved the

16   transfer of Satoshi Nakamoto's life rights?

17   A.   I don't know if I've seen -- I know there is

18   one.  I think life story rights.

19   Q.   Do you know if the deal included all

20   intellectual property created?

21        MR. RIVERO:  Objection.

22   BY MR. FREEDMAN

23   Q.   Do you know if the deal included beyond just

24   life story rights but also included intellectual

25   property rights?

1                 MR. RIVERO:  Object to the form.

2                 THE WITNESS:  As I understand it it included

3         certain -- I understand the deal included transfer

4         of certain IP assets but sitting here today I could

5         not tell you what those are.

6     BY MR. FREEDMAN

7         Q.    Owned by Robert MacGregor at the time these

8     transactions took place?

9         A.    Can you repeat that question?

10        Q.    Was nChain owned by Robert MacGregor at the

11    time these transactions took place?

12        A.    There was no nChain at the time.

13        Q.    The BITC Holdings, let me amend that.

14        A.    I think I don't know -- I'm not sure which was

15    the entity that acquired the DeMorgan Group assets and I

16    know that the entity that is now known as nChain I think

17    got created as I understand it in connection with what

18    happened with this transaction.

19            So that's why it's hard for to answer did Rob

20    MacGregor own nChain because I'm not sure the nChain

21    entity existed at the time.  I'm not certain.  I wasn't

22    involved in the transaction of the structure.

23        Q.    So the assets that were acquired by Robert

24    MacGregor in that deal with Craig eventually ended up

25    being controlled by nChain?

1              MR. RIVERO:  Object to the form.

2              THE WITNESS:  I don't know that I have a basis

3        to answer that.

4    BY MR. FREEDMAN

5        Q.   Haven't you reviewed the agreements?

6              MR. RIVERO:  Objection.

7              THE WITNESS:  They were long and I didn't

8        review them for that purpose.  In general the

9        assets that were acquired from the DeMorgan Group

10       got transferred I believe -- I just don't know if

11       they all got transferred to the same entity.

12       That's part of why I'm pausing.  It's like which

13       entity owned which assets I'm not sure.

14   BY MR. FREEDMAN

15       Q.   I'll just go where I'm getting to maybe you

16   can help me make it easier which is I'm trying to find

17   out how Robert MacGregor ended up out of the picture.

18   Because you told me he was the one that purchased

19   everything from Craig then you told me he no longer has

20   interest in nChain.  How did he get removed?

21       A.   He became unhappy with Craig at a certain

22   point and again I'm telling you this all second hand

23   because I wasn't there.  So it's what I've heard from

24   other people and he thought about closing the nChain

25   operation at one point.  Stefan Matthews wanted to

1  continue it and there was a transaction which was

2  announced in 2017 about a public investment fund in

3  Malta acquiring the nChain set of companies from Rob's

4  company.  Basically he was unhappy with Craig and didn't

5  necessarily want to be involved any more.

6      Q.   Do you know why he was unhappy with Craig?

7      A.   Yes.  Well, Craig is -- can be a difficult

8  business colleague.  You know, has been widely reported

9  in the media there was an effort in the spring of 2016 I

10  believe it was or in 2016 to show that Craig is Satoshi

11  Nakamoto, creator of Bitcoin.

12          It happened after there was some media

13  articles that tried to out Craig as Satoshi I believe in

14  the December before that this process to establish Craig

15  as Satoshi at the end did not go well and as I

16  understand it Rob was upset with Craig.

17      Q.   Can you explain what you mean "did not go

18  well?"

19      A.   Well, I'm telling you all that from reports

20  obviously because I wasn't -- I knew it was happening

21  because this was when I was in talks with Rob to start

22  working for nChain but I wasn't directly involved with

23  it.  Craig did not media interviews to come out and say

24  I am Satoshi Nakamoto creator of Bitcoin.  The Bitcoin

25  community, you know, they're very technical people

1    involved in cryptography.  They would not believe a

2    statement like that without some other proof and there

3    was supposed to be -- I can't remember the date it was a

4    date in May where he was supposed to -- I am not exactly

5    sure what he was supposed to do.  I think he was

6    supposed to either sign a transaction using private keys

7    from one of the early Bitcoin block chain blocks which

8    the Bitcoin community would recognize as only being held

9    or owned or accessible by Satoshi Nakamoto and he did

10   a -- I don't know if he was supposed to sign a

11   transaction or move a coin, I'm not entirely sure but

12   something using private key associated with one of the

13   first early Bitcoin blocks.

14         He did something but -- that the Bitcoin

15   community then quickly thought well, that's -- it's

16   using -- it wasn't using that private key of Satoshi.

17   It was using information he could have found publicly so

18   people thought well, he's just -- that doesn't prove he

19   is Satoshi.

20        Q.   It's fair to say it was a pretty big issue at

21   the time, right?

22        A.   Yes, very much.  There was a lot of news about

23   both his claim coming forward saying I'm Satoshi and

24   then there was a lot of news that came when the proof --

25   proof, you know, session, proof providing not believed

1    by the Bitcoin community and I think he posted something

2    on the blog he had at the time saying I'm sorry.

3        Q.   I saw you produced documents in response to

4    our subpoena so thank you for that.  We just got through

5    them last night and I saw that you were involved in, you

6    know, PR campaigns to kind of correct that narrative and

7    kind of remediate the harm so to speak that had been

8    caused by the false procession?

9        A.   I wouldn't describe it that way because I

10   joined --

11       Q.   I didn't hear that.  I apologize, can you

12   repeat that?

13       A.   Sure.  I would not -- the way you characterize

14   the question is not how I would characterize it.  I

15   joined nChain after this attempt of proving Craig was

16   Satoshi and the PR work I was asked to oversee was more

17   focused on the launch of nChain publicly as a company

18   which would of course trigger a question of Craig he is

19   your chief scientist, is he really Satoshi why didn't he

20   fully prove he was Satoshi back then so this was an

21   element of it but that was not the main purpose of the

22   PR work I was asked to manage.

23       Q.   You consider Craig to be a friend?

24       A.   I do now.  He is a colleague.  We're

25   colleagues at first and eventually we became friends as

1   you often do with people you work with.

2        Q.   Fair to call him your partner?

3             MR. RIVERO:  Object to the form.

4             THE WITNESS:  Not in any legal sense.  We

5        don't have any business partnership arrangements

6        together and, you know, we work together in

7        building his vision of Bitcoin and the Bitcoin

8        ecosystem.

9   BY MR. FREEDMAN

10       Q.   Do you understand whether or not this failed

11  proof session had an affect on Craig?

12            MR. RIVERO:  Object to the form.

13            THE WITNESS:  I don't know how to answer that.

14  BY MR. FREEDMAN

15  ██████████████████████████████████████

16  ████████

17  ████████████████████████████████████████████

18  ██████████████████

19  ██████████████████████████████████████

20  ████████████████████████████████████

21  ██████████████

22  ██████████████████████████████████████

23  ████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████



17    MR. FREEDMAN:  I don't know why but my

18    technology is glitching on me.  We've been going

19    for a while anyways.  Why don't we take a five

20    minute break, you can use the restroom and get a

21    drink.  I'll figure out my technical issues.

22        THE VIDEOGRAPHER:  We are going off the

23    record.  The time is 1:06 p.m.

24        (Discussion held off the record.)

25        THE VIDEOGRAPHER:  We are back on the video

1          record.  The time is 1:13 p.m.

2     BY MR. FREEDMAN

3          Q.   Mr. Nguyen, do you know what happened to the

4     deal that -- where Satoshi Nakamoto's life rights were

5     sold to Rob MacGregor?  Strike that.  Let me take a step

6     back actually.

7               Before the break you told me that there was a

8     Malta based firm that ended up buying Robert MacGregor's

9     interest out of the nChain related companies; right?

10         A.   Bought the nChain companies.

11         Q.   From Robert MacGregor's companies?

12         A.   I would say he was the principal.  As far as I

13    understood it of the nChain companies.

14         Q.   So let's talk for a second about these

15    companies.  So nChain Holdings Limited is the parent

16    company, right?

17         A.   I don't think that's true any more.  It was I

18    think at one time.

19         Q.   Let's do before the Malta based purchase

20    nChain Holdings -- actually I wrote myself a little

21    chart here because it was hard to follow but I think I

22    got it to the point where the Workshop companies

23    Holdings, the Workshop Holdings was the ultimate parent

24    company and it owned nChain's Holdings formerly called

25    EITC Holdings.  Is that consistent with your

1    recollection?

2         A.   Yes, at one point in time.  I will also

3    preface saying is I was not involved in the structuring

4    so I am answering based on just what I've seen in

5    documents after I started working for nChain.

6         Q.   And then nChain Holdings eventually acquired

7    NT International Holdings and its five subsidiaries.  Do

8    you recall that?

9         A.   I was involved at the time in terms of the

10   transactions the process by which they got held by

11   nChain Holdings or what entities were held by them I

12   couldn't answer for you.

13        Q.   I might be able to help you with that.  I

14   think your document production helped me with it.

15        A.   I know there are documents.

16             (Plaintiff's Exhibit No. 4 was

17             marked for identification.)

18   BY MR. FREEDMAN

19        Q.   I think I can help you with that.  I am going

20   to share with you I think we're now on Exhibit 4.  It's

21   a document you produced to us yesterday Nguyen 424.  Do

22   you recognize this as an e-mail from you to Jamie

23   Diaferia?

24        A.   Yes.

25        Q.   And on January 23rd 2017?

1        A.    That's what it says.

2        Q.    Do you want to take a moment to review the

3   e-mail and it appears -- I'll tell you I read it last

4   night and it is you conveying over to Mr. Deaferia who

5   works with a PR firm called Infinite Global the

6   structure of how the at the time nChain company was

7   structured and so it was very helpful to me in mapping

8   out the entities and I think this might refresh your

9   recollection.  Do you want to take a moment to review

10  it?

11       A.    Yes, I will.  I generally remember.  As you

12  can see it's a complex set of transactions.

13       Q.    I can map it out.  I have a sketch pad in

14  front of me to map it out.  It seems to me that nChain

15  Holdings -- let's -- why don't we go in the order you've

16  laid out.  NChain Holdings acquires the nTrust companies

17  through two different transactions and this is

18  accomplished by first having nTrust Tech Solutions sell

19  itself be purchased by NT International Holdings?

20       A.    Yes, that's what it says.

21       Q.    And then NT International Holdings then has

22  itself and six subsidiaries underneath it that of

23  various nCrypt nTrust companies and then nChain Holdings

24  purchases NT International Holdings and -- hold on, let

25  me find it.  Sorry, so then purchases NT International

1    Holdings and it already owns nChain Limited and nChain

2    Technology Limited and nChain Labs Limited.

3         A.   Here is what I would say.  I wasn't involved

4    in the transactions that led to this structure.  The

5    information that's contained in this e-mail was

6    summarized for me so that I could pass on to the PR

7    firm.

8              So I believe I would assume that the

9    information I summarized here is accurate because that's

10   what we were trying to communicate but I don't have

11   personal knowledge of all these transactions happening

12   in this way.

13        Q.   Right.  But at the time you were hired by the

14   company to manage their PR; right?

15        A.   Correct.  I don't have any reason to believe

16   this is incorrect.  I just can't give you personal

17   knowledge about this is what happened.

18        Q.   And then -- so at the end what ended up

19   happening was at the end of this transaction this

20   Pi-High Tech and PE Fund ends up purchasing three

21   different companies; nChain Limited, nChain Holdings and

22   NT International Holdings which basically sweeps all the

23   nChain and nTrust companies into its ownership; right?

24        A.   In effect, yes.

25        Q.   Who owns Pi-High Tech and PE Fund?

1       A.   I didn't -- did not deal with the fund

2   directly much.  As I understand it's an investment fund

3   so it doesn't really have owners, it has a fund manager

4   and then there's people who invest into the fund.

5       Q.   Do you know who has invested into the fund and

6   who its investors are?

7       A.   I do not.

8       Q.   Have you ever -- I want to go back for a

9   second to Robert MacGregor have you ever texted or

10  messaged Robert MacGregor not through e-mail?

11      A.   I think I've tried a couple of times but don't

12  think I ever had a response which --

13      Q.   What about Stefan Matthews, have you ever

14  texted or messaged him not through e-mail?

15      A.   Not through e-mail, yes.

16      Q.   We did not have any text messages in your

17  production of documents.  Did you collect them?

18      A.   I did not have any text messages with any of

19  the people that were responsive to your request.

20      Q.   Have you ever text messaged or otherwise

21  non-e-mail messaged Craig Wright?

22      A.   Yes.

23      Q.   Did you collect those and review them for

24  production?

25      A.   I reviewed what text messages I have had with

1    Craig and they are not responsive to your request.

2         Q.   So in 2015 there was a leak I think it's

3    described -- you know what, strike that.  In 2015 Wired

4    and Gizmodo ran articles contending that Craig Wright

5    was Satoshi.  Do you remember that?

6         A.   I do.

7         Q.   Were you involved in orchestrating that leak?

8         A.   No.

9         Q.   Do you know who was involved in orchestrating

10   that leak?

11        A.   No.

12        Q.   Do you know if anyone was involved -- let me

13   strike that.  Do you know if that was an orchestrated

14   leak or if it was actually a leak?

15        A.   I have no idea.

16        Q.   So then we talked about this in May of 2016

17   there was a coordinated effort to out Craig as Satoshi

18   which ended up not being successful and he failed to

19   provide public proof.  Did you talk -- do you recall

20   that?

21        A.   I recall that happening, yes.

22        Q.   Did you talk to -- were you involved in that

23   coming out?

24        A.   Not directly.  I knew it was happening.

25        Q.   Did you talk to or e-mail Andrew O'Hagan about

1    this coming out?

2        A.    No.

3        Q.    Are you familiar with an article called The

4    Satoshi Affair?

5        A.    Yes.

6        Q.    Are you aware that in The Satoshi Affair

7    Andrew O'Hagan says that you e-mailed him?

8        A.    I'm aware my name is referenced.  I don't know

9    it's my e-mail though.

10       Q.    Let's take a look at it.  I'm sharing with you

11   docket entry 83-1 to the Second Amended Complaint.  It

12   is a copy of Andrew O'Hagan's The Satoshi Affair.  Let

13   me show you the title I successfully lost our place.  I

14   think we're on page ten.  Why don't you read from this

15   paragraph that starts with A in the middle of page nine

16   for the record?

17       A.    I see it.

18       Q.    Do you want me to go ahead and read that for

19   the record for us?

20       A.    "A few weeks before the raid on Craig Wright's

21   house, when his name still hadn't ever been public

22   associated with Satoshi Nakamoto I got an e-mail from a

23   Los Angeles lawyer called Jimmy Nguyen from the firm

24   Davis, Wright & Tremaine (self described as a one stop

25   shop for companies in entertainment, technology,

1    advertising, sports and other industries).  Nguyen told
2    me they were looking to contract me to write the life of
3    Satoshi Nakamoto.  My client has acquired life story
4    rights dot dot dot from the true person behind the
5    pseudonym Satoshi Nakamoto the creator of the Bitcoin
6    protocol the lawyer wrote.  Quote, the story will be in
7    brackets of, end of bracket, great interest to the
8    public and we expect the book project will generate
9    significant publicity and media coverage once Satoshi's
10   true identity is revealed" end quote.
11        Q.   Does this refresh your recollection that you
12   did e-mail Andrew O'Hagan?
13        A.   No.  My memory is I e-mailed who I believe
14   Andrew O'Hagan's literary agent.
15        Q.   I see.  Suppose he didn't say you e-mailed him
16   directly he says I got an e-mail from a Los Angeles
17   lawyer not necessarily that he got directly from you.
18   Okay.  Do you see that he -- I got a couple questions
19   here.  He redacts out -- he replaces an ellipsis my
20   client has acquired life story rights dot dot dot from.
21   What did he remove?
22        A.   I have no memory of that e-mail.  That would
23   have been a number of years ago.
24        Q.   Then he replaced the original quote with the
25   word of.  Do you remember what it said previously?

1      A.    No.

2      Q.    Can you tell me how this occurred?  How did

3  you come about e-mailing his literary agent?

4      A.    Rob MacGregor asked me to help them find a

5  writer to write about the story of Satoshi Nakamoto

6  Craig Wright and so he asked me to reach out and see if

7  I could find a contact to Andrew O'Hagan.

8      Q.    Was that the extent of your conversation

9  with -- about this issue that you just said -- sorry,

10  strike that.  Did you follow up and ask him any details

11  about what was going on and who Satoshi was?

12      A.    Ask who?

13      Q.    I guess Robert MacGregor.

14      A.    At this point I was already in discussions

15  with Mr. MacGregor about possibly working with nChain

16  but at this time I knew that he thought this was going

17  to be obviously a significant public interest in that he

18  was acquiring through one of the companies the life

19  story rights of Craig about Satoshi Nakamoto and he

20  thought it was going to be a great book.

21      Q.    And you wrote -- in your e-mail you wrote he

22  had already acquired at this point.  Is that what you

23  understood?

24      A.    That's what I was told.

25      Q.    You had no other insight into the plan other

1    than this?

2         A.   I don't understand what you mean by the plan.

3         Q.   The plan to come out and reveal the true

4    person behind the pseudonym Satoshi Nakamoto?

5         A.   I am not sure if I had any understanding when

6    I sent that e-mail to Mr. O'Hagan's literary agent.

7         Q.   Do you know what date you sent that e-mail to

8    him?

9         A.   I don't remember.

10        Q.   Throughout the documents you produced you make

11   references to something called Project Satoshi?

12        A.   Yes.

13        Q.   Can you tell me what that is?

14        A.   It's just a name I think I gave to a project

15   that I was asked to work on.

16             MR. FREEDMAN:  Just as a housekeeping matter

17        before we continue this line of questioning I want

18        to make sure we marked for the record The Satoshi

19        Affair as Exhibit 5.

20             (Plaintiff's Exhibit No. 5 was

21             marked for identification.)

22   BY MR. FREEDMAN

23        Q.   So getting back what was the project that you

24   were asked to work on that you named the Satoshi --

25        A.   In short it was to help with the process to --

1    how do I describe it?  It changed over time.  That's why

2    I'm trying to figure out how to describe it.  Ultimately

3    what it became is to help guide the efforts to

4    commercialize and monetize intellectual property that

5    was going to be created at nChain.

6         Q.   So did that project post date the failed

7    reveal in 2016?

8         A.   I started talking about it before but it did

9    not happen until afterwards.

10        Q.   Besides the e-mail to --

11        A.   Correct.  At the time I was not really part of

12   the project team.  It was something I got asked to do,

13   you know, while I was a lawyer.

14        Q.   Why do you think they asked you to do that if

15   it's not exactly legal advice to contact a literary

16   agent?

17        A.   Because I have a lot of connections and both

18   client and business relationships in the entertainment

19   media world in the United States.

20             (Plaintiff's Exhibit No. 6 was

21             marked for identification.)

22   BY MR. FREEDMAN

23        Q.   Got it.  And then let's introduce I think

24   we're on Exhibit 6 now which is Nguyen 229 and it

25   appears to me to be an e-mail from you to Robert

1    MacGregor on -- let me take that back.  It appears to be

2    an e-mail chain between you and Robert MacGregor

3    starting on May 1st you responding on May 2 and him

4    respond -- you responding again on May 5th.  Is that

5    consistent with your observations?

6         A.   Yes, that's what it says.

7         Q.   Do you recall this e-mail?

8         A.   Yes.

9         Q.   Did you send this e-mail?

10        A.   I sent two of the e-mails on this chain.

11        Q.   Did you receive the first one on the bottom?

12        A.   Yes.

13        Q.   So Robert MacGregor tells you that the embargo

14   will lift and the news will break in 50 minutes.  Then

15   the next day you say "I see the online articles.  How

16   has reaction been in your world."  At this point did you

17   know there was a failure?

18        A.   A failure of what?

19        Q.   At this point had it blown up essentially that

20   Craig had not actually produced valid proof?

21        A.   I don't think that happened by May 2nd.  I

22   don't remember if it was -- it was certainly by May 5th

23   when I sent the top e-mail.  I don't remember what date

24   it was between the May 1st and May 5th sequence.

25        Q.   Got it.  And I don't have a response from

1   Robert MacGregor to this e-mail.  Did he call you in

2   response to your e-mail?

3        A.   (Indicating).

4        Q.   No, he did not?

5        A.   No.

6        Q.   So you just never got a response to that?

7        A.   No.

8        Q.   Were you not -- I mean you then proceeded to

9   engage in Project Satoshi which was premised on this IP

10  that partly was Craig and -- it seems odd you wouldn't

11  inquire about what happened?

12       A.   I did not hear from Rob for a long time after

13  this.  Eventually I think I reached out to his

14  assistant.

15       Q.   When that happened and you got back in touch

16  with Rob did you discuss this?

17       A.   Discuss what?

18       Q.   This failure and this debacle of May of 2016?

19       A.   I wouldn't call it a debacle but we did

20  discuss or -- I had not heard from him after Craig did

21  not provide the cryptographic proof that the Bitcoin

22  community would like to see.  So we did eventually

23  discuss it.

24       Q.   What did he say?

25       A.   He said it's a really long story so I didn't

 1   get the whole story.  He said, you know, Craig didn't

 2   sign using a private key that the Bitcoin world would

 3   accept as from a Satoshi block and he was very angry and

 4   very upset.

 5        Q.   Did he say why?

 6        A.   Rob?

 7        Q.   Yes.

 8        A.   That's what we expected Craig to do.

 9        Q.   That was a bad question.  Did he say why Craig

10   didn't sign using a private key the Satoshi blocks?

11        A.   No.

12        Q.   You were a partner at a top law firm in the

13   country; right at Davis, Wright & Tremaine?

14        A.   Yes.

15        Q.   And you left that position to work on the

16   Satoshi Project and further nChain, right?

17        A.   Yes.

18        Q.   Don't you think the responsible thing would

19   have been to kind of dig into that a little bit more

20   before you gave up something so great for this new

21   venture you were betting on?

22        A.   Not necessarily.  I had been wanting to leave

23   law for many years before this.

24        Q.   So you -- it's your testimony today that you

25   did not push for what happened and why there was a

1  failure?

2       A.   Well, I asked questions but I don't think even

3  Rob could even tell me why Craig didn't do it.

4       Q.   Did you ever Craig why he didn't do it?

5       A.   No.

6       Q.   Did you ever ask -- have you ever asked Craig

7  to give you a private proof session?

8       A.   Sorry, you cut off.

9       Q.   Have you ever -- can you hear me now?

10      A.   Yes.

11      Q.   Have you ever asked Craig to give you a

12  private proof session?

13      A.   No.

14      Q.   Why not?

15      A.   Because I knew he would if I asked him to and

16  I made a decision including before I decided to sign on

17  to nChain and leave my law practice that I wasn't doing

18  it based upon Craig having to be Satoshi Nakamoto.  That

19  I wasn't -- that that was certainly relevant to

20  everything, right, but since there's all this

21  controversy over whether he is or he isn't and how could

22  it be proven, you know, either way I had to make a

23  decision am I going to join this opportunity based upon

24  that and could be left disappointed if it turned out not

25  to be true so decided for myself while it certainly is

1    relevant that the technology that can be built and his

2    vision for it is powerful and that I needed to focus on

3    that because otherwise you can drive yourself crazy with

4    is he or isn't he Satoshi and it's also what I said

5    publicly not what I asked.  So I did ask questions about

6    it but I didn't make my decision to join nChain based

7    upon it.

8         Q.   How do you know he would show it to you if you

9    asked him to?

10        A.   I've had this discussion with Steve Shadders,

11   the chief technology officer at nChain, and Steve has

12   said to me we're pretty confident Craig would do it if

13   we asked because, you know, Craig doesn't trust very

14   many people so we work together a lot.  I have never

15   asked him the question flat out so I don't know

16   100 percent he would say yes but I think he would.

17        Q.   How would he have access to the private keys

18   if they are -- let me take a step back.  Are you aware

19   that Craig has claimed the properties are locked in a

20   trust?

21             MR. RIVERO:  Sorry, you cut out and I could

22        not hear that question.

23   BY MR. FREEDMAN

24        Q.   Are you aware that Craig has claimed the

25   private keys to his Bitcoin are locked in a trust that

1    he cannot access?

2              MR. RIVERO:  Object to the form.

3              THE WITNESS:  I'm aware that he's claimed -- I

4         can't -- I am aware that in this case he's claimed

5         that he cannot access private keys to certain

6         Bitcoin and so yes, I'm aware of that.

7    BY MR. FREEDMAN

8         Q.   And how then would he demonstrate a proof for

9    you if you asked him to?

10        A.   Well --

11             MR. RIVERO:  Object to the form.  Go ahead.

12        Sorry, Mr. Nguyen.

13             THE WITNESS:  Probably why I've never asked

14        him.

15   BY MR. FREEDMAN

16        Q.   Has Craig ever explained the trust to you?

17        A.   Only in the context of this litigation.

18        Q.   What has he said?

19             MR. SILVERGLATE:  Wait a second.  If it's in

20        the context of the litigation then it's privileged.

21             MR. FREEDMAN:  Mr. Nguyen testified he has not

22        acted as a lawyer since late 2018 or 2017 I think

23        it is.  I don't have the date.

24             MR. SILVERGLATE:  Well --

25             MR. RIVERO:  I'll join the objection and the

1    instruction.

2        MR. FREEDMAN:  Actually I will actually say

3    that in this deposition Mr. Nguyen testified that

4    he is not a lawyer for Craig Wright.

5        MR. SILVERGLATE:  Right.  I'm not suggesting

6    that he is a lawyer for Craig Wright.  What I am

7    saying is that Mr. Nguyen has a joint interest

8    agreement with Craig Wright and he has also served

9    as Craig Wright's liaison to his counsel in the

10   litigation.

11       So he's part of the litigation team even

12   though he is not serving as a lawyer but a liaison.

13   So the conversation that you're inquiring about is

14   privileged both under the joint interest privilege

15   and under the attorney-client privilege.

16       MR. FREEDMAN:  What is the joint interest that

17   you're protecting?

18       MR. SILVERGLATE:  They both have a community

19   of interest and they have a signed agreement.

20       MR. FREEDMAN:  A signed agreement can't extend

21   the privilege, it just memorializes an existing

22   privilege under existing law.  I just want to -- I

23   understand you're instructing him not to answer and

24   I can't do anything about that but I need a record

25   of it so we can challenge it eventually.  What is

1   the joint interest that you are memorializing with

2   the joint common interest privilege?

3       MR. SILVERGLATE:  Well, I believe you're

4   misstating what my objection was.  So first of all,

5   I'm asserting two privileges.  One is

6   attorney-client privilege because Mr. Nguyen is on

7   the team.  He is on the defense team, Mr. Wright's

8   defense team, okay and because of that there is

9   also a community of interest which implicates the

10  joint interest agreement and joint interest

11  privilege.

12      MR. FREEDMAN:  What is Mr. Nguyen's capacity

13  on the -- I'll direct this to Mr. Nguyen and

14  obviously you can instruct him not to answer so I

15  don't need to tell you Mr. Nguyen take a second to

16  allow your lawyer to give an instruction team.

17  What is your capacity on the defense team?

18      MR. SILVERGLATE:  You can answer that, Jimmy.

19      THE WITNESS:  When the lawsuit first got filed

20  Craig asked me to assist him in both finding

21  counsel and helping to communicate with counsel

22  regarding his defense.

23      MR. RIVERO:  And I haven't interrupted the

24  question but Mr. Nguyen, obviously you have a

25  lawyer but I just ask you to be careful since there

```
1          are dates where you were counsel to nChain, dates

2          where there was this common interest.

3              Please refrain from testifying about anything

4          that would invade those privileges and I'll just

5          join as necessary, stay out of it.

6    BY MR. FREEDMAN

7      Q.   So you are not a lawyer on the defense team,

8    you are not providing legal advice; is that correct?

9      A.   Correct.  Basically how I would describe it is

10   I am his liaison with his lawyers because to help with

11   communication Craig is a difficult communicator on what

12   are complex topics here and he felt that he asked me to

13   do this because to help him because of the need to

14   communicate with his lawyers especially about dealing

15   with complex issues in this case.

16             MR. FREEDMAN:  Okay, so as I understand this

17         is directed to the lawyers you're asserting --

18         Mr. Rivero, you're asserting Craig's

19         attorney-client privilege through you because

20         Mr. Nguyen is the go between between you and the

21         client, is that an accurate assertion of your

22         privilege?

23             MR. RIVERO:  Can I hear the last question read

24         back?  Sorry, the last question where these

25         objections were actually posed?  It was probably a
```

1    couple questions ago.

2         (Thereupon, a portion of the record

3         was read back by the reporter.)

4         MR. RIVERO:  I am asserting on behalf of Craig

5    Wright his common interest privilege with

6    Mr. Nguyen.

7         MR. FREEDMAN:  What is the common interest

8    that's seeking to be protected?

9         MR. RIVERO:  I've now answered your question.

10   Please ask your next question.  Let's move on.

11        MR. FREEDMAN:  You're not answering what is

12   the common interest question for the record?

13        MR. RIVERO:  Sir, I've made an instruction.

14   Your -- my role is to state an objection or

15   instruction.  I think your role is to ask the next

16   question.  I think that's what you should do next.

17        MR. FREEDMAN:  You are declining to answer my

18   question, Mr. Rivero?

19        MR. RIVERO:  Sir, if you want to have a good

20   faith conference about this, sir, I've already told

21   you you can speak to me and I'll be glad to discuss

22   it.  We don't have to do it on the record, you know

23   that.  We already discussed this week so please

24   move on to your next question.

25        MR. FREEDMAN:  Mr. Rivero, respectfully your

1  client's breaches of protective orders or maybe at

2  this point alleged or perceived breaches of

3  protective order don't relate to this particular

4  instance here.

5       Mr. Rivero, you need to let me finish my

6  statement and then I'll give you an opportunity to

7  respond.

8       MR. RIVERO:  I didn't know you weren't

9  finished.  Go ahead.

10      MR. FREEDMAN:  I am simply trying to make a

11  record here so when we go back to the Court here we

12  have a clear record of what your position is and I

13  know what's happening.  So I'm only asking what is

14  the joint interest you're seeking to protect?

15      MR. RIVERO:  Mr. Freedman, it does not work

16  like that.  We make objections and instructions.

17  We don't litigate the objections or instructions.

18  Go ahead and ask your next question.  If you want

19  to discuss this after this deposition is over I'll

20  be glad to.  That's a good faith conference, sir.

21      At that time you'll identify to me what your

22  theory is why you get this answer.  Then I'll

23  respond to you in a good faith conference.  That's

24  how it works.  Go ahead, continue with your

25  deposition.

1            MR. FREEDMAN:  We'll agree to disagree on how

2       it works.  Mr. Silverglate, are you also asserting

3       a privilege to prevent the answer to this question

4       or is it identical to the privilege that's been

5       asserted by Mr. Rivero?

6            MR. SILVERGLATE:  I think I've already voiced

7       my objection.  It's we've raised two objections,

8       attorney-client privilege and joint interest

9       agreement and we're making both of those

10      objections.  I'm making them on behalf of this

11      witness, Mr. Nguyen.

12           MR. FREEDMAN:  Okay, whose attorney-client

13      privilege are you invoking?

14           MR. SILVERGLATE:  For this particular question

15      we're invoking Mr. Wright's attorney-client

16      privilege because Mr. Nguyen is on his defense

17      team.

18  BY MR. FREEDMAN

19      Q.   Okay.  Mr. Nguyen, when did you start in your

20  role as a liaison?

21      A.   When the lawsuit got filed.

22      Q.   Are you still in a role as a liaison?

23      A.   Yes.

24      Q.   Is there an agreement memorializing your

25  liaison, a written agreement memorializing this liaison

1  agreement?

2      A.   No, there is not a written agreement.   There

3  is an e-mail.

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████

7  ████████████████████████████████████████████████████

8  █████████████████████████████████████

9  ████████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 ███████████████████████████████████████████████████

12 █████████████████████████

13 ██████████████████████████████████████████

14 ███████████████████████

15        ████████████████████████████████

16     ██████████████████████████████████

17 BY MR. FREEDMAN

18      Q.   I'm going to share with you, Mr. Nguyen, a

19 document that you have shared with us pursuant to the

20 subpoena.  I'm going to go to the top of this agreement

21 so you can see it's Schedule A.  Why don't we go to the

22 top of the actual agreement itself and then we can look

23 at all of it.  It looks like it starts at approximately

24 Nguyen 1586.  Do you recognize this Contracted Services

25 Agreement?

1      A.   Yes.

2      Q.   That's your signature at the bottom?

3      A.   Yes.

4      Q.   Mr. Matthew's signature at the bottom?

5      A.   Yes.

6      Q.   This is the actual Contracted Services

7  Agreement and its terms.  Do you recognize this?

8      A.   Yes.

9      Q.   I'm going to scroll down.  At any point you

10  want me to stop let me know.  This is Schedule A;

11  correct?  Is this the Schedule A of that agreement,

12  Mr. Nguyen?

13      A.   Yes.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

20      Q.   Did you tell me when this agreement
21  terminated?
22      A.   I can't remember exact time.
23      Q.   The agreement continues until Nguyen 1597;
24  correct?
25      A.   Correct.

1        Q.    Mr. Nguyen, do you act as a liaison for anyone

2    else between them and their lawyers besides Craig

3    Wright?

4        A.    No.

5        Q.    Has your liaison role in this litigation been

6    continuous?

7        A.    Yes.

8        Q.    Were you acting as a liaison then to Rivero,

9    Mestre while we were attempting to serve process on you?

10            MR. SILVERGLATE:  Object to the form.

11            MR. RIVERO:  Join.

12            THE WITNESS:  I was acting as a liaison to

13       Craig.

14   BY MR. FREEDMAN

15       Q.    Between him and Rivero, Mestre?

16       A.    Yes.

17       Q.    Has Rivero, Mestre hired you or has Craig

18   engaged you in this task?

19            MR. RIVERO:  Object to the form.

20            THE WITNESS:  Craig.

21   BY MR. FREEDMAN

22       Q.    Does he pay you for this?

23       A.    No.

24       Q.    Can you walk me through without talking about

25   I'm sure your lawyers will make sure so just make a beat

```
 1   again but I think this is a permissible question.  Can
 2   you walk me through not the substance but the mechanics
 3   of how the liaisoning goes between you and Craig and his
 4   lawyers?
 5              MR. SILVERGLATE:  Obviously I'll object if
 6        it -- if you're asking for specific communications.
 7              MR. RIVERO:  Mr. Nguyen, I know you know this
 8        but there are occasions where the procedure could
 9        reveal confidences so answer to the extent you can
10        without revealing confidences.
11              THE WITNESS:  So just procedurally it began
12        with me being the person to help find Craig counsel
13        to represent him.  So I am the one that sought out
14        law firm options and helped Craig choose the
15        Rivero, Mestre firm which represents Craig, not me.
16              And then after that I was involved in
17        communications to -- between Craig and his lawyers
18        about subject matter in the case, helping
19        understand things and helping understand Craig I
20        guess most importantly because he is a difficult
21        communicator.
22   BY MR. FREEDMAN
23        Q.   So is the procedure Craig calls you and you
24   call Rivero, Mestre or is it procedure you all get on a
25   call together or how does it work?
```

1            MR. SILVERGLATE:  Hang on.  Andres, do you

2       feel like that implicates your strategy, your

3       defense strategy?

4            MR. RIVERO:  From my perspective I would allow

5       that question but Mr. Nguyen, you're on thin ice of

6       the whole situation but you can answer the

7       question.

8            THE WITNESS:  I would say it varied.  There

9       were times where sometimes Craig asked me to deal

10      with his lawyers about a particular topic.

11      Sometimes they asked me to interface with Craig on

12      a topic.  Sometimes it was all joint.

13 BY MR. FREEDMAN

14      Q.   Are these via e-mail?  So are there e-mail

15 communications from you to Craig and then without his

16 lawyers -- let's start there.  Are there e-mail

17 communications about litigation from you to Craig that

18 his lawyers are not on?

19      A.   I don't remember.

20      Q.   Are there e-mail communications between you

21 and Rivero, Mestre that Craig is not on?

22      A.   I think so.

23      Q.   Sorry?

24      A.   I think so.

25      Q.   Are there e-mails from Rivero, Mestre to Craig

1    and from Craig to Rivero, Mestre that you are on as

2    well?

3        A.    I have been on joint e-mails among them.   That

4    was the most common.

5        Q.    Do you have a stake in this litigation

6    Mr. Nguyen?

7        A.    No.

8        Q.    Can you be adversely affected by the outcome

9    of this litigation?

10       A.    I don't think so, no.

11   █████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ██████████████████████████████████████████

14   ██████████████████████████████████████████

15   ████████████████████████████████

16   ███████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ███████████████████████████████████████████

20   ███████████████████████████████████████████

21   ████████████████████████████.

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ███████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Q.    Okay.   So is there a document that formally

1  terminates this agreement?

2      A.   I'm not sure.

3      Q.   Do you have any time -- do you have any

4  document that terminates this agreement formally?

5      A.   Not that one.  I think as I said I think there

6  was an updated one.

7      Q.   I want to -- sorry, going to jump you back to

8  the liaison role.  I want to understand the bookends.  I

9  know the current bookend is in effect meaning you're

10 still acting in that role.  I want to go back what is

11 the date that role started?

12     A.   I don't remember the exact date.  It was after

13 Craig got -- after the lawsuit was filed.  I don't

14 remember if it was before or after he got served with

15 the lawsuit.

16     Q.   It's been -- I guess the first time -- would

17 it be fair the first time Craig reached out to you about

18 the lawsuit you immediately started in that liaison

19 role?

20     A.   Yes.

21     Q.   It was sometime around the filing of the

22 lawsuit?

23     A.   Correct.

24     Q.   Do you maintain any equity at all in nChain?

25     A.   No.

1        Q.   Do you have any financial interest that is in
2   any way connected to nChain?
3        A.   No.
4        Q.   Do you have any financial interest in Pi-High
5   Tech and PE Fund?
6        A.   No.
7        Q.   Who is Arthur Davis?
8        A.   Arthur Davis is a firm called Nuovo Capital
9   and he was brought on to help with the transaction.
10       Q.   What does Nuovo Capital do?
11       A.   I'm not certain.  Similar services from that
12   transaction they acted as financial advisor.
13       Q.   Does Nuovo Capital still maintain an active
14   interest in nChain companies, in the nChain companies?
15       A.   I don't know what you mean by active interest.
16   They don't do any work for nChain companies that I know
17   about.
18       Q.   Do they have any equity in nChain?
19       A.   Not that I know of.
20       Q.   Do they have any equity in Hi-tech Private
21   Equity Fund?
22       A.   Not that I know of.
23       Q.   Do you know whether Calvin Ayre has invested
24   in Hi-Tech Private Equity Fund?
25       A.   Not that I know of.

```
 1              (Plaintiff's Exhibit No. 8 was
 2              marked for identification.)
 3   BY MR. FREEDMAN
 4        Q.   Mr. Nguyen, you produced a document to us I am
 5   going to share it on the screen with you.  It is Nguyen
 6   4 and I think we're on Exhibit 8 and in this e-mail
 7   Arthur Davis is e-mailing you and Stefan Matthews on
 8   February 14th 2017 at 5:33 p.m.; correct?
 9        A.   That's what it says.
10        Q.   Then he opens the e-mail saying "Stefan, you
11   and are completely agreement to focus 100 percent of
12   closing the transaction."  Is this transaction the
13   acquisition of nChain's companies by Hi-Tech Private
14   Equity Fund?
15        A.   I assume that's what he was referring to.
16        Q.   Mr. Nguyen, did you review all the documents
17   you produced to us before they were produced?
18        A.   Yes.  I tried to.  I tried to review them,
19   yes.
20        Q.   They were collected from your computers?
21        A.   Correct.
22        Q.   They are accurate records of what was located
23   on your computers?
24        A.   Yes.
25        Q.   Who is Marco Bianchi?
```

1      A.   Marco it's Bianchi I think is how the name is

2   pronounced.

3      Q.   Thank you.

4      A.   He is principal at a firm called Stairway

5   Global some other words.  Just call it Stairway Global.

6      Q.   What was his involvement with the -- what was

7   his involvement with this transaction?

8      A.   Marco is a director of some of the nChain

9   companies.

10     Q.   Do you know why?

11     A.   No, I don't.  He was before I got involved.

12     Q.   Do you know what his role was with any of the

13  nChain companies?

14     A.   Like I said he is director of some of the

15  companies so he is one of the directors that I would

16  report to.

17     Q.   Does Craig Wright have any equity in nChain?

18     A.   Not that I know of.

19     Q.   Does Ramona Watts have any equity in nChain?

20     A.   I can tell you what I know as of the time I

21  was CEO and the answer to both of those questions is no.

22     Q.   Did they ever have equity in any nChain

23  companies?

24     A.   Not that I know of.

25     Q.   What about Hi-Tech Private Equity Fund?

1        A.    No.

2        Q.    What about the Workshop Holdings?

3        A.    Not that I know of.

4        Q.    What about Nuovo Capital?

5        A.    I don't know anything about the ownership

6    structure of Nuovo Capital.

7        Q.    Are you familiar with the company called

8    Squire Mining?

9        A.    Yes.

10   ████████████████████████████████████

11   ███████████████████████████████████████████

12   ████████████████████████████████████████

13   ██████████████

14   ████████████████████████████████████████████

15   ████████████████████████████████████████

16   ███████████████████████████████

17       Q.    Are you on the -- I apologize.  Hold on, give

18   me one second.  Nevermind.  Are you -- do you have a

19   position in Squire Mining?

20       A.    I was one of its advisory board members until

21   last month.

22       Q.    Was that a paid position?

23       A.    I have to look at the stock option.

24       Q.    Why did you step away from the advisory board?

25       A.    I stepped away because my new role as Bitcoin

1    Association president I'm responsible for, you know,

2    being a leader in the building of the whole business

3    ecosystem for Bitcoin SV around the world.  There were

4    concerns about whether in that role I would be perceived

5    to have conflicts of interest if I also had roles with

6    other key companies in the Bitcoin SV space and so I

7    resigned from that advisory board position as well as

8    some others.

9         Q.   Does Calvin Ayre own any interest in TAAL?

10        A.   He is a shareholder.

11        Q.   Do you know what percent his shareholding is?

12        A.   I don't know.

13        Q.   Does Craig Wright have any equity interest in

14   TAAL?

15        A.   I do not know that.

16        Q.   As the president of the Bitcoin Association --

17   sorry, you are the president of the Bitcoin Association?

18        A.   Yes.

19        Q.   Is that position paid?

20        A.   Yes.

21   ███████████████████████████████████████████████

22   ████████████████████████████████

23   ███████████████████

24   ████████████████████

25      ███████████████████████████████████████████



1  ████████████████████████████t
2  ███████████████████████
3  █████████
4  ██████████████████████
5  █████████████████████████
6  ██████████████████████
7  ██████████████████████
8  ████
9  ███████████████████████
10 ██████████████████████
11 █████████████████████
12 ███████
13 ███████████████████████
14 ███████████████████
15 █████████████████████████
16 ████████████████████████
17 ██████████████████████
18 ██████
19 ████████
20 █████████████████████████
21 ███████
22 ██████

23        Q.   Do you currently have any other jobs or is

24   that your full time position?

25        A.   This is it.  Full time.  More than a full time

1   job.

2        Q.   Is there a difference between the Bitcoin

3   Association and the B Com Association?

4        A.   It's the same thing.  We rebranded the name B

5   Com to Bitcoin Association.

6        Q.   Do you know what Calais Holdings is?

7        A.   No.

8        Q.   Have you ever heard of Calais Holdings?

9        A.   Don't think so.

10       Q.   Have you ever heard of the Sterling Group?

11       A.   I've heard of Sterling.  I don't know that

12   I've ever heard it referred to as Sterling Group.

13       Q.   What is Sterling?

14       A.   I'm not sure.

15       Q.   Do you know anything about it other than that

16   you've heard of it?

17       A.   I've heard of it.  I've seen it somewhere.  I

18   don't know.  About it.

19       Q.   Before you left nChain as CEO was it making

20   any revenue?

21       A.   Very little.

22       Q.   About how much?

23       A.   I don't recall.  I only know of -- I think it

24   had received about 500,000 I don't know if it was

25   British pounds in revenue from a source before you left.

1          Q.    That was for licensing of technology?

2          A.    It was for under an agreement to help another

3    company build a more secure Bitcoin wallet.

4          Q.    Could you explain to me what nChain's purpose

5    was?

6          A.    Not sure I know how to answer that question.

7          Q.    Like every company has like a goal or mission

8    statement.  What was nChain's?

9          A.    At what point in time?

10         Q.    Why don't you start from when you joined until

11   you left if it ever changed let me know.

12         A.    That's a difficult question to answer because

13   when I first joined nChain I think the mission was not

14   that clear.  That was part of my task trying to help

15   bring clarity to it.  When I joined nChain it was set up

16   to research and development work, build an IP program,

17   to basically based upon Bitcoin block chain technology.

18   What to do with that next became less clear.  I would

19   say today from what I understand of nChain that it's

20   more clearly focused on enterprise level solutions and

21   services that want to provide the enterprises to build

22   block chain technology innovations and particular now

23   focus on Bitcoin SV chain as the scalable big block

24   Bitcoin which did not exist when I first joined nChain.

25              There was no split of the Bitcoin chain over

1    time.  That's why the purpose of nChain has evolved over
2    time given what's in the Bitcoin network.
3         Q.   So would it be fair to say when you were first
4    brought on board nChain it was sitting on this massive
5    pot of intellectual property it had a required from the
6    DeMorgan Group and you were tasked with essentially
7    commercializing that asset?
8         A.   I would not describe it that way.
9         Q.   How would you describe it?
10        A.   First I would not say that nChain was sitting
11   on this pot of IP from the DeMorgan Group that could be
12   monetized.
13        Q.   Well, had -- why don't we break that down into
14   it parts.  Had nChain acquired -- when you were brought
15   on board did you believe that nChain had been
16   acquired -- sorry, let me restart that question.  Strike
17   that.
18             When you were brought on board to nChain did
19   you understand and believe that nChain had acquired
20   significant intellectual property assets from the
21   DeMorgan Group?
22        A.   I would say I knew they acquired assets from
23   the DeMorgan Group.  I could not say they were
24   significant IP assets.
25        Q.   So then your task was to review those

1  intellectual property assets and determine how to

2  commercialize them?

3      A.   No.

4      Q.   What was your task?

5      A.   My task was to get involved with the new IP

6  program that nChain was developing and figuring out how

7  to commercial those new IP assets in the nChain

8  agreement.

9      Q.   So then you had absolutely nothing to do with

10  intellectual property that was acquired from the

11  DeMorgan Group?

12      A.   I just answered no.  I don't know what you

13  mean by nothing to do with intellectual property

14  acquired from the DeMorgan Group.

15      Q.   Well, if nChain -- is it your testimony that

16  nChain did not develop any intellectual that it obtained

17  from the DeMorgan Group?

18      A.   I can't answer that question because I never

19  reviewed in detail the assets that were acquired from

20  DeMorgan.

21      Q.   Do you know how much money Rob MacGregor paid

22  to purchase those assets from the DeMorgan Group?

23      A.   No.

24      Q.   Did you ever get the intellectual property

25  from -- that was purchased from The DeMorgan Group

1    valuated or appraised?

2         A.    From the DeMorgan Group?

3         Q.    "Uh-uh."  So you never got an evaluation of

4    intellectual property assets nChain had acquired from

5    The DeMorgan Group?

6         A.    I was not involved in The DeMorgan Group

7    transaction.  So I was not involved.

8         Q.    I'm not talking about the time of the

9    transaction.  I'm saying at some point in time you

10   became the CEO of nChain and even before that you were

11   tasked with commercializing nChain's IP and I am trying

12   to figure out whether or not you have ever and I think I

13   know the answer to this because I think I've seen copies

14   of it whether you had ever obtained or reviewed an

15   appraisal of the intellectual property that resulted

16   from -- that was obtained from The DeMorgan Group?

17        A.    So the way you phrased the question.  So I

18   have never tried to get a valuation or analysis of the

19   IP -- the value of the IP assets from the DeMorgan Group

20   of companies.  I have been involved with looking at

21   valuation of nChain's IP assets which were newly created

22   after the DeMorgan transaction.

23        Q.    Did the assets that you had evaluated at

24   nChain include assets that had been received from the

25   DeMorgan Group?

1      A.   I'll tell you what was valuated was looking at

2   the patent program that was being developed at nChain

3   which did not start until after the DeMorgan Group

4   transaction.

5      Q.   Were any of the patents that were in the

6   patent portfolio of nChain focused on intellectual

7   property obtained from the DeMorgan Group?

8      A.   I don't know.

9      Q.   Never looked at that as CEO of the company and

10  former IP lawyer?

11     A.   First of all, the patent program was started

12  before I got to nChain and was going.  That's just a

13  difficult question to answer anyway.

14     Q.   Why?

15     A.   Well, you have to look at each individual

16  patent application and go back and compare it to

17  anything the DeMorgan Group had done to be able to

18  answer that question.

19     Q.   You never conducted that analysis?

20     A.   No.

21     Q.   Are you aware of whether or not lawyers have

22  opined on whether -- where certain intellectual

23  property -- strike that.  Are you aware of whether

24  lawyers have opined on whether or not certain IP or

25  intellectual property currently owned by nChain was

1    sourced from DeMorgan?

2        A.   I don't know that one can answer that without

3    getting into questions.  Not even about this litigation,

4    about -- I can't remember if it violates the legal

5    advice I ever gave in my role.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



23    Q.    When did you first meet Craig Wright?

24    A.    Not sure of the year.  Probably around 2007.

25    Q.    I said Craig Wright.

1      A.   Oh, sorry, I thought you said Rob MacGregor.

2   When did I first meet Craig Wright, 2016.

3      Q.   Do you remember when in 2016?

4      A.   I believe it was in September.

5      Q.   Do you remember the circumstances of that

6   meeting?

7      A.   Yes.  After I -- it was clear I don't know if

8   I had signed the contract yet but after it was clear I

9   was going to start working with nChain I went to London

10  for some meetings and Stefan introduced me to Craig.

11     Q.   Do you remember what you talked about in that

12  initial conversation with Craig?

13     A.   We had dinner and I don't have any memory of

14  what we talked about other than trying to get to know

15  each other.

16     Q.   Did Craig ever mention Satoshi Nakamoto to

17  you?

18     A.   I guess I don't know how to answer that.  Had

19  he ever used that phrase Satoshi Nakamoto with me?

20     Q.   I'm trying to figure out.  Let me take a step

21  back.  You were aware before meeting him he claimed to

22  be Satoshi Nakamoto?

23     A.   Yes.

24     Q.   Who told you initially that they believed he

25  was Satoshi Nakamoto?

1        A.    Rob MacGregor.

2        Q.    When was that?

3        A.    The year before this so sometime in the summer

4   of 2015.

5        Q.    Did you ask Rob MacGregor how he knew that,

6   why he knew that, what his proof was?

7        A.    I didn't ask him all those questions.  We had

8   a conversation about it.

9        Q.    What did he say?

10       A.    He said I think I found Satoshi Nakamoto.

11       Q.    You knew who that was at the time?

12       A.    The name didn't immediately trigger my memory.

13   I had seen the name in the past about Bitcoin but my

14   first response was who.  He said you know, the creator

15   of Bitcoin.  I said oh, yes, that's right.

16       Q.    And then in September of 2016 you come to

17   meet -- let me take a step back.  Going to meet Craig in

18   September 2016 did you have an opinion one way or

19   another whether he was or was not Satoshi Nakamoto?

20       A.    No.

21       Q.    So you come to meet the individual who is

22   claiming to be Satoshi Nakamoto who your long time

23   client thought was Satoshi and trying to figure out

24   whether -- so you're Satoshi Nakamoto how did that work?

25       A.    Not in that first time I met him.

1      Q.   Do you remember the first time you had a

2  discussion with Craig about him -- his Satoshiness?

3      A.   It wasn't for a long time after that.

4      Q.   Do you remember the context of that setting?

5      A.   No, I don't.  I mean it's obviously a topic

6  that comes up a lot in my world with lots of people so I

7  don't remember the first time I spoke with Craig about

8  it.

9      Q.   I would imagine something you kind of needed

10  to know about because you were taking a leading role in

11  nChain or like it or not it was a big feature of nChain;

12  right?

13      A.   The answer to that is I needed to know about

14  it but I didn't need to know for myself as I explained

15  earlier.  I made a decision personally that I would be

16  willing to do this opportunity whether it was true or

17  not.

18      Q.   When you eventually got on to the topic of

19  Craig being Satoshi Nakamoto what did he say?

20      A.   I'm trying to remember how the first time I

21  even talked to him about it.

22      Q.   I mean would say tell me the story, did you

23  never say tell me your story?

24      A.   I know you might think I would but you know

25  it's a sensitive topic.  Obviously specially after that

1    year with the potential reveal and I at the time thought

2    you know what, I'm not going to ask about it now.

3        Q.   That's fair.  So when eventually he got to

4    know you well enough and you got to know him well enough

5    when it came up what did he say?

6        A.   Not really how it happened.  It's not like one

7    day I asked tell me whether you're Satoshi or not.  It

8    was part of general conversations and communications we

9    had at the company about him being Satoshi.

10        Q.   Tell me what you remember him telling you.

11    Like tell me the narrative he told you.

12        A.   I don't think I -- he's told me a number of

13    times he is Satoshi Nakamoto, the creator of Bitcoin.  I

14    don't think he ever -- he told me any details about the

15    story until gosh it might have been in maybe in 2018 we

16    did like an interview at one of the Coin Geek

17    conferences, G-E-E-K, conferences where he was going to

18    talk about it for the first time publicly with me and I

19    think that's the first time I went into any detail with

20    him about the story.

21        Q.   What did he tell you in that preparation

22    session?

23        A.   It wasn't a preparation session.

24        Q.   So you took -- let me ask it.  Did you not

25    prepare for that interview?

1          A.    I came up with some sample questions and sent

2     them to him.  We did not -- I sent him a list of sample

3     questions to make sure he was comfortable talking about

4     them but we did not meet or rehearse or go over any of

5     them beyond him saying I'm comfortable answering these

6     questions.

7          Q.    And until that Coin Geek conference you never

8     discussed him becoming Satoshi or being Satoshi?

9          A.    I can't say we never discussed it.  I just

10    don't have any memory of the conversation where we went

11    into any detail about the story of, you know, how he

12    created Bitcoin or why.  I think little bits of it would

13    come out in regular communication such as when -- it

14    became more of a work function.

15          For example, when we would talk about why does

16    nChain need support, you know, the big block position in

17    Bitcoin why is it so important that we oppose this thing

18    at this time called Segregated Witness that the Bitcoin

19    core people were going to add to Bitcoin which we

20    thought was going to change Bitcoin and not make it no

21    longer Bitcoin and be detrimental.

22          The topic of -- would come up where he would

23    say well, that would change what I created.  That's no

24    longer a Bitcoin and he might sometimes talk about

25    things he did at the beginning and why certain parts of

1    the technical design of Bitcoin are there.  It came up

2    more in that context as -- than going through all the

3    details.

4         Q.   Did he ever talk about -- when he was talking

5    to you about the things he did at the beginning of

6    Bitcoin did he discuss specifics of what he did?

7         A.   Not really until that interview I did of him

8    at Coin Geek Toronto.

9         Q.   Prior to that Coin Geek interview in Toronto

10   did Craig ever mention Dave Kleiman?

11        A.   I think I heard the name before but I didn't

12   know that much about their relationship.

13        Q.   Did you ever ask Craig whether he was Satoshi

14   alone or whether there was a team of people involved?

15        A.   I didn't ask it that way.

16        Q.   How did you ask it?

17        A.   I think I asked him if he had help.

18        Q.   What did he answer?

19        A.   He said "I was the primary creator but some

20   people helped me."

21        Q.   Did you ask him who?

22        A.   I don't remember if I did at the time.

23        Q.   Did you ever ask him how they helped?

24        A.   I don't remember.

25        Q.   Were you involved in preparing Craig for any

1    of the media prep sessions that led up to his 2016

2    reveal?

3        A.   No.

4        Q.   Are you aware that there were media prep

5    sessions?

6        A.   I am aware now.

7        Q.   Did you ever review any of the transcripts

8    that were taken during those media prep sessions?

9        A.   No.

10       Q.   I'll represent to you that in those

11   transcripts Craig gives a lot of credit to Dave Kleiman

12   for --

13            MR. RIVERO:  Sorry?

14   BY MR. FREEDMAN

15       Q.   A lot of credit to Dave Kleiman for helping

16   him create Bitcoin and I am surprised to hear that you

17   don't recall hearing Dave Kleiman's name prior to that

18   date although you said you recall hearing it but not

19   prominently.  So I guess my question is can you think

20   hard and recall what it was he said about Dave Kleiman

21   that causes you to remember the name?

22            MR. RIVERO:  Objection to the form.

23            THE WITNESS:  That's a hard -- I don't even

24       know how to answer that question.  I'm not sure I

25       even heard of Dave Kleiman first from Craig.

```
 1   BY MR. FREEDMAN
 2        Q.   Did you ever hear about Dave Kleiman from
 3   Craig?
 4        A.   From Craig?
 5        Q.   Yes.
 6        A.   Yes, at different points in time, yes.
 7        Q.   What did he say?
 8        A.   Well, some of it I learned in the context of
 9   this litigation so I'm sure my lawyer would tell me not
10   to talk about that.
11        Q.   I'm sure he will.  Why don't we hear that
12   instruction from the lawyer.
13             MR. SILVERGLATE:  You're instructed not to
14        talk about things you learned during the course of
15        the litigation that are privileged but outside of
16        that you can answer the question.
17             MR. RIVERO:  Join.
18             THE WITNESS:  Well, in sum he told me that
19        Dave was a very good friend of his.  Probably his
20        best friend.  He doesn't have a lot of close
21        friends and that Dave was one of the few people who
22        he felt close to and that he told me some of Dave's
23        life story I think at one point that he was -- that
24        Dave would tell Craig he was very ill at the end
25        before Dave died and that Craig was very hurt and
```

1          sad when he found out that Dave died and that he

2          had helped him with Bitcoin.  I think he said at

3          one point he helped Craig edit the white paper of

4          Bitcoin and trying to think if there was anything

5          else.  That's the gist of it.

6     BY MR. FREEDMAN

7          Q.   Did he ever refer to Dave Kleiman as his

8     partner?

9          A.   No.  Not to me.

10         Q.   You have a very clear recollection he never

11    referred to Dave Kleiman as his partner?

12              MR. RIVERO:  Object to the form.

13              THE WITNESS:  I have never heard him use that

14         word with almost anybody.

15    BY MR. FREEDMAN

16         Q.   Did you ever ask Craig how much Bitcoin he

17    mined as Satoshi and again given your lawyer's

18    instruction that will stay outside -- obviously without

19    prejudice to my right to get this later but I understand

20    the instruction you've been given so for purposes of the

21    deposition stay outside your liaison role?

22         A.   No, I never asked the question.

23         Q.   Did he ever tell you how much he mined?

24         A.   No.

25         Q.   When you had that Coin Geek conference where

1  you hosted an interview of Craig about him being Satoshi

2  what was that date?

3      A.   It was sometime in 2018.

4      Q.   Had the lawsuit already been filed?

5      A.   Yes.

6      Q.   So you put Craig on a public stage, asked him

7  about Dave Kleiman's participation in the Bitcoin and

8  you had absolutely no preparation sessions with him

9  about that?

10     A.   That is correct.

11     Q.   Did anybody have preparation sessions with him

12  about it?

13     A.   Not that I know of.  Not how Craig works.

14     Q.   Did you think that was advisable?

15     A.   I told him we should be aware of what he said

16  publicly.  It would be viewed by opposing counsel.

17     Q.   So there was --

18     A.   I didn't have a session with him to prepare

19  what he would say.

20     Q.   But you admonished him to be careful?

21     A.   Yes.

22     Q.   Which is --

23     A.   Not the right word.  I obviously said, you

24  know, be aware that not just in that interview, anything

25  he says publicly, right, could be reviewed and since

1   that was a first big effort time where he sat down and

2   talked about the creation of Bitcoin, you know, I want

3   him to be extra mindful.

4        Q.   Perfectly reasonable thing to do.  Did -- what

5   did he say?

6        A.   What do you mean what did he say?

7        Q.   When you told him be careful because opposing

8   counsel can review what's being said and he just said

9   okay?  Did he comment?  Did he not respond?  What was

10  his response?

11            MR. SILVERGLATE:  Objection, it calls for a

12       privilege.

13            MR. RIVERO:  Join.

14  BY MR. FREEDMAN

15       Q.   Did Craig Wright ever tell you that Dave

16  Kleiman was not his partner?

17            MR. SILVERGLATE:  Outside the scope of the

18       privilege, Jimmy.

19            THE WITNESS:  I can't answer the question.

20  BY MR. FREEDMAN

21       Q.   Just so it's clear while obviously I want to

22  know all the answers within that scope and your lawyers

23  and I don't see eye to eye on that you've been

24  instructed not to answer so you should assume for all of

25  my questions that you are not -- unless you are

1    instructed otherwise by your lawyer you are not to give

2    me answers for that time period, okay?  We already have

3    a record that you're not going to answer anything so

4    don't want to waste our time to ask questions that

5    you'll be instructed.

6              In the media sessions that I referenced

7    earlier there are notes from the PR company about how to

8    alter the tone of the message or tweak the message

9    that's being given to make Craig more of a central focus

10   of the Satoshi Nakamoto team or the driving force behind

11   it.  Was that concern carried over into your tenor at

12   nChain?

13        A.   I'm not familiar with the notes you're talking

14   about.  I have never seen them.

15        Q.   So then let's -- let me rephrase that

16   question.  During your time at nChain was there a

17   concern about making sure Craig spoke very prominently

18   about his contribution to being Satoshi as opposed to

19   giving credit out to anyone else?

20        A.   No.

21        Q.   Did you see that Craig had a tendency to give

22   credit to other people when he talked about Satoshi --

23   about being Satoshi?

24        A.   I saw that he would acknowledge people often.

25   From what I've seen in his public statements were fairly

1   consistent about that.

2        Q.   Do you believe that Dave Kleiman participated

3   in Bitcoin's early days?

4        A.   I don't have any basis to answer that.

5        Q.   Do you think that a lot of people will

6   acknowledge that?

7             MR. SILVERGLATE:  Object to the form.

8             MR. RIVERO:  Objection to the form.

9             THE WITNESS:  I can't speculate on what people

10            would acknowledge.

11            (Plaintiff's Exhibit No. 9 was

12            marked for identification.)

13   BY MR. FREEDMAN

14        Q.   I am going to share with you Mr. Nguyen a news

15   article.  I think we're going to be marking now as

16   Exhibit 9.  You see that article and let me scroll to

17   the top for you.  It's an interview with you conducted

18   by Finance Magnates and it was about April 9th of 2019.

19   Do you see that?

20        A.   Yes.

21        Q.   Do you remember giving this interview?

22        A.   Like I said I give a lot of interviews.  I

23   remember this happened but I don't remember the actual

24   interview itself but I remember it happened.

25        Q.   I want to point you to this quote where the

1   reporter -- can you read it for the record?  Can you

2   read this quote for the record?

3       A.   "And more importantly if you look at the Court

4   order even though Craig disagrees with it, the Judge

5   decided to find that Craig was in a partnership with

6   Dave Kleiman.  A lot of people, even if they are

7   detractors of Craig will acknowledge that Dave was a

8   good person who participated in Bitcoin's early days."

9       Q.   Do you remember giving that quote?

10      A.   I don't remember saying it but it it's there

11  and that's what it says.

12      Q.   Do you doubt that you said it?

13      A.   I don't have any reason to doubt it.

14      Q.   So do you think you can agree with this

15  statement that a lot of people acknowledge that Dave

16  participated in Bitcoin's early days?

17      A.   From what I hear I think what I was

18  referencing there I rely on looking at the Bitcoin block

19  chain industry and there are people who believe Dave

20  Kleiman participated in the -- in helping Craig with

21  Bitcoin.

22      Q.   Again outside of your role as a liaison did

23  Craig ever tell you that he mined Bitcoin with Dave

24  Kleiman?

25           MR. RIVERO:  Objection, asked and answered.

1          THE WITNESS:  Well, I can answer he's never

2       told me that.

3   BY MR. FREEDMAN

4       Q.   I'm not sure if you're including the time you

5   were as a liaison there but I think your lawyers will

6   let you answer the question.  I just want to be clear as

7   the timeframe you gave that answer for.

8          MR. RIVERO:  Let me just be clear from our

9       perspective Mr. Nguyen, which we already talked

10      about we're instructing you not to answer in that

11      time period at all so just be careful.  That's the

12      instruction.

13         THE WITNESS:  No, he's never told me that.

14  BY MR. FREEDMAN

15      Q.   When you gave your answer before when you were

16  limiting it to the permissible timeframe let's say?

17      A.   I guess I wasn't thinking about the timeframe.

18         MR. SILVERGLATE:  Well, we'll move to strike

19      his testimony if it was within the impermissible

20      timeframe.

21         MR. FREEDMAN:  Why don't we just get a clear

22      answer whether it was or wasn't.  Was it in the --

23      did your answer include the impermissible

24      timeframe?

25         THE WITNESS:  I didn't think about it so --

1          MR. RIVERO:  You know what it is a negative --
2      I don't want to have an argument about this later
3      on.  So if it's a negative it's a negative.
4          THE WITNESS:  I don't recall any time.
5          MR. RIVERO:  Exactly.
6  BY MR. FREEDMAN
7      Q.   Let's stay within the timeframe that you're
8  permitted to talk about.  Did he -- did he ever tell you
9  that they did not mine Bitcoin together?
10         MR. RIVERO:  Object to the form.
11         THE WITNESS:  I think to the time period which
12     is covered by the privilege.
13  BY MR. FREEDMAN
14     Q.   No, just asking outside of that timeframe did
15  he ever tell you "I did not mine Bitcoin with Dave
16  Kleiman?"
17     A.   I don't think so.
18     Q.   Did Craig ever tell you within the permissible
19  timeframe that he was holding backup files for Dave
20  Kleiman?
21     A.   No.
22     Q.   When is the first time you heard of W&K Info
23  Defense Research?
24     A.   After this lawsuit was filed.
25     Q.   So it's safe to say Craig never mentioned W&K

1    prior to this lawsuit?

2        A.   That's correct.

3        Q.   You don't recall ever seeing W&K in any

4    documents you reviewed prior to this document?

5        A.   I do not recall seeing it before.

6        Q.   You don't recall any documents showing

7    potential concerns over ownership of intellectual

8    property vis a vis nChain because of W&K?

9        A.   I don't recall that.

10       Q.   Has Craig ever expressed a concern to you

11   about having to pay taxes on his Bitcoin?

12       A.   He's not expressed a concern to me about that.

13       Q.   Has he ever talked to you about strategically

14   deploying his Bitcoin so as to avoid taxation?

15       A.   No.  He has not said that.

16       Q.   Has he ever expressed a desire to become

17   Antiguan before he accesses his Bitcoin in order to

18   avoid a taxable event?

19       A.   He's never said that to me.

20       Q.   Has he ever expressed any kind of tax planning

21   statement around accessing Bitcoin?

22       A.   I have heard him generally say he needed to

23   deal with paying tax on Bitcoin when his family accesses

24   it one day.  That's pretty much all I know.

25            MR. FREEDMAN:  I think this is a good place

1   for me to stop.  We're close enough to 12:00 your

2   time that we had talked about having a lunch break.

3   So if that works.  Do we want to take like an hour

4   20 and then come back on the record?

5        MR. SILVERGLATE:  I am not sure we even need

6   that much time do you Andres or Jimmy?

7        MR. RIVERO:  No.  It may be Amanda when we

8   resume but I don't think we need an hour 20.

9        MR. SILVERGLATE:  Want to say an hour?

10       MR. FREEDMAN:  I need the hour 20.  I will --

11  if you want I think there's an e-mail chain with

12  all of us on it if we can finish up earlier but I

13  need an hour 20.

14       MR. SILVERGLATE:  Any idea when you intend to

15  complete the deposition?

16       MR. FREEDMAN:  I've got to go back through my

17  notes see how your instruction has altered the

18  timeframe.  So let me figure that out and hopefully

19  when we get back I'll have a better sense of that.

20       MR. SILVERGLATE:  Okay.  Before we break I'm

21  going to join in designating the deposition as

22  confidential.

23       MR. FREEDMAN:  Okay.  You have a copy of the

24  protective order, there's timeframes you have to

25  de-designate and that sort of thing.  Great.  So

1        thank you all see you back in about an hour 20.

2        I'm terrible with math so 3:20 about?

3             THE VIDEOGRAPHER:  Going off the video record

4        the time is 2:50 p.m.

5             MR. SILVERGLATE:  4:20.

6             MR. FREEDMAN:  I gave the caveat I am terrible

7        at math.  I wish I wouldn't have said it on the

8        record because now I look like an idiot.  It is

9        what it is.  4:20 it is.  Thank you everyone.  See

10       you soon.

11            (Thereupon, a brief recess was taken.)

12            THE VIDEOGRAPHER:  We are back on the video

13       record.  The time is 4:26 p.m.

14  BY MR. FREEDMAN

15       Q.   Good afternoon, Mr. Nguyen, I hope your lunch

16  was nice.  That was a little broken up but I don't know

17  if it was your connection or can you try to speak one

18  more time?

19       A.   Yes, thank you.

20       Q.   I want to spend a little bit more time

21  unpacking your liaison role.  So cautionary word of

22  caution wait a minute before -- after I ask my question

23  allow Spencer and Mr. Rivero to object if they feel

24  necessary.  Is there a joint defense agreement that you

25  are a party to?

```
 1        A.   Yes.
 2        Q.   What is the date of that joint defense
 3   agreement?
 4        A.   There are two.
 5        Q.   Sorry, I can't hear you.
 6        A.   There are two.  I'm individually a party to is
 7   the signed one in April of 2020.
 8        Q.   So both joint defense agreements were signed
 9   in April of 2020?
10        A.   No.  There is a joint defense agreement --
11   Spencer I'm assuming I can answer the question.
12             MR. SILVERGLATE:  You can describe the other
13        joint defense agreement, Jimmy.
14             THE WITNESS:  This is the first joint defense
15        agreement is between nChain and Craig Wright.
16   BY MR. FREEDMAN
17        Q.   What is the date of that agreement?
18        A.   I don't remember the exact date.  I don't have
19   a copy of it.  It would have been executed shortly after
20   the lawsuit was filed after outside counsel was selected
21   so early on in the case in 2018.
22        Q.   And are you a party to that individually?
23        A.   That I'm not a party to individually.
24        Q.   There is a second joint defense agreement.
25   What is the date on that one?
```

1      A.    I don't know it has a specific date.   It's

2    signed in April 2020.

3      Q.    That's between you personally and who?

4      A.    Between Craig Wright, nChain and me

5    personally.

6      Q.    Did an amendment of the original or is it a

7    brand new defense agreement?

8      A.    Second joint defense agreement.   Not an

9    amendment.   It's not called a joint defense agreement

10   it's called interest agreement or common interest

11   agreement.

12     Q.    So the joint defense agreement from early 2018

13   between nChain and Craig Wright what is the basis of

14   that joint defense agreement?

15     A.    I guess I'm not sure I understand the

16   question.

17     Q.    What is the joint interest that is seeking to

18   be protected?

19     A.    I don't have the agreement in front of me.   I

20   know it discusses that.   I can tell you assuming Spencer

21   is allowing me to answer the question.   Can I answer the

22   question?

23          MR. SILVERGLATE:   You can answer, yes.

24          THE WITNESS:   The general feeling at the time

25      was -- at the time I was nChain's CEO we heard the

1          lawsuit was filed.  We knew the lawsuit was against

2          Craig personally but the lawsuit I believe reading

3          the complaint asserted claims to an interest in any

4          intellectual property.  I don't know how it was

5          phrased but from or created by Craig in connection

6          with Bitcoin.

7               We believed there was a chance that the

8          Kleiman estate which you represent would either

9          assert claims directly or indirectly against nChain

10         or any of its assets and since Craig was an

11         employee of nChain and chief scientist we felt it

12         appropriate to enter into the agreement.  NChain or

13         any of its (inaudible) implicated whether it got

14         sued directly or not.

15    BY MR. FREEDMAN

16         Q.   What is the basis or what is the common

17    interest seeking to be protected in the new April 2020

18    agreement?

19         A.   Again I don't have it in front of me so I know

20    there's a description of it in there.  I would say

21    generally the -- I guess I have to be careful not to

22    disclose privileged communications here but in general I

23    left my role with nChain in March of 2020 just last year

24    so my dealings and communications with respect to the

25    lawsuit while I was at nChain would have been covered

1    under the first joint interest agreement between nChain

2    and Craig and now that I am not with nChain any more

3    because the knowledge I have that relates to nChain

4    lawsuit is obviously being examined in this case I

5    thought it was appropriate to enter into a second

6    agreement to add to the first one to cover going forward

7    Craig Wright, nChain and me individually.

8         Q.   What is your specific interest in this

9    litigation that aligns with nChain and Craig Wright?

10        A.   I don't have a -- Spencer, can I answer this

11   question?

12             MR. SILVERGLATE:  Well, I would say -- so I've

13        already asserted what the interest is when you

14        asked me the question and I've already explained he

15        is a liaison to Craig in the litigation.  So that's

16        the interest.  If Jimmy wants to expand on that

17        that's fine but we've already plowed that ground I

18        think.

19   BY MR. FREEDMAN

20        Q.   Do you have anything to add to that,

21   Mr. Nguyen?

22        A.   Not at this time.

23        Q.   Are you aware of communications between Craig

24   and nChain that are subject to the joint defense

25   agreement?

```
 1          A.    I'm not sure how to answer that question.

 2     Obviously an employee of nChain as well as a separate

 3     individual capacity.

 4          Q.    So in your role as a liaison did you ever do

 5     your -- did you ever liaise in person?

 6          A.    Yes.

 7          Q.    Did you ever liaise through e-mail?

 8          A.    Yes.

 9          Q.    Did you ever liaise through text messages?

10          A.    Yes.

11          Q.    Did you ever liaise in any other form of

12     communication?

13          A.    I think that covers most of it.

14          Q.    Does Craig have access to his nChain e-mail

15     account?

16          A.    I can't answer that question.  I don't know.

17          Q.    While you were CEO did Craig have access to

18     his nChain e-mail account?

19          A.    I would assume so, yes.

20          Q.    Did you get e-mails from him from his nChain

21     e-mail account while you were CEO?

22          A.    Yes.

23          Q.    Have you recently received an e-mail from

24     Craig from his nChain e-mail account?

25          A.    Probably.  I haven't had that many e-mails
```

1    with Craig but yes, probably.

2         Q.   In your role as liaison did you assist in the

3    collection of documents in this litigation?

4         A.   No.  You mean for Craig?  No.

5         Q.   Prior to -- I think your testimony earlier was

6    you began liaising before Rivero, Mestre was hired; is

7    that correct?  Sorry, I didn't hear the answer.

8         A.   That is correct.

9         Q.   I think there might be something up with your

10   mic if you can just project a little louder.

11        A.   That is correct.  Again liaising with Craig

12   before Rivero, Mestre was engaged to represent him.

13        Q.   So I'm not sure what your lawyer is going to

14   do here but pause a second allow Spencer.  Prior to

15   Rivero, Mestre being retained did you discuss this

16   lawsuit with Dr. Wright?

17             MR. SILVERGLATE:  So the answer to that

18        question is yes or no.

19             THE WITNESS:  Yes.

20   BY MR. FREEDMAN

21        Q.   And pause again, what were the substance of

22   those communications?

23             MR. SILVERGLATE:  Objection, instruct him not

24        to answer, it's privileged.

25             MR. RIVERO:  Join.

```
 1   BY MR. FREEDMAN

 2        Q.   Again I'm going to ask you to give your lawyer

 3   a chance I'm not sure how they're going to come out on

 4   this.  Did you ever discuss your subpoena with Rivero,

 5   Mestre?

 6             MR. SILVERGLATE:  Objection.  Don't answer,

 7        it's privileged.

 8             MR. FREEDMAN:  Based on that instruction I'm

 9        going to skip all the subsets of that.

10   BY MR. FREEDMAN

11        Q.   When did you first find out you had been

12   subpoenaed or attempted to be subpoenaed in this

13   litigation?

14        A.   I found out through counsel.

15        Q.   Who are you referring to when you say counsel?

16        A.   I found out not through my counsel, through

17   Craig's counsel.

18        Q.   Do you recall the date?

19        A.   I don't know the exact date.  It would have

20   been in --

21             MR. SILVERGLATE:  Stop Jimmy, stop.  I believe

22        that this is privileged.  It's your communications

23        with Craig's counsel so it's subject both to the

24        joint interest agreement and to the attorney-client

25        privilege.  So I'm going to assert the privilege
```

1       here.

2   BY MR. FREEDMAN

3       Q.   Besides Rivero, Mestre that you've identified

4   as part of your liaising duties do you liaise with any

5   other lawyers for Craig Wright?

6            MR. SILVERGLATE:   Asked and answered.

7            MR. FREEDMAN:   You can answer unless he

8        instructs you not to.

9            MR. SILVERGLATE:   You can answer.

10           THE WITNESS:   Not on this case.

11  BY MR. FREEDMAN

12      Q.   Are there any other members of the defense

13  team that you're aware of that are similar -- are also

14  act as a liaison?

15      A.   No.

16      Q.   In your role on the defense team do you act as

17  a liaison between Craig and anyone that is not an

18  attorney?

19      A.   Not that I can recall.

20      Q.   Did you ever liaise between Craig and nChain?

21      A.   Not for this purpose.

22      Q.   Did you ever act as a liaison between Craig

23  Wright's lawyers and someone other than Craig Wright?

24      A.   Yes.

25      Q.   I am going to ask you but give your lawyer a

1    second I don't know what he is going to say who did you

2    liaise in that capacity for?

3            MR. SILVERGLATE:  Are we talking about in the

4        litigation?

5            THE WITNESS:  Yes.

6            MR. SILVERGLATE:  Okay, can you answer without

7        encroaching on privileged communications?

8            THE WITNESS:  I think so, yes.  Steve

9        Shadders.

10   BY MR. FREEDMAN

11       Q.   Anyone else?

12       A.   I can't recall anybody else.

13       Q.   What about Calvin Ayre?

14       A.   No.

15       Q.   How about Ron Tarter?

16       A.   No.  Actually let me correct that.  I do

17   recall having communications with Ron Tarter in

18   connection with explaining things that were happening

19   with Craig in the lawsuit.

20       Q.   So wait before you answer.  Can you tell me

21   the content of those communications?

22           MR. SILVERGLATE:  So I'm not sure who this is.

23           MR. RIVERO:  Let me step in.  I'm going to

24       assert the common interest privilege and if the

25       question is about the substance of the conversation

1        we're going to assert the privilege.

2    BY MR. FREEDMAN

3        Q.   Ron Tarter, is there a defense agreement

4    between Craig Wright -- to your knowledge Mr. Nguyen is

5    there a defense agreement between Craig Wright and any

6    of Calvin Ayre's companies?

7        A.   I do not know.

8        Q.   And you understand Ron Tarter works for Calvin

9    Ayre?

10       A.   Correct.

11       Q.   Is there a common interest between Calvin Ayre

12   and Craig Wright?

13       A.   I don't know if I can answer that question.

14   Certainly they have a common interest in, you know,

15   Bitcoin and the growth of Bitcoin.

16       Q.   But as it relates to this litigation?

17       A.   I don't know how to answer.  I don't have the

18   basis to answer that question.  I suppose you can say --

19       Q.   Just to be clear what was the date of the

20   communication between you and Ron Tarter?

21            MR. SILVERGLATE:  Before he answers that I

22       think you cut off his last answer.

23            MR. FREEDMAN:  I'm sorry, go ahead.

24            THE WITNESS:  I was going to say Calvin is now

25       a shareholder of nChain as was announced sometime

```
 1        last year and obviously nChain is -- I've explained
 2        has a common interest with Craig about this
 3        litigation.
 4   BY MR. FREEDMAN
 5        Q.   What was the date of your communication with
 6   Ron Tarter?
 7        A.   I don't recall.  It would have been in I would
 8   say summer of 2018.  Later in the summer or fall of
 9   2018.
10        Q.   That would be before Calvin Ayre became a
11   shareholder of nChain?
12        A.   I don't have the date -- I have the years
13   wrong.  2019.
14        Q.   Still before Calvin Ayre became a shareholder
15   of nChain?
16        A.   I don't know the exact date Calvin became a
17   shareholder.  I know when it was announced.  I don't
18   know when it became effective.
19        Q.   Did you ever liaise between Craig Wright and
20   Stefan Matthew?
21        A.   That was strange.
22        Q.   Steven Matthews.  Did you ever liaise between
23   Craig Wright and Steven Matthews?
24        A.   You mean Stefan?
25        Q.   Yes.
```

1      A.    Stefan is part of nChain.  So I would get

2  questions about what's going on with the lawsuit to

3  provide him just general status of where the lawsuit is

4  going or what's happening with it, status to people like

5  Stefan.

6           MR. SILVERGLATE:  Vel, I think we lost Andres.

7           MR. FREEDMAN:  I see that.  Zalman is on.

8       Zalman -- I do see Andres is on.  He's turned off

9       his video but he is on.  He has muted himself so we

10      can't hear him.  He has not muted himself.  Somehow

11      he's been muted.  I'll try to undo that.

12          MR. RIVERO:  I did take myself off video.  I

13      didn't mute myself.  I don't know how that happens.

14  BY MR. FREEDMAN

15      Q.    Have you ever acted as liaison between Craig

16  Wright and Ramona Watts?

17      A.    No.

18      Q.    Have you ever participated in discussions

19  about this lawsuit between -- that involved Craig Wright

20  and Ramona Watts and yourself?

21      A.    Yes.

22      Q.    Give your lawyer a minute here but I'm going

23  to ask what was the content of those communications?

24          MR. SILVERGLATE:  I'm going to object if those

25      communications were with Craig Wright and Ramona I

1        think it would all be subject to the privilege.

2            MR. RIVERO:  Join.

3            MR. FREEDMAN:  You said object Spencer, I

4        assume you're instructing him not to answer?

5            MR. SILVERGLATE:  I instruct him not to

6        answer.

7            THE WITNESS:  I guess I have to rephrase my

8        answer to the last question.  I won't answer the

9        substance of communications.  You asked me did I

10        act as a liaison between Craig and Ramona.  My

11        initial thought -- that's a hard question to

12        answer.

13            My initial thought was to say no but I was

14        asked to help facilitate understanding

15        communication things related to the case with Craig

16        and with Ramona involved and does that mean I was

17        liaising with Craig to Ramona to some extent I

18        guess it does.

19   BY MR. FREEDMAN

20        Q.   Well, I'm going to repeat my question and you

21   can take a beat there for Spencer to jump in.  Can you

22   tell me the content of those communications?

23            MR. SILVERGLATE:  I'm going to object and

24        assert the privilege instruction.

25            MR. RIVERO:  Join.

 1        MR. FREEDMAN:  Just so the record is clear

 2   which privilege are you invoking?

 3        MR. SILVERGLATE:  Attorney-client joint

 4   interest.

 5        MR. FREEDMAN:  Whose joint interest?

 6        MR. SILVERGLATE:  I'm asserting a joint

 7   interest privilege and I don't think I need to get

 8   into a colloquy or argument with you here.

 9        MR. FREEDMAN:  Okay.  There's two different

10   joint interest agreements, just trying to figure

11   out which one you're invoking.

12        MR. SILVERGLATE:  It depends which timeframe

13   we're talking about.

14        MR. FREEDMAN:  Fair question.  What was the

15   timeframe of these communications.

16        MR. SILVERGLATE:  He's already described that.

17        MR. FREEDMAN:  I don't think so.  He just

18   talked about their existence for the first time a

19   few minutes ago.

20        MR. SILVERGLATE:  You're right, I thought you

21   were asking about the timeframe for the agreements.

22   You're right, he didn't talk about the

23   communications.

24        THE WITNESS:  I can tell you it was during the

25   timeframe covered by the first joint interest

```
1        agreement.
2              (Discussion held off the record.)
3    BY MR. FREEDMAN
4        Q.   Do you know if anyone else could fill the
5    liaison role you're filling -- that you described?
6              MR. RIVERO:  Object to the form.
7              THE WITNESS:  Do I believe anybody else could?
8        In theory you know yes, there probably could be
9        other people.  I would answer that -- how I would
10       answer that is Craig asked me because he felt I was
11       uniquely situated to do it because not that many
12       people understand Craig given his difficulty in
13       communication and also I was a former lawyer in the
14       U.S. and also I understand, you know, Bitcoin from
15       working with him and so that's a rare combination
16       to find in one person especially the part about
17       deciphering Craig as I would say.  He's often
18       difficult to understand and people who are new to
19       him working with him have challenges understanding
20       what he is trying to say or communicate.
21             So could someone else fill this role, you
22       know, there's a lot of people in the world
23       potentially.  I am just -- I was the obvious choice
24       for it given my working relationship with him and
25       those other factors.
```

1    BY MR. FREEDMAN

2        Q.   Have you heard -- had you heard of Dave

3    Kleiman prior to January of 2017?

4        A.   I think I might have seen the name somewhere

5    but I didn't really know much about him.

6        Q.   Do you know where you saw that name from?

7        A.   Before I reviewed documents that produced to

8    you in response to the subpoena I didn't think I had

9    even heard the name at all until much later but I think

10   there's an e-mail where Kleiman is mentioned and I don't

11   even remember seeing the reference to Kleiman in the

12   e-mail.

13          That may be the first time I saw it but at the

14   time I probably would not have even given it much

15   thought.  I think I did not really understand who Dave

16   Kleiman was until late 2017, maybe early 2018.

17          (Plaintiff's Exhibit No. 10 was

18          marked for identification.)

19   BY MR. FREEDMAN

20       Q.   I share with you what we're going to mark as

21   Exhibit 10.  It's Nguyen 642.  Is this the e-mail you're

22   referencing?

23       A.   That's correct.  I saw this e-mail in my

24   review to produce documents to you and some of it had

25   mentioned Dave Kleiman but when I saw it I don't even

1    remember seeing the reference to Dave Kleiman at the

2    time.

3         Q.    You ask on the 27th of December you say "who

4    is Uyen" and then you get a response back from Stefan he

5    says "long story she worked with CSW" which is Craig

6    Steven Wright; correct?

7         A.    Correct.

8         Q.    "And Dave Kleiman professes love for CSW.

9    Sees us destroying our involvement with the CSW."  Did

10   you follow up with this and say who the heck is Dave

11   Kleiman?

12        A.    Not at the time.

13        Q.    Did you know who he was?

14        A.    No.  I think I had heard or read -- there's a

15   lot of media coverage about Craig and Bitcoin and this

16   question who is Satoshi Nakamoto.  I mean in my process

17   of understanding this world before I left my legal

18   practice to join nChain I remember surfing the internet

19   trying to read what I can see and I think I remember

20   seeing Dave Kleiman's name but I didn't have much of a

21   background so I didn't understand it.  This e-mail

22   you're focusing on Uyen in fact when I saw Dave

23   Kleiman's name like I said I can't even remember it

24   triggering any reaction at the time.

25        Q.    Glad you can help solve a little debate on our

 1   side here which is how do you pronounce her name?

 2       A.   Well, again there's the Vietnamese

 3   pronunciation and Americanized pronunciation.  Her last

 4   name is mine Nguyen and I actually have -- even though I

 5   am Vietnamese American I don't know that I've ever known

 6   another person with that name so how I pronounce in

 7   Vietnamese is I guess it would be Uyen Nguyen which

 8   sounds very weird.  I'm not certain because I have never

 9   met another Vietnamese person with that name.

10       Q.   I understand that the last name Nguyen is a

11   very common last name from Vietnam.  But I have to ask

12   obviously is there any relationship between you and

13   Ms. Nguyen?

14       A.   No.  And contrary to some internet rumors I am

15   not her.

16       Q.   I've seen pictures and I can attest to that

17   unless you're a master of disguise.  Prior to the time

18   and your not being permitted to testify about had Craig

19   ever mentioned about the trust to you?

20       A.   No.

21       Q.   Based on -- again prior to the time you're not

22   being permitted to testify did Craig ever mention the

23   Australian Tax Office investigation to you?

24       A.   Yes.

25       Q.   What did he say about it?

1        A.   Well, generally I got the, you know, short
2   version of what I assume is a much longer story that he
3   had applied for tax credits for research and development
4   tax credits in Australia, the Australian Tax Office
5   denied those credits.  That led to some big, you know,
6   fight with the Australian Tax Office and that he felt
7   that the credits were proper and they did not understand
8   Bitcoin -- the work he was doing was a business.  They
9   thought it was a hobby which is why he said they denied
10  the tax credits and that led to a big fight.
11       Q.   Did he ever tell you that the Australian Tax
12  Office accused him of forging documents?
13       A.   I don't know if he told me that.  I heard that
14  somewhere.
15       Q.   Did he ever tell you that his lawyers in
16  Australia terminated their representation of his
17  companies based on these forgeries?
18       A.   No.  I never heard that before today.
19       Q.   Did he ever talk to you about Andrew Summer?
20       A.   I don't think so.  The name doesn't ring a
21  bell.
22       Q.   Did he ever tell you that he had meetings with
23  the Tax Office?
24       A.   I know he said he met with the Tax Office.
25       Q.   Did he ever tell you that there were

1    transcripts made of his meetings with the Tax Office?

2         A.   I don't know if he told me that.   Somehow I

3    became aware there are.

4         Q.   Did he ever mention those transcripts to you?

5         A.   Nope.

6         Q.   Did he ever mention the name Mark Ferrier to

7    you?

8         A.   No.

9         Q.   Prior -- again all these are prior to the time

10   period you're permitted to testify about pursuant to

11   your lawyer's instruction.   Prior to the time -- prior

12   to the time you're forbidden to talk about did Craig

13   ever mention Uyen to you?

14        A.   Yes.

15        Q.   What did he say about her?

16        A.   I don't remember.   What I remember him

17   saying -- I had seen her name somewhere on the internet.

18   I thought it was funny that she has another Vietnamese

19   name and I asked who was she and he said, she used to

20   work for me.

21        Q.   You just left it at that?

22        A.   Yes.   Because this was at a point in my

23   working relationship with Craig where I don't think I --

24   we weren't -- I wouldn't call us friends at that point.

25   We were just getting to know each other and he's a hard,

1  difficult person to get to know so I didn't feel

2  comfortable, you know, asking, you know, more probing

3  questions.

4      Q.   Did you ever talk to him again about her prior

5  to this time you're not permitted to testify about?

6      A.   I think her name came up again at some point

7  and I'm trying to remember when.  I think sometime in

8  2017.

9      Q.   Do you remember what that was about?

10     A.   Yes, I think it was I was at a conference with

11 Craig and Ramona in the Netherlands and I think it was

12 Ramona asked me if I knew that -- whether Uyen Nguyen

13 might be there and something -- that's the only

14 conversation I remember about it.

15     Q.   When you started working at nChain you

16 understood at that time that Satoshi Nakamoto had

17 control over billions of dollars of Bitcoin; right?

18     A.   I had read on the internet that there was this

19 question of who is Satoshi Nakamoto and that there were

20 all these coins that were mined, controlled by Satoshi

21 that had never been moved.

22     Q.   Did you make the connection to the extent

23 Craig Wright was Satoshi Nakamoto he would have control

24 over billions of dollars of Bitcoin?

25     A.   I didn't necessarily make the connection that

1   he would have control over it because I didn't at the

2   time know any details about how the coins were held or

3   anything like that but did I think that yes, Craig

4   Wright or his family might have access at some point one

5   day to a lot of Bitcoin yes, I did -- that thought did

6   occur to me.

7        Q.   Why say one day, why wouldn't you think he

8   didn't have access immediately?

9        A.   Because I had read on the internet somewhere.

10  This is Satoshi Nakamoto, you know, question raises a

11  lot of internet stories and I think I read on some of

12  the online stories about that these coins had never

13  moved and that there were rumors.  There were in some

14  kind of trust or that they were locked up for some time

15  and that one day they would become accessible.

16       Q.   You never asked Craig about it?

17       A.   No, I didn't feel comfortable.

18       Q.   You exercised a lot of restraint?

19       A.   Well --

20            MR. SILVERGLATE:  Object to the form.

21            THE WITNESS:  He's a -- you know, here is what

22       I would say.  When I first joined nChain that was

23       after the proof attempt that did not go well so he

24       was very sensitive at that time and volatile as a

25       personality to anything -- talking about anything

1          about being Satoshi Nakamoto and when I joined it

2          was my job to understand the work that was being

3          done at the company, get to know him, just that he

4          would be comfortable working with me and he is

5          important.

6               I didn't want to push him because that -- he's

7          got -- it's his personality where he is not like

8          the normal person.  He can blow up quickly so I

9          felt it more important to focus on the work that we

10         were doing than try to push what our sensitive

11         topics to extract questions out of him that I knew

12         he wouldn't want to talk about.

13    BY MR. FREEDMAN

14         Q.   You said before that he was volatile after the

15    proof failed.  What do you mean by volatile?

16         A.   Well, I wasn't at in London or nChain's office

17    after the proof failed.  I can only tell you about my

18    experience or things I learned afterwards and after I

19    joined nChain.  He's had moments of being volatile with,

20    you know, employees we had at the time at nChain in the

21    office.

22               He resisted wanting to do any media for a long

23    time.  When people -- when he feels he is not understood

24    he can, you know, get angry, blow up and what I've

25    learned is he has a hard time being understood, you

1    know, what I say to you normal people might understand

2    and he gets really frustrated and agitated often when he

3    is trying to say something to me, people in our office

4    lot of times and they're not getting it and there were a

5    lot of times where there would be blow ups.

6         Q.   Prior to this time that you start acting as

7    liaison did Craig Wright ever mention Denis Mayaka?

8         A.   Yes.

9         Q.   What did he say about him?

10        A.   The first time I think I heard of Denis Mayaka

11   is I got an e-mail I'm not sure if it was from Denis or

12   someone who knew Denis about asking Craig to come speak

13   at a conference somewhere in Africa and I did not know

14   who this person was so I asked Craig who is Denis.

15        Q.   What did he say?

16        A.   He said he's someone who I know in Africa and

17   I don't know if he said he works for him but something

18   to the extent, you know, he does work for me or my

19   family, you know, I don't know if he said companies.

20   There was some professional relationship between them.

21        Q.   Did he say he was his lawyer?

22        A.   I don't remember.  I remember him saying at

23   some point he is a lawyer because it came up that I was

24   a lawyer and he was a lawyer.

25        Q.   Do you know if Mayaka is a lawyer?

1          A.    I never asked the question I don't think.  I
2     was just told he is.
3          Q.    Have you ever spoken to Mayaka?
4          A.    No.
5          Q.    Do you know Mayaka exists?
6          A.    I think I've gotten a couple of e-mails over
7     the course of time.  That was about following up about
8     trying to find a time to get Craig to come speak at a
9     conference because that was part of the role I filled
10    while I was at nChain was fielding, facilitating,
11    speaking requests for Craig and so I got e-mails from
12    him but I have never spoken to him.  I got e-mails from
13    who I was told was Denis.
14         Q.    That was my next point which is you don't
15    actually know who sent you those e-mails, do you?
16         A.    No.  I just know they were named -- they came
17    from an e-mail account or person's name that was Denis.
18         Q.    Have you ever liaised with Mayaka?
19         A.    No.
20         Q.    Did he ever mention Mayaka and trusts?
21         A.    Only after the litigation was started.
22         Q.    Prior to the -- your job as a liaison did
23    Craig ever mention a bonded courier to you?
24         A.    I'm sorry, could you repeat the question?
25         Q.    Did Craig ever mention a bonded courier to

1   you?

2        MR. SILVERGLATE:  Prior to your job as a

3   liaison.

4        THE WITNESS:  No.

5   BY MR. FREEDMAN

6        Q.   Prior to your job as a liaison did Craig ever

7   mention Shameer's Secret Sharing Algorithm to you?

8        A.   I don't know if he mentioned it.  I know I was

9   involved in meetings and discussions at nChain about the

10  concept of Shameer's Secret Sharing Scheme in the

11  context of the work being done at nChain by some of the

12  researchers and I believe Craig may have been in the

13  room for one or more of those meetings.

14       Q.   Do you believe Satoshi Nakamoto was one person

15  or a team of people?

16       MR. RIVERO:  Object to the form.

17       THE WITNESS:  I don't know that I can answer

18       that question.  I can tell you, you know, based on

19       what I know and my discussions with Craig, you

20       know, that would not fall into the privileged area

21       that he has consistently said he was the primary

22       visionary, architect, creator of Bitcoin and

23       drafter of the white paper.

24       He did the -- he coded most of the first

25       client software for Bitcoin, first version of the

1          client software but that he had help.

2    BY MR. FREEDMAN

3          Q.    But he never expanded on what help meant?

4          A.    I think I said earlier I believe at one point

5    he said -- told me that Dave helped him edit the white

6    paper and that conversation came up because I -- one of

7    my early tasks in starting to work with Craig was to

8    help him with his papers that he was trying to put out

9    while he was at nChain and so I helped review and edit

10   some of his papers to the best I could and he -- that's

11   how we got to somehow the conversation about he told me

12   that Dave Kleiman had helped him with it, the Bitcoin

13   white paper.

14         Q.    Did you ask him any more details about that?

15         A.    No.  Like I said it was probably a good year

16   in my working with nChain before I felt I could -- I

17   knew Craig enough that we had a level of relationship

18   where I can ask to -- to talk about the Satoshi topic

19   without risk of him, you know, getting agitated.

20         Q.    Do you believe Craig Wright is Satoshi

21   Nakamoto?

22         A.    Yes.

23         Q.    Why?

24         A.    It's based on a collection of many things.

25   Based on him telling me very consistently about it but

1    it's more based on through my work with him seeing the

2    depth of knowledge he has about Bitcoin, the original

3    protocol, what it is capable of doing as a technology

4    platform.  People think of it just as a digital

5    currency.

6           A lot of the world that's all they know of

7    Bitcoin but it's protocol rule set and technology system

8    as I learned from Craig to be used for so many more

9    powerful things and he has explained to me things he put

10   in Bitcoin's early design and protocol and code that

11   have all of these advanced uses and features that no one

12   else would have been able to figure out or at least

13   certainly other Bitcoin developers wondered why for

14   example this certain thing in the code and it's because

15   as I learned from him he's always had this grand vision

16   that what it could be used for.

17          So that is a big part of why.  My

18   conversations with people like Steve Shadders, the CTO

19   of nChain who is very technically knowledge about

20   Bitcoin.  In fact probably the most knowledgeable

21   Bitcoin person I've met or worked with.  He believes

22   Craig is Satoshi.  We've had that discussion and he

23   knows more technically to be able to challenge Craig on

24   a lot of things than I do and also because people like

25   Stefan Matthews have told me the reasons for their

1  belief.  So it's a collection of a lot of things that

2  lead me to the conclusion.  It's not any one thing.

3      Q.   Prior to the time you began acting as a

4  liaison did Craig ever mention to you that he had been

5  hacked?

6      A.   Yes.

7      Q.   What did he say?

8      A.   He told me that he's been the subject of many

9  hack attempts.  That that was an issue in his case with

10  the Australian Tax Office that someone hacked his

11  company computers and tried to change documents.

12          He believed it was former disgruntled

13  employees, staff and that caused all kinds of problems

14  in dealing obviously with defending himself before the

15  Tax Office.

16      Q.   Any other times?

17      A.   We've had that conversation more than once and

18  I'm trying to remember if there was anything to add to

19  that.  There was a former I guess I don't know if he was

20  an employee.  Someone who worked for Craig, his company

21  unless Australia I think his name was Jamie Wilson,

22  something to that effect who I got connected to because

23  he -- after nChain went public, surfaced publicly we

24  started getting all kinds of inquiries and e-mails and

25  stuff and Jamie Wilson I don't know how he contacted us

1  but got somehow landed in my e-mail box wanting to sell

2  some IP he claimed he owned to nChain and said he knew

3  Craig from the past.

4          So I asked Craig who is this person and he

5  told me be very careful with him because he didn't trust

6  him and he thinks he was responsible for either altering

7  company documents or somehow doing something to disturb

8  the company computers and records and I think he was the

9  CFO or some kind of financial role.

10     Q.   Did Craig mention to you that the alterations

11  to the documents in the Australian Tax Office supported

12  the positions that he was taking in front of the

13  Australian Tax Office?

14     A.   I don't recall that.

15     Q.   Do you believe Craig's been hacked?

16     A.   I have no basis to answer that question since

17  I wasn't there at the time.  I just know what he told me

18  and he and I believe Ramona his wife also told me he had

19  to get some kind of forensic I don't know if you call it

20  forensic audit, investigator to go back in and try and

21  prove this.  So I don't have any personal basis to be

22  able to say yes or no.

23     Q.   Do you believe Craig is a truthful person?

24          MR. RIVERO:  Object to the form.

25          THE WITNESS:  Should I answer that question?

```
 1              MR. FREEDMAN:  Sure.
 2              THE WITNESS:  I believe Craig is a truthful
 3         person who has difficulty answering questions and
 4         communicating in ways to normal people so that
 5         people often think he is being less truthful than
 6         he is.
 7    BY MR. FREEDMAN
 8         Q.   Has Craig ever lied to you?
 9         A.   Not that I know of but I had to -- sometimes
10    he'll tell me something and it doesn't seem to make
11    sense and then I have to ask like five more questions to
12    extract out well, what do you mean that doesn't make
13    sense I thought you said this the other day.  Something
14    slightly different and then I have to -- when I ask five
15    follow-up questions then I get to the answer.  I said --
16    I'll say why didn't you just tell me that in the first
17    place and he'll say but that's not exactly the question
18    you asked and what I've learned is he is very linear,
19    right, in his way of thinking and answering questions
20    where, you know, you might ask me, you know what time of
21    day it is and I'll look at my clock I'll say okay it's
22    2:16 p.m. Pacific time.  Then he'll say but you didn't
23    ask me what part of the country or what part of the
24    world and in the beginning it was frustrating to deal
25    with him in that regard but I've learned that it's -- he
```

1    interprets questions and how he answers them in a very,

2    you know, I would say in his own head in a way that I

3    learned that it takes time to sometimes get from him the

4    information you need.

5        Q.   I am going to share with you what's been filed

6    as Exhibit 15 to the second amended complaint.  Have you

7    ever seen this document before?  I'm going to keep

8    scrolling unless you tell me to stop.

9        A.   I'm not sure I've seen this exact document but

10   I've seen things that look like it.

11       Q.   Have you seen this page before?

12       A.   I have seen like -- as I recall there may be

13   disputes about different versions of this.  I've seen a

14   page that looks like this.

15       Q.   Have you ever asked Craig about it?

16       A.   Only in the context of litigation.

17            MR. FREEDMAN:  Sorry, that will be Exhibit 11

18       I think we're at to the deposition.

19            (Plaintiff's Exhibit No. 11 was

20            marked for identification.)

21   BY MR. FREEDMAN

22       Q.   Do you understand that the judge in this --

23   magistrate judge in this litigation has found that Craig

24   submitted forged documents as evidence?

25            MR. RIVERO:  Objection to form.

```
 1              MR. SILVERGLATE:  I'm going to object.  If you
 2         learned as part of the litigation and as part of
 3         your privileged work in the litigation I'll
 4         instruct you not to answer.
 5              MR. RIVERO:  Join that as well.
 6              MR. FREEDMAN:  It's a publicly filed opinion.
 7              MR. SILVERGLATE:  Can you read back the
 8         question, please?
 9              (Thereupon, a portion of the record
10              was read back by the reporter.)
11              MR. SILVERGLATE:  If you learned from public
12         records then fine.  If you learned from the lawyers
13         then I'm instructing you not to answer.
14              MR. RIVERO:  I'll repeat my form objection.
15         You may answer.
16              THE WITNESS:  I read the magistrate's order.
17         I don't recall the exact phrasing of it but I got
18         the order from counsel.
19    BY MR. FREEDMAN
20         Q.   Do you have any opinion on that?
21              MR. RIVERO:  Objection.
22              MR. SILVERGLATE:  Object to the form.
23              THE WITNESS:  Can I answer that question?
24              MR. RIVERO:  Yes.
25              THE WITNESS:  The only opinion I can draw upon
```

1            is based on what I've been told or know in the
2            context of assisting Craig with the litigation
3            under the joint interest arrangement.
4                    MR. SILVERGLATE:  I'm going to instruct him
5            not to answer.
6                    MR. RIVERO:  Join.
7    BY MR. FREEDMAN
8            Q.   Do you understand that the magistrate in
9    Florida has found that Craig Wright has committed
10   perjury in his presence?
11                   MR. SILVERGLATE:  Same admonition, Jimmy.
12                   THE WITNESS:  As I said I read the
13           magistrate's -- I haven't read all the magistrate's
14           orders so if there's more than one I don't know.
15           I've read a magistrate order that discusses whether
16           Craig committed perjury or not.  I don't remember
17           the exact phrasing.
18   BY MR. FREEDMAN
19           Q.   So you testified earlier that you're aware we
20   were trying to subpoena you in February of 2020;
21   correct?
22           A.   Yes.
23           Q.   And you told the Court in Washington that you
24   lost access -- actually why don't you tell me when did
25   you lose access to your nChain e-mail address?

1          A.    It was in March of 2020 sometime.

2          Q.    So did you not collect documents from your

3    nChain e-mail address in response to our subpoena?

4          A.    The document request only -- the time period

5    of your document request was only to May 2018 if I

6    recall; is that correct?

7                So the e-mails I have on my work computer only

8    go back one year, 2019.  So I didn't have any e-mail

9    communications from the time period that's responsive to

10   your request.

11         Q.    Where are the prior e-mails stored?

12         A.    Probably would be on the nChain server, I

13   assume.

14         Q.    Do you have access to that server?

15         A.    No, I do not.

16         Q.    When did you lose access to that server?

17         A.    Well, I don't control the server.  It's

18   nChain's information technology people who control the

19   server.

20         Q.    If you wanted an e-mail that was older than a

21   year old while you were still CEO of nChain how would

22   you get it?

23         A.    If I was still CEO then yes, I would talk to

24   one of the IT professionals.

25         Q.    You had no ability to search for documents,

1    e-mails on your own that were over a year old?

2         A.   I don't recall how that was set up.

3         Q.   Did your access to nChain's e-mails change --

4    let me strike that.  When did you lose access to your

5    nChain e-mail account?

6         A.   I think it was around March 12th through 19th

7    timeframe.

8         Q.   And prior to March 12th through 19th did your

9    ability to access your nChain e-mail account change from

10   before you were CEO to after you were CEO and were the

11   chair of the Strategic Advisory Board?

12        A.   I'm sorry, can you repeat the question?

13        Q.   Yes, prior to March12th did your access to

14   your nChain e-mail account change when you went from

15   being nChain's CEO to the chair of nChain's Strategic

16   Advisory Board?

17        A.   No, but I can tell you something that I think

18   will short circuit this subject matter which is I -- my

19   first nChain e-mail account was using a domain called

20   nChainHoldings.com since I was working for the holding

21   company and that was until I believe sometime in the

22   summer or fall of 2018 when some of us who use

23   nChainHoldings.com account such as me Stefan Matthews

24   and some other people we decided to basically

25   consolidate down at the time and I moved over to an

1   nChain.com e-mail account which was after the time

2   period of -- covered by your subpoena request and so any

3   access I would have to the nChainHoldings.com e-mail

4   account is not in my work.  In fact I didn't have that

5   e-mail box on my computer.

6        Q.    Remind me -- I know you said it.  What was the

7   date that you switched from nChain Holdings to the --

8        A.    I believe it was summer or fall of 2018.

9        Q.    Did Craig also have an nChain Holdings e-mail

10  account?

11       A.    I don't think he ever did.

12            MR. FREEDMAN:  I need to take -- we've been

13        going over an hour.  I need to take a quick

14        restroom break.  I don't know if anybody else does.

15        I can do five minutes or three minutes or even two

16        it's up to -- anybody have any preferences?

17            MR. RIVERO:  Follow up on Spencer's question

18        from earlier, any ETA on when we finish here?

19            THE VIDEOGRAPHER:  Should we go off the video

20        record?

21            MR. FREEDMAN:  Sure.

22            THE VIDEOGRAPHER:  Going off the video record

23        5:26 p.m. eastern.

24            (Thereupon, a brief recess was taken.)

25            THE VIDEOGRAPHER:  We are back on the record.

1        The time is 5:33 p.m. Eastern Standard Time.

2   BY MR. FREEDMAN

3        Q.   Mr. Nguyen, when did you -- when did you form

4   the belief that Craig Wright was Satoshi Nakamoto?

5        A.   That's a tough question to answer.  I don't

6   know that there was a specific date.

7        Q.   Why don't we do it this way.  Did that you

8   have belief by the time you were CEO of nChain?

9        A.   Yes, I would say by then, yes.

10       Q.   So by December 2017 you were confident he was

11  Satoshi?

12       A.   Yes, by that point I had been working with him

13  for over a year.  It was -- I would say, you know, nine

14  months to a year after working with him.  It's a hard

15  question to answer because, you know, my level of

16  confidence grew over time in believing that he is

17  Satoshi so at what point it gets past I feel confident

18  enough to say it out loud.

19       Q.   If by November of 2018 -- sorry, if by

20  December of 2017 when you came CEO you were pretty

21  confident about it.  Safe to say by January of 2019 you

22  were very sure about it or sufficiently sure that you

23  had reached maximum assurance you were going to reach?

24       A.   I wouldn't say I had reached maximum assurance

25  by then.  I would say just sufficiently confident.

1        Q.   Do you recall in approximately January of 2019

2   being interviewed by SFOX?

3        A.   SFOX, yes, I've done more than one interview

4   with them so I don't remember the particular months but

5   I remember being interviewed by SFOX.

6             MR. FREEDMAN:  I am going to try and get this

7        on the screen for you.  This is going to be our

8        Exhibit 12.

9             (Plaintiff's Exhibit No. 12 was

10            marked for identification.)

11  BY MR. FREEDMAN

12       Q.   Do you see that video on the screen now?

13       A.   I do.

14            MR. FREEDMAN:  So bear with me.  Let's listen

15       to the 24 minute 43 second mark.

16            MR. NGUYEN:  Disrupt that economic balance.

17       So while I again Satoshi's not sitting around

18       publicly telling us this is what I meant or didn't

19       mean.  So it was very hard to read early writings

20       and know what is meant.  That's why I say it

21       doesn't mean there can't be basic improvements to

22       fix bugs.  You shouldn't be messing around with

23       core principles.  A good example is --

24  BY MR. FREEDMAN

25       Q.   Did you -- do you recall making that sentence?

1       A.   Not specifically.  I remember doing that

2  interview.

3       Q.   That's you and that's your statements; right?

4       A.   Correct.

5       Q.   At a time when you said you were very sure

6  that Craig Wright was Satoshi you just said I get it

7  Satoshi is not sitting around telling us what he meant.

8  I don't understand how those two statements are

9  consistent.

10       A.   What I mean by that is first of all, not

11  everybody -- in fact most of the digital currency world

12  does not believe Craig is Satoshi and it's all over the

13  internet.  I was talking about whether we follow the

14  original protocol of Bitcoin which is a big debate in

15  the Bitcoin community and what I was meaning is that

16  there is not a person that everyone believes is Satoshi

17  and he is saying this is what I meant in section five of

18  the white paper and this part the code and therefore

19  people will follow him if there is a debate over what to

20  do.

21          I'll give you an analogy.  Ethereum which is a

22  competing block chain project Vitalik Buterin is well

23  known and recognized as founder of Ethereum.  If he says

24  we need to scale Ethereum with this new attempted

25  technology feature people will believe him because they

1  believe he is the founder of Ethereum.  When Craig

2  Wright comes forward and says I am Satoshi many people

3  do not believe him and that's why in the debates over

4  the Bitcoin protocol and how to scale Bitcoin there's

5  not a Satoshi people have consensus on that if he

6  surfaces and says this is what we should do to grow

7  Bitcoin and follow my original plan for Bitcoin no one

8  believes it.  I hope that makes sense.

9      Q.   Would you say that nChain was set up to

10  professionalize the research and work efforts that Craig

11  Wright had been doing in Australia?

12      A.   I would say nChain was set up to

13  professionalize Craig and Craig's work and certainly,

14  you know, professionalize his efforts to realize his

15  visions of Bitcoin.

16          MR. FREEDMAN:  I am going to share with you

17      what is now going to be Exhibit 13.

18          (Plaintiff's Exhibit No. 13 was

19          marked for identification.)

20  BY MR. FREEDMAN

21      Q.   Do you remember giving an interview to Bit

22  Stocks Media in March of 2019?

23      A.   I do.

24          MR. FREEDMAN:  And I'm going to bring you to

25      the 43 minute mark and let's take a listen here.

```
1                VIDEO AUDIO VOICE:  Good morning.
2                MR. NGUYEN:  No, yes, no, yes, I did -- I
3        thought about this whole effort.  I worked with him
4        sort of behind the scenes to help on certain
5        things.  Craig had moved his family from Australia
6        to London, the nChain business was set up to sort
7        of professionalize the research and work efforts he
8        had been undergoing in Australia and I had got
9        asked one day after just through conversations to
10       take on a role because I think they knew -- I had
11       close relationships with clients and I was looking
12       to explore something else.  I wasn't the obvious
13       person to bring on board because I was in the
14       United States, I didn't want to move to London
15       but --
16   BY MR. FREEDMAN
17       Q.   I can keep going but the part -- so do you
18   recall giving this interview?
19       A.   I do recall the interview.
20       Q.   That's you and an accurate recording?
21       A.   Yes.
22       Q.   So a couple questions.  What did you mean when
23   you said "I worked with them sort of behind the scenes."
24   Who is them?
25       A.   I was referring to the nChain company that we
```

1  discussed.

2      Q.   You said "to help on certain things."  Are

3  those the things we've discussed in this deposition?

4      A.   Yes.

5      Q.   And then I believe you gave kind of the quote

6  what I was saying before nChain business was set up to

7  sort of the professionalize the research efforts he had

8  you know been undergoing in Australia.  Is that

9  accurate?

10      A.   Yes.  It's accurate that it was set up to

11  professionalize the research work efforts.

12      Q.   But actually at this time you hadn't even had

13  any communications with Craig Wright; correct?

14      A.   That's not -- at the time of the interview you

15  mean?

16      Q.   Not at this time of the interview.  At the

17  time you came on board to help behind the scenes.

18      A.   I had not had any communications with Craig.

19  I had communications with Stefan Matthews about the work

20  they were trying to do with nChain.

21      Q.   So was the plan to move him from Australia to

22  London and set up a business around him?

23      A.   I can't tell you what happened in the very

24  beginning because I was not involved with the

25  discussions with Craig which led to him moving to the

 1   United Kingdom.  I can tell you what I've learned since

 2   if that's what you're asking.

 3             MR. FREEDMAN:  So let me bring up another --

 4        it will become Exhibit 14.

 5             (Plaintiff's Exhibit No. 14 was

 6             marked for identification.)

 7   BY MR. FREEDMAN

 8        Q.   I am going to share with you.  All right.  Do

 9   you see an interview you've done here with Vincent

10   Everts?

11        A.   Yes.

12        Q.   Do you recall this interview?

13        A.   I do.

14        Q.   I'm going to bring you to the 16:43 minute

15   mark or so.  Okay.  Let's listen here for a minute and

16   I've got some questions for you if that's all right?

17        A.   Sure.

18             MR. NGUYEN:  Exploring digital currency and

19        then Craig was -- the plan was set to have him move

20        from Australia to London and reset the business.

21        He was running the business in Australia doing

22        Bitcoin research.  Essentially similar to what

23        nChain is doing now but we needed more professional

24        teams around him to elevate his process.  So I was

25        involved --

1    BY MR. FREEDMAN

2        Q.   That's the part.  So I guess first

3    housekeeping accurate portrayal of your statements?

4        A.   That is my interview.

5        Q.   And so you just said the plan was to set -- to

6    have him move from Australia to London and reset up a

7    business around him.  He was running businesses in

8    Australia and doing Bitcoin research, block chain

9    research there essentially similar to what nChain is

10   doing now but needed more professional teams around him

11   to elevate his process.  Is that an accurate portrayal

12   of your statement?

13       A.   That's correct.

14       Q.   Is that a true statement?

15       A.   Yes, as far as I understand I guess I should

16   just explained what I mean by that.  As I understand it

17   Craig's Australian companies the work was to be, you

18   know, to be succinct about it a big mess.  It was messy.

19   He has brilliant ideas but they were not directed.

20   There was research being done.  There was data being

21   collected through I think like some super computer but

22   he didn't have a particularly good vision of what to do

23   with it all and also manage a team.

24            Craig is not and he has told me this many

25   times himself that's why he didn't become CEO of nChain

1    when it was formed he didn't want to manage people on a

2    business.  He wanted to focus on his work.  He is not

3    good at managing teams.  So I was told that what was,

4    you know required from the DeMorgan Group of companies

5    there was research but very just sort of undirected, not

6    a clear vision and plan of what to do with things.  A

7    lot of things about Bitcoin block chain and no effort or

8    even idea of patenting anything and nChain when it went

9    up and when I helped to move this process along was to

10   bring a professional team around him of both researchers

11   and developers and have a more coherent plan for what

12   the business was going to try to do and manage that and

13   developing an actual patent program that the DeMorgan

14   companies never even thought to do or tried to do.

15          Apparently Craig's told me several times while

16   he was in Australia at the DeMorgan companies he never

17   even thought about patenting anything.  The idea was

18   only raised by Rob MacGregor.  He's told me that as well

19   in the discussions to do the transaction that led to the

20   acquisition of DeMorgan assets and moving Craig to the

21   UK.

22          So it was putting a more professional team

23   around him and more professionalizing just the purpose

24   of the work because Craig is just not good at that.

25      Q.   Would it be fair to say that the nChain

1  business in its origins was birthed by Craig?

2      A.   That's a hard question for me to answer

3  because I wasn't there.  I can just go from what I've

4  been told.  You know, I understand it was birthed by Rob

5  MacGregor.  Obviously Craig is, you know, a proponent of

6  it because he's the chief scientist and thinker but who

7  birthed nChain that's a tougher question for me to

8  answer.

9      Q.   I mean you were at one point the CEO of the

10 company.  I mean --

11     A.   Correct.

12     Q.   Didn't you review its records, didn't you go

13 through its contracts, didn't you get an understanding

14 of where it came from?

15     A.   I saw for example in one of the documents you

16 showed me earlier the history of entities that were part

17 of the group.  They were formed before me and as I

18 understood them and I was told they were formed by Rob

19 or people who worked for Rob.  The formation of the

20 company was as I understood it not formed by Craig.

21     Q.   But you saw that the assets were acquired and

22 the business was moved to London?

23     A.   Well, I would correct that statement.  The

24 DeMorgan businesses were not moved to London.  They were

25 as I understand them wound down.  I think there maybe --

1    so what was moved to London is Craig assets acquired,

2    right, from the DeMorgan Group were not technically

3    moved to London.  I think they're owned by the nChain

4    Holdings company but the work -- the work process was

5    moved to London so the entities were not moved to

6    London.

7              I guess I hope that explains things.  In

8    Australia and/or wound down and nChain Holdings was

9    created in Antigua and nChain Limited was created in the

10   UK.  New companies that did not exist before with

11   Craig's DeMorgan Group of companies in Australia.

12       Q.   It just sounds to me that you're getting

13   technical about what exactly was moved but it seems to

14   me that at the -- end of the day the assets were

15   acquired and the business was moved to London with those

16   assets?

17             MR. RIVERO:  Object to the form.

18             THE WITNESS:  Depends what you mean by the

19        business moved to London.

20   BY MR. FREEDMAN

21       Q.   Well, why don't we take a look at this

22   interview you gave.  Do you recall giving this interview

23   introduction to nChain Jimmy Nguyen from ESILV?

24       A.   I'm not sure this is an interview.  It might

25   be a speech.

```
1              MR. FREEDMAN:  Okay, that works too.  Let's go
2         to the 2:32 mark.
3              MR. NGUYEN:  Into huge wins.  Let me tell you
4         about nChain.  The nChain business in its origins
5         was birthed by Dr. Craig Wright our chief scientist
6         with businesses in Australia.
7              (Plaintiff's Exhibit No. 15 was
8              marked for identification.)
9    BY MR. FREEDMAN
10        Q.   Let me stop you there for a second.  I asked
11   you that before and you told me that's not what you said
12   that's exactly you said exactly verbatim in the speech?
13             MR. RIVERO:  Object to the form.
14             THE WITNESS:  Yes, I would say that's probably
15        not the most artfully phrased way of putting it.
16        What I meant by that is look, the work Craig wants
17        to do is about Bitcoin, block chain.  It's work he
18        started with research in Australia.  Those assets
19        were acquired.  He moved to the United Kingdom to
20        London and he wants to continue doing the same
21        field of work.
22             So I think it is accurate to say aspects of
23        his work were moved to London.  I think probably
24        why I didn't clarify because I was giving a speech
25        to students here, didn't want to get into all the
```

1        technical details entities were not moved to London

2        and technically the assets of the DeMorgan Group

3        companies were actually not owned by the new London

4        company.  They were owned by a company in another

5        country.

6             This is me talking to this is a university in

7        Paris talking to students in shorthand you know

8        rather than getting into these more formal

9        corporate and technical legal details.

10   BY MR. FREEDMAN

11        Q.   But at the end of the day the company that

12   purchased the assets may have been formed in a foreign

13   jurisdiction still part of the nChain Group of

14   companies, right?

15        A.   I'm sorry, could you repeat that question?

16        Q.   Sure.  You seem to be saying that it's not

17   that the business was moved to London because the entity

18   that purchased the DeMorgan Group assets was actually

19   not incorporated in London, it was a foreign entity and

20   my statement to you is at the end of the day it was a

21   sister company that was a subsidiary of nChain Holdings;

22   right?

23        A.   I think at the time it was a subsidiary.

24        Q.   All part of the nChain Group of companies?

25        A.   Yes.  I think it's fair to say -- yes, it's

1   part of the nChain group of companies.

2       Q.   I just wanted to let's hear the next sentence

3   here.

4           MR. NGUYEN:   The assets were acquired and the

5           business was moved to London.

6   BY MR. FREEDMAN

7       Q.   Again you were quibbling with it before I

8   understand you're explaining that you were talking to

9   students I think you and I are now on the same page that

10  while technically there might have been a foreign

11  jurisdiction the entity was still part of nChain's group

12  of companies, fair enough?

13      A.   Yes, but I think you may be misstating what

14  I'm intending here.  Craig's entities were not moved to

15  London.  They remained in Australia and were wound down.

16  So if you're asking me whether Craig's businesses, the

17  actual companies were moved to the United Kingdom or

18  anywhere else in Australia that's not true as far as I

19  understand.

20      Q.   Go ahead.  Sorry.  I think you're 100 percent

21  right and it's not my intention to say you took DeMorgan

22  and moved it to the UK, not you but whoever orchestrated

23  this, stripped out all the assets of the company, its

24  intellectual property and moved those into another

25  company?

```
 1              MR. RIVERO:  Object to the form.  Is this a
 2        question?
 3              MR. FREEDMAN:  You didn't let me finish.  I
 4        guess it's not yet.  Why don't you let me finish my
 5        question.  Let me restate that.
 6   BY MR. FREEDMAN
 7        Q.   I understand that the actual entity itself
 8   wasn't moved and DeMorgan was wound down.  My point is
 9   somebody and it appears it was either orchestrated by
10   Robert MacGregor took the assets of DeMorgan, its
11   intellectual property assets and moved those to the
12   nChain Group of companies?
13              MR. RIVERO:  Object to the form.
14              MR. FREEDMAN:  Sorry, you said that's correct.
15              THE WITNESS:  That is correct.
16              MR. FREEDMAN:  Thank you.
17   BY MR. FREEDMAN
18        Q.   Do you know whether after that sale occurred
19   if Craig retained any ownership interest in the
20   intellectual property?
21        A.   That was assigned to the nChain Group of
22   companies from DeMorgan?
23        Q.   Correct.
24        A.   I don't believe so.  I have had review of the
25   transaction documents in the past that I don't recall
```

1    when he retained any.  Pretty sure they wanted -- when

2    you're acquiring a business you want -- the assets you

3    want to acquire what you can acquire.

4        Q.   Do you think that part of the motivation for

5    the sale was not to have challenges to any IP later on

6    when nChain really started to get big?

7        A.   I can't answer that question because I was not

8    involved in the transaction.

9        Q.   Do you think any motivation from these

10   transactions were about removing ownership from former

11   directors because -- before they knew what it would

12   become?

13            MR. RIVERO:  Objection.

14            THE WITNESS:  I have no basis to answer that

15        question.

16            MR. FREEDMAN:  I'm going to share with you

17        Mr. Nguyen an exhibit document that's been produced

18        by the defendant in this litigation.  It's under

19        the Bates label Defense AUS1585291 and that will

20        become according to my list Exhibit 16 to the

21        deposition.

22            (Plaintiff's Exhibit No. 16 was

23            marked for identification.)

24   BY MR. FREEDMAN

25        Q.   Can you see that document there?

```
 1        A.    I can.
 2        Q.    Do you recognize this as a -- the C@Wyno.CA as
 3   Calvin's e-mail address?
 4        A.    No.
 5        Q.    Do you Craig S. Wright Craig@RCJBR as Craig's?
 6        A.    I believe that's Craig's personal address.
 7        Q.    Have you e-mailed Craig at his personal e-mail
 8   address?
 9        A.    I think I have.
10        Q.    Has he e-mailed you back from his personal
11   e-mail address?
12        A.    Yes.
13        Q.    Also I see here that Sterling was mentioned.
14   Is this potentially where you picked up Sterling?
15        A.    No.  Because I don't recognize that e-mail
16   address.  I'm not sure I've ever seen an e-mail address
17   with the Sterling domain.
18        Q.    Have you ever seen this e-mail before?
19        A.    No.
20        Q.    Show you this e-mail that was sent from
21   Craig's personal e-mail address to C@Wyno.CA which I'll
22   represent to you is Calvin Ayre's e-mail address with CC
23   to Jim Phillip who I don't know and Stefan Matthews who
24   we both know.  It's on June 19th 2015 and I want to
25   bring you down to the bottom of the e-mail and I want
```

```
 1   to -- if you can, can you read from this paragraph here
 2   that starts with so?
 3        A.   So I understand who is the person who
 4   supposedly sent this portion of the e-mail thread?
 5        Q.   Craig from his personal e-mail address.  You
 6   see it there?
 7        A.   Okay.
 8        Q.   Go ahead.  From "so" please for the record?
 9        A.   Portion you're asking me to read says "so,
10   what I am seeking to do is have the entity as clean and
11   polished as I can before we start going forth.  I do not
12   want to have challenges to any IP later on when things
13   start to get big."
14        Q.   Can you read the second -- the next paragraph
15   underneath that that one that starts with I?
16        A.   Yes, next paragraph says "I want to remove any
17   ownership from former directors before they know what it
18   could become so they cannot challenge anything later."
19        Q.   Does this surprise you?
20        A.   I have no reaction to it.
21        Q.   I mean it seems to be and I'm not an IP lawyer
22   like you it seems to be Craig saying he wants to get the
23   assets out of the DeMorgan Group of companies before
24   anybody realized they had value and he wanted to
25   monetize them?
```

```
1        A.   I don't interpret it that way.

2             MR. RIVERO:  Object to the form.

3    BY MR. FREEDMAN

4        Q.   How do you interpret it?

5             MR. RIVERO:  Objection to the form.

6             THE WITNESS:  Well, I wasn't involved at the

7        time or -- with this e-mail thread so I don't know

8        the full context of what they're talking about but

9        it sounds like you know, when you are setting up a

10       new company you don't want to have problems with,

11       you know, past company relations.  That's pretty

12       normal with acquisitions.

13            Then he says at the bottom the last line you

14       did not have me read concludes the e-mail "if you

15       need anything else explained I am open and will

16       answer honestly and completely."

17            That tells me that there wasn't anything

18       untoward going on here.  He is just saying he will

19       answer honestly and completely.

20   BY MR. FREEDMAN

21       Q.   Let's break that down a little bit.  Who

22   that -- he is e-mailing here Calvin Ayre and Stefan

23   Matthews the people who are helping him strip the assets

24   out, start a new company and monetize it so I wouldn't

25   say he is being open and honest here with the directors
```

1  he's seeking to remove their ownership from before they

2  realize they actually had assets.  He is saying he will

3  be open and honest with his coconspirators?

4           MR. RIVERO:  Objection, argumentative.

5           THE WITNESS:  I disagree with many

6       characterizations in your very long question.  And

7       as I said I was not involved in this e-mail thread

8       or any of the discussions at the time of this

9       e-mail so I can't comment on it any further.

10  BY MR. FREEDMAN

11      Q.   As an IP lawyer who practiced for a long time

12  did you regularly see people say they want to remove any

13  ownership of former directors before they know what it

14  could become so they cannot challenge it later?

15           MR. RIVERO:  Objection, Mr. Nguyen is not

16       appearing as an expert so object to the form of the

17       question.

18           MR. FREEDMAN:  You can answer Mr. Nguyen.

19           THE WITNESS:  Have I heard that statement like

20       that before in my legal practice obviously I cannot

21       tell you about things that are protected by my

22       years of attorney-client privileged relationships.

23  BY MR. FREEDMAN

24      Q.   Mr. Nguyen, when nChain was formed did it have

25  any assets other than the assets that had been purchased

1  from DeMorgan?

2      A.   I don't know because I was not there when the

3  nChain entities were formed.

4      Q.   During your time as CEO of nChain did you

5  identify any assets that were sourced from the beginning

6  of nChain that did not come from DeMorgan group of

7  companies?

8      A.   Well, while I was working for nChain including

9  while I was CEO nChain created many new assets.

10      Q.   But I'm not talking about what they did later.

11  I'm saying when nChain was formed did it have any assets

12  outside -- let me make it a narrow question.  When

13  nChain was formed did it have any intellectual property

14  assets outside of the ones it acquired from the DeMorgan

15  Group?

16      A.   I do not know.

17      Q.   Are you aware of any assets, any intellectual

18  property assets, it had at the time of its formation

19  besides the DeMorgan Group?

20      A.   Talking about nChain Holdings company or which

21  entity?

22      Q.   I realize I threw a word there that doesn't

23  belong.  Let me restate the question.  Are you aware of

24  nChain Holdings having any intellectual property outside

25  of the DeMorgan intellectual property assets it acquired

1    when it acquired those assets?

2        A.   NChain Holdings did not that I know of.  I

3    guess I'll say I don't know whether nChain Holdings had

4    any other IP assets at this time of its formation or

5    acquisition of the DeMorgan assets.

6            Certain nChain Holdings subsidiaries, other

7    companies in the nChain group did.  I'll complete that

8    sentence.  Other subsidiaries in the nChain group of

9    companies did have other IP assets apart from and

10   unrelated to the DeMorgan Group assets.

11       Q.   Okay.  Mr. Nguyen, I'm going to share with you

12   another document that's been produced in this litigation

13   as Defense 1074241.  Can you -- is it showing up on your

14   screen?

15       A.   It is.

16           MR. FREEDMAN:  Can you take a look at that

17       document and let me know if you recognize it.  It

18       it's going to be marked as Exhibit 17 to your

19       deposition.

20           (Plaintiff's Exhibit No. 17 was

21           marked for identification.)

22           THE WITNESS:  I have never seen this before.

23   BY MR. FREEDMAN

24       Q.   You have never seen this document before?

25       A.   No.

1      Q.   Do you know what ended up happening to the

2  company called nCrypt Limited?

3      A.   That's a little confusing.  I have to go back

4  and look at the history because I believe nCrypt Limited

5  that is referenced here because it's referencing a UK

6  address in London that is a prior name of nChain Limited

7  UK entity.  There was a name change.

8      Q.   And you were brought on board nChain about a

9  month after this was signed, right, less than a month.

10  In September of 2016.  So weeks after this was signed --

11  after this power of attorney was made; correct?

12      A.   Yes.

13      Q.   And during your entire stint at nChain

14  including your time as its CEO you did not know that

15  nChain held a power of attorney over the intellectual

16  property that had been assigned to it by Craig Wright?

17      A.   The purpose of these power of attorneys

18  typically is part of the patent prosecution process

19  where because Craig worked for the company for under its

20  name nCrypt Limited and changed to nChain Limited when a

21  patent lawyer files patent applications they need a

22  power of attorney.

23          So I don't know what happened with this one

24  but I'm assuming based on my experience with the patent

25  prosecution process that's why this was executed.

1        Q.    That's certainly one use for them I agree but

2   isn't it also true that this would authorize nCrypt to

3   manage any litigation over intellectual property created

4   by Craig Wright?

5        A.    I have to read this first.

6        Q.    Why don't you go ahead.  Tell me.

7        A.    Yes, I think there's a mistake in the first

8   paragraph.  What this is meant to do is when employee

9   typically intellectual property I work for a company and

10  I create work product, you know, inventions, things

11  while doing my work at the company the company owns the

12  intellectual property, not the employee.  But when you

13  file patent applications you have to name who the

14  inventor is and the inventor is actually the individual

15  employee.

16              So for example I work for Microsoft I invent

17  something great and new at Microsoft.  I'm personally

18  the inventor but Microsoft under its employment

19  agreement or conditions with me owns the invention to

20  file a patent application for that patent lawyers still

21  have to identify the individual who is the inventor and

22  confirm that they have the power to file the patent

23  application in the name of the company even though the

24  inventor is the individual.

25              So that's why there is the explanation that

1    this is designed to give power of attorney to be able to

2    file IP registration prosecution applications for the

3    employee IP as you can see is a defined term where Craig

4    is an employee of the company and therefore he needs to

5    give power of attorney to the company and its lawyers to

6    be able to prosecute, take action to protect the IP.

7         Q.   Do you know whether Ira Kleiman or Dave's

8    estate had any shares in Craig's former companies?

9         A.   I have no idea.

10        Q.   Do you know what the book value of any of

11   those former shares were?

12        A.   I said I don't know if they had any shares so

13   I couldn't tell you what the value is.

14        Q.   Let me refine that question.  Do you know what

15   the book value of any of the shares of Craig's former

16   companies were worth?

17        A.   No.

18        Q.   Are you aware of a WK ID software package that

19   was owned by Craig's companies prior to nChain?

20        A.   Could you repeat that?

21        Q.   Sure.  Are you aware of a WK ID software

22   package owned by Craig's companies prior to nChain?

23        A.   That does not ring a bell.

24             MR. FREEDMAN:  Why don't we take five.  Let me

25        see if I can reorganize things in a way to get us

```
 1          out of here a little quicker rather than sit and
 2          wait while I do it.  Let's take five.
 3               THE VIDEOGRAPHER:  Going off the record at
 4          6:13 p.m. eastern time.
 5               (Thereupon, a brief recess was taken.)
 6               THE VIDEOGRAPHER:  We are back on the video
 7          record.  The time is 6:29 p.m. Eastern time.
 8    BY MR. FREEDMAN
 9          Q.  Mr. Nguyen, I want to -- let's introduce
10    Exhibit 18 to your deposition which is another
11    interview.  You weren't kidding, you do a lot.  I
12    actually can't hear you.  I think you might be -- either
13    you're on mute -- you're not on mute but I can't hear
14    you talking.
15          A.  Can you hear me now?
16          Q.  Yes.
17          A.  I heard you play something.  I heard an audio
18    of me talking but didn't see anything.
19               MR. FREEDMAN:  I realize it's not Exhibit 18.
20          I already introduced this video as Exhibit 13.  I
21          already confirmed that's an accurate video of you
22          so we don't need to go back.
23    BY MR. FREEDMAN
24          Q.  Is it accurate Jimmy -- Mr. Nguyen, to say
25    nChain has one of the largest block chain portfolios in
```

1    the world?

2         A.   Yes, from what I understand, yes.

3              (Plaintiff's Exhibit No. 18 was

4              marked for identification.)

5    BY MR. FREEDMAN

6         Q.   And I am going to now introduce what I hope is

7    going to work as Exhibit 18 and see if I can get that to

8    share with you.  Do you see that video up there?

9         A.   I see something that says Risk Warning and

10   Disclaimer.

11        Q.   Underneath Jimmy Nguyen on Bitcoin SV from

12   Trader Cobb.

13        A.   Okay.

14        Q.   I just want you -- do you recall this

15   interview now that you've had a chance to see it?  Happy

16   to let it play longer if you want.

17        A.   I recall being interviewed by Trader Cobb.  I

18   don't remember this specific one.

19        Q.   Play it for a minute.  You want to listen for

20   a minute to see if it recalls your recollection?

21             MR. NGUYEN:  I started working more with the

22             nChain business in 2016 and then it merged publicly

23             in 2016.  Recently I took an executive role with

24             dealing with IP portfolio.  It is one of the

25             largest block chain patent portfolios in the world.

1       Eventually took another role as CEO.

2   BY MR. FREEDMAN

3       Q.   Again happy to let it play.  You don't recall

4   giving this interview?

5       A.   I don't recall it sitting here but I'm sure I

6   did because that's me.

7       Q.   That's an accurate portrayal of your

8   interview?

9       A.   Yes.

10      Q.   Approximately how valuable is nChain's IP

11  portfolio?

12      A.   I could not tell you.

13      Q.   As nChain's IP portfolio grows in value so

14  does nChain; right?

15      A.   Yes.  The enterprise value of nChain which is

16  different than IP value.

17      Q.   Have you ever contacted any prospective buyers

18  regarding nChain's intellectual property pursuant -- let

19  me just stop there.  Have you ever tried to sell any of

20  nChain's intellectual property or nChain itself?

21      A.   No.

22      Q.   Even though you were contracted to do that?

23      A.   Correct.

24      Q.   Why did you not end up doing that?

25      A.   It was too early in nChain and each new IP

1    portfolio's life.  Intellectual property especially

2    patents take a long time to get through the system.

3    When you file a patent application it can take two,

4    three, sometimes even longer years for it to be granted.

5    And before a patent -- when a patent is still just an

6    application, right, you don't know if you're going to

7    get it granted.  You don't know what the scope of your

8    patent is.  You can get narrowed.  You can get split

9    into more than one.

10           So you know from my experience as a former IP

11   lawyer in dealing with such things value is.  Greater --

12   first of all, there's not that much value in patent

13   applications before they're granted.  Once they're

14   granted I think people would understand of course it

15   adds more value because it's been granted.  Then patents

16   get even more value after they've been tested,

17   challenged for example, right, just because you have a

18   patent another company or person can still challenge it

19   and say I think it infringes mine or it's invalid or it

20   gets tested in the litigation.

21           So patents have the most value after they have

22   not just been applied for, granted but tested and then

23   also commercialized.  Just because you have a piece of

24   intellectual property, a patent until companies use it,

25   you know, in business, make money off of it, right, it's

1   very -- first of all, it's hard to show what its value

2   is.  You have a patent who an invention but you don't

3   know what the market demand for it is.  How many -- what

4   types of businesses want to use it.  What's the

5   industry.  Even though I was brought on board to

6   commercialize and help monetize the IP portfolio one of

7   the biggest, you know, pieces of advice I delivered

8   early on was I think this is too early.

9        Q.   So while you were doing your job of trying to

10   commercialize that IP portfolio did you -- were you

11   involved in the tracking the progress of these patents

12   as they were moving forward toward patents?

13        A.   I was involved.

14        Q.   And did nChain have like a patent road map or

15   a large Excel sheet of some kind where it would keep

16   track of all its patents and its inventorship and where

17   it was holding and what stage that sort of thing?

18        A.   I believe our outside patent counsel kept

19   that.

20        Q.   I'm going to share with you another exhibit I

21   think this is going to become.  Hold on.  There we are.

22   Technology is great until it stops working on you.

23        A.   I know that from block chain.

24        Q.   Come up with a deposition solution for block

25   chain.

1        A.    I will try to think of one.











1 ████████████████████████████████████

2 ██████████████████████████████████████

3 ██████████████████

4 ████████████████████████████████████

5 ████████████████████████████████████

6 ██████████████████████████████████████

7 ████████████████████████████████

8      Q.   You just said a moment ago you're not a

9 professional patent appraiser; right?

10      A.   That is correct.

11      Q.   But Baker & McKenzie is a professional patent

12 appraiser; correct?

13      A.   I don't know.

14           MR. RIVERO:  Objection.

15 BY MR. FREEDMAN

16      Q.   They were hired to perform this analysis?

17      A.   They were.  Not by me but they were.

18      Q.   And they are a very large, well known firm?

19      A.   Yes.

20      Q.   Did you ever orchestrate another assessment or

21 valuation of nChain's intellectual property?

22      A.   I did.

23      Q.   With who?

24      A.   It was precisely because I -- not just me

25 Stefan Matthews because he is the one who sent me this

1    Baker & McKenzie report to look at.  Neither of us found

2    it credible.  So he said would you -- he asked me to try

3    and find other valuation firms to take a look at the IP

4    portfolio and get a second or even a third opinion.

5    Like going to a doctor and not, you know, believing what

6    the doctor says and you want to get a second or third

7    opinion.

8            MR. FREEDMAN:  Let me just give you an update.

9        I've gone through my entire outline that I had

10       here.  I think I'm probably done.  I want to go

11       through it all, make sure there's nothing left.

12       Then I'll turn it over.  I don't know if Mr. Rivero

13       has any questions or not.

14           So let's take ten this time and hopefully come

15       back and either let you go right away or it will be

16       very short guaranteed.

17           THE WITNESS:  Thank you.

18           THE VIDEOGRAPHER:  Going off the video record

19       6:47 p.m. eastern time.

20           (Thereupon, a brief recess was taken.)

21           THE VIDEOGRAPHER:  We are back on the record.

22       The time is 7:03 p.m. Eastern Standard Time.

23   BY MR. FREEDMAN

24       Q.   Mr. Nguyen, did you ever discuss -- again

25   during the time period that your lawyer's permitting you

1    to testify about did you ever discuss with Craig how he

2    should explain his role and the development of Bitcoin?

3         A.    No.  I don't think I remember discussing that.

4         Q.    Did you ever discuss with Craig how he should

5    explain the role of others in the development of

6    Bitcoin?

7         A.    I heard him talk about it but I never talked

8    to him about how he described anything.

9         Q.    Did you ever convey to Craig he should

10   emphasize his role in developing Bitcoin and

11   de-emphasize the role of others?

12        A.    No.

13        Q.    To your knowledge has anyone conveyed that

14   sentiment to Craig?

15        A.    I have never heard that.

16        Q.    Did you ever convey to Craig that it was in

17   nChain's best interest for Craig to be Satoshi alone?

18        A.    No.

19        Q.    To your knowledge has anyone else tried to

20   convey to Craig that that was in nChain's best interest?

21        A.    Not to my knowledge.

22        Q.    Do you believe it's in nChain's best interest

23   for Craig to have been Satoshi alone?

24        A.    Right now I don't speak for nChain any more

25   but I'll say what I say to media generally which is I

1    don't think it matters for nChain or for what is being

2    built in the Bitcoin SV ecosystem.  Both that company as

3    well as Bitcoin SV after we're trying to build real

4    value based on real utility and therefore that's more

5    important than this question of whether Craig is Satoshi

6    Nakamoto or not which I know is a question of great

7    interest out there but I believe the company as well as

8    what we're doing at Bitcoin SV has to succeed based on

9    its technology, not on whether Craig is Satoshi.

10        Q.   I understand that and I understand the

11   argument you're making and that's fine but that's not

12   quite what I was asking.  Let me phrase it this way.  Do

13   you really believe that nChain's value would not

14   increase if Craig came out and conclusively proved to

15   the crypto community that he was Satoshi Nakamoto?

16            MR. RIVERO:  Object to the form.

17            THE WITNESS:  Yes, I can't really answer that

18        question because mostly because of the second part

19        of it.  I don't know that there's anything he could

20        do given the history of the Satoshi question that

21        would definitively prove to the cryptocurrency

22        cryptography world that he is Satoshi Nakamoto.

23        There are too many people who will always doubt it.

24   BY MR. FREEDMAN

25        Q.   I mean sitting here today you do not believe

1    the value of nChain would increase if Craig Wright

2    signed a message publicly with a private key to the

3    Genesis block?

4              MR. RIVERO:  Object to the form.

5              THE WITNESS:  I don't have a basis to answer

6         that.

7    BY MR. FREEDMAN

8         Q.  Do you really think the majority of the

9    Bitcoin world would reject his claim of being Satoshi

10   Nakamoto if he could sign with a private key to the

11   Genesis block?

12             MR. SILVERGLATE:  Object to the form.

13             MR. RIVERO:  Object to the form.

14             THE WITNESS:  I can't speak for the majority

15        of the Bitcoin community.  I can tell you I've seen

16        online posts, social media, you know, messages

17        online, I don't know if the media reports, lots of

18        online chatter with people saying even if he did

19        sign a transaction using a private key from one of

20        the early Bitcoin blocks that people would believe

21        it's Satoshi.

22             People wouldn't believe him.  I've seen many

23        people write that.  They'll say he just, you know,

24        got the keys from someone else, that they're not

25        really his and they don't prove he is Satoshi.

1          Doesn't prove it.

2              Digital currency community has gone through

3          this evolution of all the different ways where you

4          could believe Craig is not Satoshi Nakamoto because

5          there's such dislike for him among so many people

6          in the cryptocurrency world.  That's what I mean by

7          there's almost nothing I think do that would

8          conclusively prove to many of the cryptocurrency

9          world.

10    BY MR. FREEDMAN

11         Q.   There will always be people on the fringes of

12    any community Mr. Nguyen I understand that.  There are

13    some people that will never accept Craig Wright as

14    Satoshi Nakamoto.  Are you really testifying that it's

15    your -- it's your testimony today that you think there

16    wouldn't be a significant contingent of people who would

17    accept his claim of Satoshi if he signed a public

18    message with the private key of the Genesis block?

19             MR. RIVERO:  Objection to form.

20             THE WITNESS:  I think if Craig did that it

21         would lead more people to conclude that he is

22         Satoshi Nakamoto.  I still believe there would be

23         many doubters.  So I can't really -- have no basis

24         to quantify whether an action like that would lead

25         the consensus of the world to believe that he is

```
 1        Satoshi.  I just know that many people are saying
 2        even now they still wouldn't believe him.
 3   BY MR. FREEDMAN
 4        Q.   But many people would believe it.  Sorry, let
 5   me finish the question.  Don't you think that would lead
 6   to an increase in nChain's value?
 7             MR. SILVERGLATE:  Object to the form.
 8             MR. RIVERO:  Object to the form.
 9             THE WITNESS:  I think you're asking me to
10        speculate on a number of different things as to how
11        it would play out.  I don't have a basis to do
12        that.
13   BY MR. FREEDMAN
14        Q.   I mean Robert MacGregor clearly believed he
15   would be able to sell the intellectual property for a
16   lot of money if he could prove Craig was Satoshi; right?
17             MR. RIVERO:  Objection.
18             MR. SILVERGLATE:  Objection.
19             THE WITNESS:  That's what was said to me.  I
20        don't know that it was just about selling the
21        intellectual property but monetizing it.
22   BY MR. FREEDMAN
23        Q.   Do you believe that Bitcoin's Satoshi Vision
24   or BSV would increase in value if Craig were able to
25   prove -- if Craig came out and signed with the key to
```

1    the Genesis block?

2            MR. RIVERO:  Objection to this entire line of

3        questioning.

4            MR. SILVERGLATE:  Same objection.

5            THE WITNESS:  Again that would require me to

6        speculate on what affects digital currency prices

7        which SV -- if you've seen the digital currency

8        world are very volatile and frankly very hard to

9        explain.

10   BY MR. FREEDMAN

11       Q.   I understand I'm asking you to speculate.

12   Speculate for me do you think the price would go up?

13           MR. RIVERO:  Objection to form.

14           THE WITNESS:  I've always been advised to not

15       speculate in a deposition.

16   BY MR. FREEDMAN

17       Q.   That's true.  That's good advice but I am

18   specifically asking you to speculate so speculate for

19   me.

20           MR. RIVERO:  Objection.

21   BY MR. FREEDMAN

22       Q.   What do you think would happen to the price?

23           MR. SILVERGLATE:  Form.

24           THE WITNESS:  I don't know.  I can't tell you,

25       the event has not happened.  So it's clearly been

1       as I recall when there was the proof efforts to try

2       and prove Craig is Satoshi in early reports.   I

3       don't remember that Bitcoin price at the time but I

4       don't recall that causing a significant change in

5       price then or significant drop in the price when it

6       appeared that Craig did not prove conclusively he

7       was Satoshi back in May of 2016.

8            That's the only basis I would have to know

9       about whether an event like that would affect the

10      price of Bitcoin.

11   BY MR. FREEDMAN

12      Q.   There was no BSV when he failed to prove in

13   2016 that he was Satoshi; right?

14      A.   That's true but there was BTC.

15      Q.   Sure.  But my point is BSV claims to be

16   following Satoshi's original vision?

17      A.   Yes.

18      Q.   Craig is very important part of the BSV story,

19   it's not the only part of BSV story but you and I can

20   agree it's an important part of the BSV story; right?

21      A.   It's certainly an important part of -- yes

22   it's important part of the BSV.  Exactly as you said I

23   in particular as a leader of the ecosystem has worked

24   very hard to make Bitcoin SV not about Craig.  Bitcoin

25   SV has to grow and grow in value and succeed not because

1    of any one person.  It has to technically work.

2           We have to get away from a digital currency

3    value that's tied to a personality.  Who would want long

4    term to own a digital asset and to use a block chain

5    technology platform based upon the personality of one

6    person?  To me that doesn't give the coin value, real

7    value.  Sort of saying it's valuable because he is a

8    person.  That doesn't make sense.

9           Q.   Craig has stated to you that for a period he

10   sought to keep his involvement in Bitcoin a secret;

11   right?

12          A.   Yes.

13          Q.   And do you know why he sought to keep it a

14   secret?

15          A.   I don't know fully the reason in his head.  At

16   the time it it's been over a very long period of time

17   before I knew Craig but as I understand from my talks

18   with him over the years he wanted privacy.  He likes to

19   work.  He wants to sit and work on his research and

20   thinking.  He is an academic.

21          He did not -- he is not comfortable or was not

22   comfortable with attention.  He's gotten more

23   comfortable with it now.  He was not comfortable with

24   public attention.  He wanted to protect his family from,

25   you know, too much scrutiny and the other thing he's

1    told me is that, you know, some people -- a lot of
2    people in the digital currency world want to try and try
3    to treat Satoshi as like a god.  Some mythic figure,
4    right that has delivered Bitcoin to the world and he
5    didn't want to be that.  Be perceived that way he's told
6    me.
7         Most importantly big debate that happens in
8    the Bitcoin world is whether you should change the
9    protocol, the technical rule set upon which Bitcoin
10   works.  There is an early Satoshi Nakamoto famous online
11   post, famous in the digital currency world where Satoshi
12   says the Bitcoin protocol needs to be set in stone after
13   its client version I believe 0.1.0 and the reason that's
14   important to why Craig didn't want to be out as Satoshi
15   is he said his philosophy is like Craig rule set it's
16   got to say frozen, not change like the internet protocol
17   does not change very much therefore we can operate on a
18   stable platform.  And therefore there's nobody in
19   charge.
20        There's no king of Bitcoin who can change the
21   rules.  It should just be left there and if in the
22   beginning he told me if he was perceived to be Satoshi
23   then everyone will just follow what Satoshi says to do
24   and he wanted Bitcoin to be a system that was not
25   susceptible to interference by government or businesses

1    who could change it in ways.

2              It was designed to provide light, prevent

3    fraud in the world.  All these things he envisioned that

4    required but not to be someone in charge of it or

5    perceived to be in charge of it.

6         Q.   I am going to keep asking questions.  My

7    screen I'm getting a little bit of interference.  I am

8    going to shut my video off to see if it helps with the

9    feed.  Still can you hear me?

10        A.   Yes.

11             (Plaintiff's Exhibit No. 20 was

12             marked for identification.)

13   BY MR. FREEDMAN

14        Q.   So I am going to share with you a video for

15   time purposes I just want to verify that this is in fact

16   an interview you recall.  This is Dr. Craig Wright Jimmy

17   Nguyen at the Oxford Union.  Happy to play some of it

18   for you so you can take a look.

19        A.   I remember this.

20             VIDEO AUDIO VOICE:  Everything it needs to do

21             anything --

22   BY MR. FREEDMAN

23        Q.   Do you recall this interview or this

24   recording, presentation?

25        A.    Yes.  It was not an interview more of I don't

1   know what you call it.

2        Q.   Presentation of some kind?  Is this video an

3   accurate portrayal of that episode?

4        A.   I haven't watched the whole video but I would

5   assume so.

6        Q.   Any reason to believe it's not an accurate

7   video?

8        A.   Not so far from what you've shown me so far.

9             MR. FREEDMAN:  Well, then let's go

10        particularly to one particular portion.

11            MR. NGUYEN:  It's been the internet's biggest

12        mystery for long time who is Satoshi Nakamoto.  For

13        reasons we won't talk about here Craig chose to be

14        private about his history in Bitcoin.  As you might

15        imagine, you know, this has an impact on one's

16        family and one's personal life.

17            For various reasons he chose to be private

18        about it.  For various reasons that emerge

19        including the battle over Bitcoin's future what we

20        believe is vital to ensure that the network thrives

21        and survives.

22   BY MR. FREEDMAN

23        Q.   Is that an accurate statement you made?

24        A.   Yes.

25        Q.   And Craig was the one who told you he wanted

1  to keep his involvement in Bitcoin a secret?

2       A.   He didn't say so in so many words.  Talk about

3  why he was private about it.

4       Q.   He never told you he wanted to stay private

5  about it?

6       A.   No, I said he told me he wanted to stay

7  private.  I don't know that he used the word secret.  We

8  have had discussions where -- reasons why he wanted to

9  stay private.  He did not want to be known publicly.

10            MR. WRIGHT:  Gizmodo were played by a

11       contrarian.  Mr. Contrarian was sending documents

12       that were stolen from my company and payment we

13       didn't talk about our employees and everyone else.

14       As Jimmy knows we have 45 staff in 2013.  In the

15       dates when no one knew about Bitcoin I had 45 staff

16       in Australia working on Bitcoin projects basically

17       secretly under the radar.

18  BY MR. FREEDMAN

19       Q.   SO he has used the word "secret" involved in

20  his discussions of Bitcoin; right?

21       A.   There he is talking about secret team of

22  employees in Australia working in secret.  Wasn't

23  talking about keeping Satoshi a secret.  Not quibbling

24  over the word secret.  Certainly didn't want to be

25  private about being Satoshi.

1    Q.   You don't have to use the word secret.  He

2  definitely expressed the desire he didn't want people to

3  know he was Satoshi; fair?

4    A.   Yes.

5    Q.   Are you now willing now that we've skipped

6  around this are you willing to say this is an accurate

7  video recording of your session at the Oxford Union?

8         MR. SILVERGLATE:  Objection to form.

9         THE WITNESS:  Sorry?

10        MR. SILVERGLATE:  I objected to the form.

11        MR. FREEDMAN:  Jimmy, what was your answer?

12        MR. RIVERO:  Join.

13        THE WITNESS:  Yes.  Obviously I hadn't watched

14        the whole video.  I never have.  It looks -- I

15        don't have any reason so far to believe it's not an

16        accurate recording.

17        (Plaintiff's Exhibit No. 21 was

18        marked for identification.)

19  BY MR. FREEDMAN

20    Q.   Okay.  You've mentioned this other let's

21  introduce Exhibit 21 to the deposition which is I

22  believe you've talked about this particular presentation

23  today with -- are you seeing the Bitcoin Association You

24  Tube on the screen?

25    A.   This is from Coin Geek's channel but has a

1   picture of me with any name and Bitcoin Association on

2   it if that's the one.

3       Q.   This is I believe the interview you were

4   talking about earlier about interviewing Craig but why

5   don't we watch a few minutes of it and you tell me if

6   you recognize it?

7           VIDEO AUDIO VOICE:  So did you create Bitcoin?

8           MR. WRIGHT:  Yes.

9           THE WITNESS:  I did not to see any more.  This

10      is the video.

11  BY MR. FREEDMAN

12      Q.   You see it's on Coin Geek's channel.  Is this

13  an accurate portrayal of your back and forth with Dr.

14  Wright?

15      A.   Yes.

16      Q.   In this interview do you recall Craig telling

17  you that he had help from Dave Kleiman?

18      A.   Yes, I believe he said that.

19      Q.   And do you recall Dave telling you that --

20  sorry, strike that.  Do you recall Craig telling you

21  that Dave Kleiman responded from the Satoshi account?

22      A.   I don't remember if he said that in the

23  interview but it sounds familiar.  It's something Craig

24  has told me.  Whether it's in this interview or not I

25  don't recall.

1      Q.   So Craig has told you previously that Dave

2 interacted and had access to the Satoshi account?

3      A.   He's told me that they both posted from

4 Satoshi account sometimes.

5      Q.   I just want to spend a little bit more time

6 because I would have thought that would have come out

7 earlier did he say anything else to you about Dave's

8 role as assisting him as Satoshi?

9      A.   In this interview or generally?

10     Q.   Generally.

11     A.   Not much other than what I've told you.

12     Q.   Did he tell you that Dave helped keep the

13 system running in the beginning?

14     A.   I don't remember if that quote was used.

15     Q.   Let's take a look first at --

16     A.   There's some familiarity to that --

17          MR. WRIGHT:  Because I had a cattle ranch and

18          ran up there with all the machines.  The other

19          aspect that followed that that I needed to address

20          was Microsoft and patch Tuesday.  Anyone remember

21          patch Tuesday?  I really hadn't thought about

22          running a bunch of stand alone Windows XP machines

23          until everything turned off at the same time.

24               So that was another reason Bitcoin before the

25          current block chain turned off from crashing

1          literally on that Tuesday night everything updated,

2          turned off and restarted and just caused a massive,

3          massive problem because the two things split and

4          didn't sync and I had not thought about that one.

5          So that was the next part I had to do.  I had to

6          run around and I bought a whole bunch of Microsoft

7          licenses at excessive prices and installed a domain

8          in there and a work group and so I set up a forest

9          between my two locations and ran out all these

10         machines.  Set up a WUSS server, W-U-S-S, many

11         Australians we made fun of Microsoft calling it a

12         Wuss but we set up a Wuss service and Dave actually

13         helped on some of that because I couldn't get it

14         all done fast enough.  I had to set up a full --

15    BY MR. FREEDMAN

16         Q.   Does that help refresh your recollection?

17         A.   Yes, I did not remember that part of the

18    exchange but what you played for me I do remember that.

19         Q.   Did Craig tell you that Dave was one of the

20    first two users of Bitcoin?

21         A.   I don't recall and it depends what you mean by

22    users, user of Bitcoin.

23              MR. FREEDMAN:  Take a look.

24              MR. WRIGHT:  So that every node wouldn't go

25         out and calculate their own and people say it's

```
 1          wasting 50 Bitcoin but it's not wasting anything
 2          because there was no value at the time.  We're
 3          talking no exchanges, no users.  I mean for the
 4          first few days I was the only user.  Then hell,
 5          when Dave and a few other people jumped in.
 6    BY MR. FREEDMAN
 7          Q.   Do you recall now him telling you that Dave
 8    was one of the first couple users or few users of
 9    Bitcoin?
10          A.   Yes, I guess I interpret users of Bitcoin is
11    differently.  I think he is referring to running a
12    version of the client software and mining.
13          Q.   So right, that's -- you're right.  Let me
14    state that better.  Do you recall Craig telling you that
15    Dave Kleiman was one of the first two people to have ran
16    a Bitcoin node and mined Bitcoin beside himself?
17          A.   I think in that click you've just referred --
18    shown me that's what he means.  To the extent he didn't
19    quite phrase it that way.  My interpretation is that
20    what that means.
21          Q.   Did -- has he ever told you anything besides
22    that -- sorry, strike that.  Has he ever told you this
23    in any other setting besides this one?
24          A.   No.
25          Q.   You said to me previously that you believe --
```

 1   actually you know what let me ask you.  Do you believe

 2   that Satoshi was a group of people or just one person?

 3            MR. RIVERO:  Object to the form.

 4            THE WITNESS:  I don't have a basis to answer

 5        that because I wasn't there at the creation of

 6        Bitcoin.  Did not work with whoever created Bitcoin

 7        at the time.

 8   BY MR. FREEDMAN

 9        Q.   So let's introduce -- if it will let me,

10   Exhibit 22 to your deposition.  I'm going to bring us

11   to -- I think this is Exhibit 2 to your deposition

12   already.  Let's take a look at this time stamp.

13            MR. NGUYEN:  Does that mean I believe he is

14        Satoshi.  First of all I think Satoshi Nakamoto was

15        a group of people.

16   BY MR. FREEDMAN

17        Q.   Can you explain that?

18        A.   Yes, I have to see I guess the rest of the

19   answer.

20            MR. FREEDMAN:  Sure.  Hold on.  That's fair.

21        Let me play it for you.

22            MR. NGUYEN:  And do I believe --

23            MR. FREEDMAN:  I'll rewind it for you.

24            MR. NGUYEN:  So does that mean I believe he is

25        Satoshi Nakamoto.  First of all I think Satoshi

1          Nakamoto was a group of people.  I don't think

2          that's a shock to anyone out there.  Do I believe

3          he was part of that group, tune in May 30th, Coin

4          Geek Toronto.

5    BY MR. FREEDMAN

6          Q.   Do you want to hear more?

7          A.   No, I think that's enough.

8          Q.   Is that a true statement?

9          A.   Yes, I think that's what I was willing to say

10   at the time.  You can tell I was trying to be coy to

11   tease what was going to happen at this conference.  I

12   think it's consistent with what I've said before which

13   is Craig was the -- as I understand is the primary

14   creator of Bitcoin and he had help including help as you

15   mentioned here responding from Satoshi online accounts.

16         Q.   Right.  But there's a difference between I am

17   Satoshi and I had some help doing it and I believe

18   Satoshi is a group of people.

19         A.   Well, like I said it depends on was there a

20   group of people who worked on helping Craig with the

21   creation of Bitcoin including at least one I've been

22   told responded from the Satoshi Nakamoto account, yes.

23         Q.   And one of those individuals is Dave Kleiman?

24         A.   Yes.

25         Q.   And your reference here to that group of

1    people included a group that included Dave Kleiman?

2        A.   What's the date here?  Yes, it would include

3    Dave Kleiman because I had understood at the time he,

4    you know, was a friend of Craig and he helped Craig.

5        Q.   Are you aware of an expert report that's been

6    filed in this litigation by Amy Klinn?

7        A.   No.

8        Q.   Do you believe Craig is incapable of

9    manipulating anyone?

10           MR. RIVERO:  Object to the form.

11           THE WITNESS:  I can't answer that question.  I

12       don't have a basis to answer that question.  I am

13       not even sure what that means.

14   BY MR. FREEDMAN

15       Q.   Do you believe Craig is incapable of lying?

16           MR. RIVERO:  Objection.

17           THE WITNESS:  I can't answer that question.  I

18       don't know.

19   BY MR. FREEDMAN

20       Q.   Do you think he can lie?

21           MR. RIVERO:  Objection.

22           THE WITNESS:  I don't know.

23   BY MR. FREEDMAN

24       Q.   You don't know if you think he can lie?

25           MR. RIVERO:  Objection.

 1          MR. SILVERGLATE:  Objection, asked and

 2      answered.

 3          MR. FREEDMAN:  You can answer.

 4          THE WITNESS:  I don't have a basis to answer

 5      that because I have not had an occasion to think

 6      that he lied to me.

 7  BY MR. FREEDMAN

 8      Q.   Not asking if he is a liar or if you think he

 9  lied to you.  I'm just asking if you think he is capable

10  of telling a lie?

11      A.   I am not sure what you're asking.  To me?

12          MR. RIVERO:  Standing objection.  I've been

13      listening to this gibberish for almost eight hours,

14      seven hours.  You've asked the same thing four

15      times.  It's an improper question.  How long are

16      you going to keep going on this -- when you told us

17      40 minutes ago you were taking a ten minute break

18      because you were almost done?

19          MR. FREEDMAN:  Mr. Rivero, you know you're

20      limited to objection to form.

21          MR. RIVERO:  What's your time estimate since

22      once again you proved that I can't rely on your

23      word?  What's your time estimate?

24          MR. FREEDMAN:  Mr. Rivero, I have seven hours

25      and since every time I try in good faith to tell

1     you how long I think it's going to take I told you

2     I made a mistake I pointed out I had missed a

3     module, that I was trying to get you out of here.

4     You can believe what you want to believe but please

5     objection to form.

6         MR. RIVERO:  Mr. Videographer, please count

7     the time up because I know how this ends.  I've

8     been to this movie before with this judge.

9         MR. FREEDMAN:  Do you want to take a break and

10    let him count it up?

11        MR. RIVERO:  No, sir, I want you to keep

12    going.  Ask your questions.

13 BY MR. FREEDMAN

14    Q.   So before we were interrupted, Mr. Nguyen, I

15 asked you yes, if he is mentally capable of telling a

16 lie?

17    A.   I have no basis to judge that.  Mental health

18 expert psychologist I don't know who would even be

19 qualified -- what kind of qualifications you need to

20 answer that question.

21    Q.   Have you ever heard to have someone called

22 Garreth Williams?

23    A.   I feel like I've heard the name.  I don't know

24 who that is.

25    Q.   Has Craig ever mentioned this person to you?

1     A.   I don't recall.  I feel like I've heard the

2  name but not sure.

3     Q.   Has Craig ever mentioned Wing Commander Don

4  Linem to you?

5     A.   Again I think that name I heard before but I'm

6  not sure.

7     Q.   Have you ever reviewed a document identifying

8  potential red flags or competing claims to nChain's IP?

9     A.   Not that I can recall.

10     Q.   Has Calvin Ayre invested in BSV?

11     A.   What does that mean invested in BSV?

12     Q.   Do you think Calvin Ayre has assets invested

13  in BSV?

14     A.   I guess that's one question that does not make

15  sense to me.

16     Q.   I hear you.  Let me refine it for you.  Do you

17  believe that Calvin Ayre holds large amounts BSV?

18     A.   I know he mines BSV so I'm sure he holds BSV.

19     Q.   Do you believe Stefan Matthews holds large

20  amounts of BSV?

21     A.   I don't know.

22     MR. FREEDMAN:  That's all I have.  Thank you

23    so much Mr. Nguyen.  I apologize for interrupting

24    your day.  We can go off the record but I wanted to

25    have a meet and confer with Spencer.  Doesn't need

1  to be on the record.  As far as I'm concerned

2  Mr. Nguyen you're free to go.  Thank you.

3       THE WITNESS:  Thank you.

4       MR. SILVERGLATE:  Questions, Andres?

5       MR. RIVERO:  Thank you Jimmy, I don't.  No, I

6  don't.

7       MR. SILVERGLATE:  We don't waive reading and

8  we will read the deposition if it's ordered.

9       THE VIDEOGRAPHER:  The time is 7:35 p.m. and

10 we're going off the video record.

11      MR. FREEDMAN:  Can you give me the rough

12 tonight, whatever condition it's in?

13             (Witness excused.)

14         (Deposition was concluded.)

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF REPORTER

3            THE STATE OF FLORIDA

4            COUNTY OF DADE

5

6        I, Rick Levy, Registered Professional Reporter
and Notary Public in and for the State of Florida at
7   large, do hereby certify that I was authorized to
and did report said deposition in stenotype of DR.
8   JIMMY NGUYEN; and that the foregoing pages, numbered
from 1 to 206, inclusive, are a true and correct
9   transcription of my shorthand notes of said
deposition.

10
         I further certify that said deposition was
11   taken at the time and place hereinabove set forth
and that the taking of said deposition was commenced
12   and completed as hereinabove set out.

13        I further certify that I am not attorney or
counsel of any of the parties, nor am I a relative
14   or employee of any attorney or counsel of party
connected with the action, nor am I financially
15   interested in the action.

16        The foregoing certification of this transcript
does not apply to any reproduction of the same by
17   any means unless under the direct control and/or
direction of the certifying reporter.

18
         IN WITNESS WHEREOF, I have hereunto set my hand
19   this 7th day of May, 2020.

20
     _____
21
         Rick Levy, RPR, FPR, Notary Public
22       in and for the State of Florida
         My Commission Expires:  12/8/2023
23       My Commission No.:  GG937684

24

25

1                        CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3              COUNTY OF DADE

4

5        I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

6    Notary Public, State of Florida, certify that JIMMY

7    NGUYEN remotely appeared before me on the 30TH day

8    of April, 2020 and was duly sworn.

9

10             Signed this 7th day of May, 2020.

11

12

13

14

15             _____

16             Rick Levy, RPR, FPR
               Notary Public – State of Florida
17             My Commission Expires:  12/8/2023
               My Commission No.:  GG937684

18

19             RICK LEVY
               Notary Public - State of Florida
20             Commission # FF 939483
               My Comm. Expires Dec 7, 2019
21             Bonded through National Notary Assn

22

23

24

25